Slip Op. 18-169

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| POSCO,<br><br>               Plaintiff,<br><br>NUCOR CORPORATION,<br><br>               Consolidated Plaintiff,<br><br>ARCELORMITTAL USA LLC and SSAB<br>ENTERPRISES LLC,<br><br>               Plaintiff-Intervenors,<br><br>   v.<br><br>UNITED STATES,<br><br>               Defendant,<br><br>   and<br><br>SSAB ENTERPRISES LLC, NUCOR<br>CORPORATION, ARCELORMITTAL USA LLC and<br>POSCO,<br><br>               Defendant-Intervenors. | Before: Gary S. Katzmann, Judge<br>Consol. Court No. 17-00137<br><br>**PUBLIC VERSION** |

## OPINION

[Plaintiff's motion for judgment on the agency record is granted in part and Commerce's <u>Final Results</u> are remanded consistent with this opinion.]

Dated: December 6, 2018

<u>Brady W. Mills</u> and <u>Ragan W. Updegraff</u>, Morris, Manning & Martin LLP, of Washington, DC, argued for plaintiff and defendant-intervenor *POSCO*. With them on the brief were <u>Donald B. Cameron</u>, <u>Julie C. Mendoza</u>, <u>R. Will Planert</u>, <u>Mary S. Hodgins</u>, <u>Eugene Degnan</u>, and <u>Sarah S. Sprinkle</u>.

<u>Christopher Weld</u> and <u>Adam M. Teslik</u>, Wiley Rein, LLP, of Washington, DC, argued for consolidated plaintiff and defendant-intervenor *Nucor Corporation*. With them on the joint brief was <u>Alan H. Price</u> and <u>John Herrmann</u>, Kelley Drye & Warren, LLP, of Washington, DC, for plaintiff-intervenor & defendant-intervenor *ArcelorMittal USA LLC*; <u>Roger B. Schagrin</u> and

**PUBLIC VERSION**

Christopher Cloutier, Schagrin Associates, of Washington DC, for plaintiff-intervenor and defendant-intervenor *SSAB Enterprises LLC.*

Stephen C. Tosini, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant *United States*. With him on the brief were Chad A. Readler, Acting Assistant Attorney General, Jeanne E. Davidson, Director, Tara K. Hogan, Assistant Director, and Vito S. Solitro, Attorney. Of counsel on the brief was Rezza Karamloo, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

Katzmann, Judge:  The issue of the provision of electricity and other benefits by foreign government entities to producers without adequate remuneration and the resulting lower price of imports has generated intense heat in the ongoing litigation under American laws designed to promote a level playing field for American goods in the domestic marketplace.  More generally, the Department of Commerce's ("Commerce") adequate remuneration and adverse facts available methodologies have been at the center of such fair trade remedy disputes.  Before the court is the challenge to Commerce's final affirmative determination in the countervailing subsidy investigation of certain carbon and alloy steel cut-to-length ("CTL") plate[1] from Korea.  Certain Carbon and Alloy Steel Cut-To-Length Plate From the Republic of Korea: Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination, 82 Fed. Reg. 16,341 (Dep't Commerce Apr. 4, 2017), P.R. 505 and accompanying Issues and Decision Memorandum ("IDM") (Mar. 29, 2017), P.R. 497.  Plaintiff POSCO, a producer and exporter of CTL plate from Korea, contests multiple aspects of Commerce's application of adverse facts available ("AFA") and asks the court to remand the Final Determination.  POSCO's Br., Nov. 9, 2017, ECF Nos. 42, 45.  Consolidated Plaintiff Nucor Corporation ("Nucor"), an American steel

---

[1] For purposes of this investigation, Commerce defined CTL plate as "certain carbon and alloy steel hot-rolled or forged flat plate products not in coils, whether or not painted, varnished, or coated with plastics or other non-metallic substances."  Final Determination, 82 Fed. Reg. at 16,343.

Case 1:17-cv-00137-GSK   Document 81   Filed 12/06/18   Page 3 of 39

Consol. Court Number 17-00137                                                    Page 3
**PUBLIC VERSION**

producer, contests various other aspects of Commerce's determination -- particularly its

conclusion that POSCO did not benefit from subsidized electricity -- and also requests that this

court remand the Final Determination. Nucor's Br., Nov. 9, 2017, ECF Nos. 43–44, 46–47.

Defendant the United States ("the Government") asks the court to sustain Commerce's decision in

its entirety. Def.'s Br., Mar. 23, 2018, ECF Nos. 52–53. The court sustains the Final

Determination in part and remands Commerce's countervailability determination for POSCO M-

Tech's research and development grants and Commerce's application of the highest AFA rate for

reconsideration.

## BACKGROUND

### I. *Legal Background.*

To empower Commerce to offset economic distortions caused by countervailable subsidies

and dumping, Congress enacted the Tariff Act of 1930.[2] Sioux Honey Ass'n v. Hartford Fire Ins.

Co., 672 F.3d 1041, 1046 (Fed. Cir. 2012); ATC Tires Private Ltd. v. United States, 42 CIT __,

__, 322 F. Supp. 3d 1365, 1366 (2018). Under the Tariff Act's framework, Commerce may --

either upon petition by a domestic producer or of its own initiative -- begin an investigation into

potential countervailable subsidies and, if appropriate, issue orders imposing duties on the subject

merchandise. Sioux Honey, 672 F.3d at 1046; ATC Tires, 322 F. Supp. 3d at 1366–67; 19 U.S.C.

§§ 1671, 1673. Commerce determines that a countervailable subsidy exists where a foreign

---

[2] Further citations to the Tariff Act of 1930, as amended, are to the relevant provision of Title 19
of the U.S. Code, 2012 edition. Citations to 19 U.S.C. § 1677e, however, are not to the U.S. Code
2012 edition, but to the unofficial U.S. Code Annotated 2018 edition. The current U.S.C.A.
reflects the amendments made to 19 U.S.C. § 1677e (2012) by the Trade Preferences Extension
Act of 2015, Pub. L. No. 114–27, § 502, 129 Stat. 362, 383–84 (2015). The TPEA amendments
are applicable to all determinations made on or after August 6, 2015, and therefore, are applicable
to this proceeding. See Dates of Application of Amendments to the Antidumping and
Countervailing Duty Laws Made by the Trade Preferences Extension Act of 2015, 80 Fed. Reg.
46,793, 46,794 (Dep't Commerce Aug. 6, 2015).

**PUBLIC VERSION**

government provides a financial contribution, a benefit is thereby conferred, and the subsidy is

specific.  19 U.S.C. § 1677(5).  A "financial contribution" includes "the direct transfer of funds,

such as grants, loans, and equity infusions, or the potential direct transfer of funds or liabilities,

such as loan guarantees" and "foregoing or not collecting revenue that is otherwise due."  19 U.S.C.

§ 1677(5)(D)(i)–(ii).  In cases where an authority makes a financial contribution through the

provision of goods or services, a benefit occurs when those goods or services "are provided for

less than adequate remuneration."  19 U.S.C. § 1677(5)(E)(iv).  The adequacy of remuneration

"shall be determined in relation to prevailing market conditions for the good or service being

provided" in the relevant country.  19 U.S.C. § 1677(5)(E).  Prevailing market conditions include

"price, quality, availability, marketability, transportation, and other conditions of purchase or

sale."  Id.  If Commerce determines that the goods or services are provided for less than adequate

remuneration, "a benefit shall normally be treated as conferred," whereas a benefit will not be

found if adequate remuneration is received.  19 U.S.C. § 1677(5)(E)(iv).

     Commerce's regulations set forth three ways to measure the adequacy of remuneration.  19

C.F.R. § 351.511.  Commerce "will normally seek to measure the adequacy of remuneration by

comparing the government price to a market-determined price for the good or service resulting

from actual transactions in the country in question."  19 C.F.R. § 351.511(a)(2)(i).  When market

prices are not available, Commerce "compar[es] the government price to a world market price

where it is reasonable to conclude that such price would be available to purchasers in the country

in question."  19 C.F.R. § 351.511(a)(2)(ii).  If a world market price is also unavailable, then

Commerce "will normally measure the adequacy of remuneration by assessing whether the

government price is consistent with market principles."  19 C.F.R. § 351.511(a)(2)(iii).  The last

approach, known as a "Tier 3" benchmark, may be particularly appropriate "for such goods or

services as electricity, land leases, or water, and the circumstances of each case vary widely." <u>See</u> <u>Countervailing Duties</u>, 63 Fed. Reg. 65,348, 65,378 (Dep't Commerce Nov. 25, 1998) ("<u>CVD</u> <u>Preamble</u>").  Factors Commerce uses to assess whether the government price is consistent with market principles include the government's price-setting philosophy, costs, or possible price discrimination among recipients of the good or service.  <u>Id.</u>; 19 C.F.R. § 351.511(a)(2)(iii).

When either necessary information is not available on the record, or a respondent (1) withholds information that has been requested by Commerce, (2) fails to provide such information by Commerce's deadlines for submission of the information or in the form and manner requested, (3) significantly impedes an antidumping proceeding, or (4) provides information that cannot be verified, then Commerce shall "use the facts otherwise available in reaching the applicable determination."   19 U.S.C. § 1677e(a).   This subsection thus provides Commerce with a methodology to fill informational gaps when necessary or requested information is missing from the administrative record.  <u>See</u> <u>Nippon Steel Corp. v. United States</u>, 337 F.3d 1373, 1381 (Fed. Cir. 2003).  Commerce "may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available" if it "finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information."  19 U.S.C. § 1677e(b)(1)(A).  Commerce may apply an adverse inference for a respondent's "failure to cooperate to the best of [its] ability, regardless of motivation or intent."  <u>Nippon Steel</u>, 337 F.3d at 1382.  A respondent's failure to cooperate to "the best of its ability" is "determined by assessing whether [it] has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries."  <u>Id.</u>  To meet this standard, importers must "conduct prompt, careful, and comprehensive investigations of all relevant records that refer or relate to the imports in question to the full extent of the importers' ability to do so."  <u>Id.</u>

## II.      Factual and Procedural Background.

Domestic producers of CTL[3] filed petitions with Commerce and the United States International Trade Commission on April 7, 2016, alleging that an industry in the United States was materially injured or threatened with material injury due to certain carbon and alloy steel CTL plate product imports that were being subsidized or sold at less than fair value.  <u>Certain Carbon and Alloy Steel Cut-to-Length Plate from Austria, Belgium, Brazil, the People's Republic of China, France, the Federal Republic of Germany, Italy, Japan, the Republic of Korea, South Africa, Taiwan, and Turkey: Petitions for the Imposition of Antidumping and Countervailing Duties</u> (Apr. 8, 2016), P.R. 1–29, C.R. 1–30.  Commerce initiated a countervailing duty investigation of CTL plate from Korea on April 28, 2016.  <u>Certain Carbon and Alloy Steel Cut-to-Length Plate from Brazil, the People's Republic of China, and the Republic of Korea: Initiation of Countervailing Duty Investigations,</u> 81 Fed. Reg. 27,098 (Dep't Commerce May 5, 2016), P.R. 59.  Commerce selected POSCO and POSCO Daewoo Corporation (collectively, "POSCO") as mandatory respondents.[4]  Respondent Selection Memorandum (Dep't Commerce May 31, 2016), P.R. 102,

---

[3] Collectively, Nucor Corporation, ArcelorMittal USA LLC, and SSAB Enterprises LLC.

[4] In countervailing duty investigations, Commerce may select mandatory respondents pursuant to 19 U.S.C. § 1677f-1(e)(2), which provides:

If [Commerce] determines that it is not practicable to determine individual countervailable subsidy rates [in investigations or administrative reviews] because of the large number of exporters or producers involved in the investigation or review, [Commerce] may—

(A) determine individual countervailable subsidy rates for a reasonable number of exporters or producers by limiting its examination to—

(i)     a sample of exporters or producers that the administering authority determines is statistically valid based on the information available to the administering authority at the time of selection, or

**PUBLIC VERSION**

C.R. 44.  On June 1, 2016, Commerce issued its initial questionnaire to the Government of Korea

("GOK") and POSCO, which required POSCO to report, among other things, a list of trading

companies that exported POSCO-produced CTL plate to the United States during the period of

investigation ("POI") and to identify any cross-owned affiliates.  Letter to the Government of

Korea Regarding the Initial Countervailing Duty Questionnaire (Dep't Commerce June 1, 2016),

P.R. 99; Letter to POSCO Regarding the Initial Countervailing Duty Questionnaire (Dep't

Commerce June 1, 2016), P.R. 100; Letter to Daewoo International Corp. Regarding the Initial

Countervailing Duty Questionnaire (Dep't Commerce June 1, 2016), P.R. 101; Initial

Countervailing Duty Questionnaire (Dep't Commerce June 1, 2016) at 2–3, P.R. 103.  Commerce

uses such information to determine whether any subsidies received by cross-owned companies

should be attributed to POSCO.  See 19 C.F.R. § 351.525(b)(6), (c).

Commerce subsequently required the unaffiliated company Hyundai Corporation

("Hyundai") and two of POSCO's cross-owned supply companies -- POSCO M-Tech ("M-Tech")

and POSCO Chemtech ("Chemtech") -- to submit questionnaire responses.  First Suppl.

Questionnaire for POSCO (Dep't Commerce June 28, 2016), P.R. 142; Second Suppl.

Questionnaire for POSCO (Dep't Commerce July 8, 2016), P.R. 155.  The questionnaire requested

information on government subsidies received by Chemtech, M-Tech, and Hyundai.  All three

companies responded to Commerce's questionnaires.  Hyundai Corp.'s Initial Questionnaire Resp.

(July 13, 2016), P.R. 156–58; POSCO Chemtech's Initial Questionnaire Resp. (July 18, 2016),

---

        (ii)  exporters and producers accounting for the largest volume of
             the subject merchandise from the exporting country that the
             administering authority determines can be reasonably
             examined; or

       (B) determine a single country-wide subsidy rate to be applied to all
       exporters and producers.

P.R. 247–51, C.R. 252–60; POSCO M-Tech's Initial Questionnaire Resp. (July 25, 2016), P.R.

256–69, 267–73.

Nucor also filed deficiency comments on the GOK's initial questionnaire response

regarding Commerce's previous investigations of the GOK's provision of electricity for less than

adequate remuneration.  Nucor alleged that previous investigations improperly ignored the role of

the Korean Power Exchange ("KPX") in the Korean electricity market and this failure, according

to Nucor, negatively impacted any analysis of whether Korean electricity prices were set in

accordance with market principles.  Letter from Wiley Rein LLP to Sec'y Commerce, re: Certain

Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea: Comments on the

Government of Korea's Initial Questionnaire Response (Aug. 3, 2016) at 1–15, P.R. 278–80, C.R.

291–93.  Pertinent to this appeal, Nucor urged Commerce to request a full questionnaire from a

company called POSCO Energy to determine whether a cross-owned supplier relationship between

POSCO and POSCO Energy existed.  Id. at 1–6.  Nucor also provided Commerce with a schedule

of KPX "system marginal prices" that Commerce could potentially use in its analysis.  Letter from

Wiley Rein LLP to Sec'y Commerce, re: Certain Carbon and Alloy Steel Cut-to-Length Plate from

the Republic of Korea: Submission of Factual Information – Benchmark Data (Aug. 8, 2016), P.R.

283–86.

On September 14, 2016, Commerce issued its Preliminary Determination.  Certain Carbon

and Alloy Steel Cut-to-Length Plate From the Republic of Korea: Preliminary Negative

Determination, 81 Fed. Reg. 63,168 (Dep't Commerce Sept. 14, 2016), P.R. 373, and

accompanying Preliminary Decision Memorandum ("PDM"), P.R. 360.  The Preliminary

Determination found "no information on the record that POSCO is treated differently from other

industrial users of electricity that purchase comparable amounts of electricity because the rates

Case 1:17-cv-00137-GSK   Document 81   Filed 12/06/18   Page 9 of 39

Consol. Court Number 17-00137                                              Page 9
**PUBLIC VERSION**

paid were from the applicable tariff schedule applicable to all industrial users" and found no benefit

as a result.  PDM at 29.

On November 2, 2016, Commerce released the verification agenda for the GOK, which

stated that the deadline for filing factual information was November 2, 2016.  Verification Agenda

for the Government of Korea (Nov. 2, 2016) at 4 n.2, P.R. 444.  POSCO submitted additional

factual information that same day, stating that Chemtech had received a small amount of port usage

grants from the Pohang Youngil Port.  POSCO's Submission of Additional Factual Information

(Rejected & Retained Document) (Nov. 2, 2016) at 2, P.R. 447, C.R. 424.  Two days later,

Commerce rejected this submission but indicated that POSCO could resubmit the information

"accompanied by a written explanation identifying the subsection of 19 CFR 351.102(b)(21) under

which the information is being submitted."[5]  Rejection of POSCO's Submission of Additional

Factual Information (Nov. 4, 2016), P.R. 452.  POSCO resubmitted the Chemtech port usage grant

information on November 7, 2016.  POSCO's Resubmission of Factual Information (Rejected

Document) (Nov. 7, 2016), P.R. 456.  Commerce rejected this resubmission on November 10,

2016, stating that it "contain[ed] untimely filed new factual information relating to a previously

unreported subsidy program received by POSCO Chemtech" and further noted that "this new

factual information falls under 19 CFR 351.102(b)(21)(i) as being responsive to the Department's

initial questionnaire, and should have been submitted by July 18, 2016," the due date for POSCO's

initial questionnaire response.[6]  Rejection of POSCO's Resubmission of Additional Factual

Information (Nov. 10, 2016), P.R. 459.

---

[5] 19 C.F.R. § 351.102(b)(21) identifies and defines types of factual information parties and
Commerce may submit during an investigation.

[6] 19 C.F.R. § 351.102(b)(21)(i) provides that "factual information" parties may submit during an
investigation includes "[e]vidence, including statements of fact, documents, and data submitted

Commerce then conducted verification of POSCO, POSCO Energy, M-Tech, Chemtech, and Hyundai.  Verification Report for POSCO (Jan. 10, 2017) at 1, P.R. 469, C.R. 475; Verification Report for Hyundai Corp. (Jan. 10, 2017) at 1, P.R. 470.  Relevant here, Commerce observed in its Verification Report that: (1) verification of M-Tech's tax returns revealed deductions from taxable income related to R&D grants received by two companies acquired by M-Tech; and (2) Chemtech's port usage grants were not considered minor corrections, and could not be submitted as such at verification.  POSCO Verification Report at 2–3.  Commerce also noted that Hyundai submitted its 2015 income tax return instead of its 2014 income tax return filed in 2015, and that due to Hyundai's reliance on the wrong tax return, it failed to report its usage of RSTA Article 22 during the POI.  Hyundai Verification Report at 2.

Additionally, subsequent to the Preliminary Determination, Commerce placed facts on the record and issued a supplemental questionnaire to POSCO regarding its relationship with POSCO Energy.  Memorandum from Yasmin Bordas, Sr. Int'l Trade Compliance Analyst, AD/CVD Operations, Off. VI, to the File, re: Countervailing Duty Investigation of Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea: Placing Information on the Record (Sept. 21, 2016), P.R. 390; Letter from Morris, Manning & Martin, LLP to Sec'y Commerce, re: Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea, Case No. C-580-888: Sixth Supplemental Questionnaire Response (Oct. 4, 2016), P.R. 415, C.R. 417.  POSCO's response provided details about POSCO and POSCO Energy's relationship.[7]  Commerce

---

either in response to initial and supplemental questionnaires, or, to rebut, clarify, or correct such evidence submitted by any other interested party."

[7] Namely, that [[


                    ]].  POSCO's Sixth Suppl. Questionnaire Resp. at 1, 4, Ex. 38.

Case 1:17-cv-00137-GSK   Document 81   Filed 12/06/18   Page 11 of 39

Consol. Court Number 17-00137                                                    Page 11
**PUBLIC VERSION**

confirmed this information at verification.[8]

Commerce issued its <u>Final Determination</u> on April 4, 2017.  Applying a "standard pricing

mechanism" analysis drawn from the 1993 investigation of <u>Magnesium from Canada</u>, Commerce

found that no benefit was conferred by the provision of electricity.  <u>IDM</u> at 32–33.  Specifically,

Commerce did not attribute electricity subsidies received by POSCO Energy to POSCO, "because

the electricity is sold to KPX, and not to POSCO directly."  <u>Id.</u> at 24.  Commerce applied AFA to

POSCO for: (1) Chemtech's failure to timely report the port usage grants; (2) M-Tech's failure to

report the R&D grants received by the companies it had acquired; and (3) Hyundai's failure to

report its use of RSTA Article 22.  <u>Id.</u> at 11.  To establish rates for these programs, Commerce

stated that it used its standard CVD AFA methodology and selected the 1.05 percent rate

established for a tax credit program in <u>Washers from Korea</u> as M-Tech and Hyundai's AFA rate,

and a 1.64 percent rate established for an export insurance program in <u>Refrigerators from Korea</u>

for Chemtech's port usage grants.  <u>Id.</u> at 14–15, 18–19.  Because it had failed to request additional

information from Chemtech regarding its R&D grants, Commerce did not apply AFA in that

respect.  <u>Id.</u> at 47.  POSCO's final CVD rate was 4.31 percent.  <u>Final Determination</u>, 82 Fed. Reg.

at 16,342.

POSCO subsequently commenced this action challenging Commerce's <u>Final</u>

<u>Determination</u>, and Commerce's application of AFA in particular.  Compl., June 2, 2017, ECF No.

---

[8] Notably, that [[

          ]] and that [[                                                                                    ]].  Memorandum from
Yasmin Bordas, Sr. Int'l Trade Compliance Analyst, Off. VI, AD/CVD Operations and John
Corrigan, Int'l Trade Compliance Analyst, Off. VI, AD/CVD Operations, Through Brian C. Davis,
Program Manager, Off. VI, AD/CVD Operations, to the File, re: <u>Countervailing Duty Investigation</u>
<u>of Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea: Verification</u>
<u>of the Questionnaire Responses of POSCO</u> (Jan. 10, 2017) at 11–16, P.R. 469, C.R. 475.

Case 1:17-cv-00137-GSK   Document 81   Filed 12/06/18   Page 12 of 39

Consol. Court Number 17-00137                                                    Page 12
PUBLIC VERSION

6.   Nucor also brought an action challenging Commerce's determination with regards to the

attribution of electricity subsidies.   Case No. 17-00156, Compl., July 21, 2017, ECF No. 9.   On

August 2, 2017, POSCO and Nucor's actions were consolidated.   Order, ECF No. 31.   Nucor filed

its opening brief on November 9, 2017, ECF Nos. 43–44, 46–47, as did POSCO, ECF Nos. 42, 45.

The Government responded to both Nucor and POSCO on March 23, 2018.   Def.'s Br., ECF Nos.

52–53.   POSCO filed its response to Nucor on the same day, POSCO's Resp., ECF Nos. 54, 56,

ad did Nucor, Nucor's Resp., ECF Nos. 55, 57–58.   On May 4, 2018, both POSCO and Nucor filed

their replies.   POSCO's Reply, ECF Nos. 61, 63; Nucor's Reply, ECF Nos. 62, 64–65.   This court

heard oral argument on October 24, 2018.   ECF No. 70.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C.

§ 1516a(a)(2)(A)(i)(I) and (a)(2)(B)(ii).   The standard of review in this action is set forth in 19

U.S.C. § 1516a(b)(l)(B)(i): "[t]he court shall hold unlawful any determination, finding or

conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in

accordance with law[.]"

## DISCUSSION

### I.    *Provision of Electricity.*

#### A.  *Standard Pricing Mechanism Analysis.*

Nucor contends that Commerce's determination that the provision of electricity conferred

no benefit is not supported by substantial evidence and is contrary to law.   Specifically, Nucor

argues that Commerce's use of the standard pricing mechanism analysis from Magnesium from

Canada is inconsistent with the Uruguay Round Agreements Act ("URAA") amendments to

United States countervailing duties law.   Nucor's Br. at 9.   Furthermore, Nucor alleges that

Commerce failed to address its arguments and did not explain its determination in light of opposing evidence on the record.  Id.  The court concludes that Commerce's determination was supported by substantial evidence and in accordance with law.

As discussed above, Commerce's regulations set forth three ways to measure the adequacy of remuneration.  19 C.F.R. § 351.511.  See supra, p. 4.  In this investigation, Commerce relied on the Tier 3 benchmark to determine whether Korea's electric authority, KEPCO, provided electricity "for less than adequate remuneration."  To evaluate KEPCO's price-setting philosophy for its standard pricing mechanism, Commerce utilized the framework developed in Pure Magnesium Alloy and Alloy Magnesium from Canada, 57 Fed. Reg. 30,946, 30,954 (Dep't Commerce July 13, 1992).

Nucor alleges that Commerce's use of this framework was impermissible because the Magnesium from Canada analysis relies on evidence of preferential pricing (i.e., pricing discrimination among recipients), and the URAA makes clear that adequacy of remuneration "replaces" preferential pricing as the standard for determining provision of a benefit.  Nucor's Br. at 11 (citing the Statement of Administrative Action, H.R. Doc. No. 103-316, col. 1 (1994) at 927, reprinted in 1994 U.S.C.C.A.N. 4040, 4240 ("SAA")).  According to Nucor, Commerce recognizes that "it may not rely on the preferentiality standard alone to determine adequacy of remuneration."  Id. at 12.  When promulgating its current regulations, Nucor notes that Commerce explained that its new approach to benchmarks under the adequate remuneration standard "addresses the concerns . . . about potentially continuing the use of the preferentiality standard by shifting the focus of our inquiry toward whether the government employed market principles in setting prices."  Id. at 12–13 (quoting CVD Preamble, 64 Fed. Reg. at 65,378 (emphasis added by Nucor)).  Furthermore, Nucor states that Commerce has recognized that the preferentiality analysis "cannot be said to

measure adequate remuneration" and "is no longer sufficient to say that the government does not

discriminate among buyers" in its more recent investigations.  Id. at 12 (quoting Softwood Lumber

Products from Canada, 66 Fed. Reg. 43,186, 43,196 (Dep't Commerce Aug. 17, 2001) (emphasis

added by Nucor)).  "Rather . . . [Commerce] must determine whether the government is receiving

adequate remuneration, i.e., a market-based price."  Id. (quoting Softwood Lumber, 66 Fed. Reg.

at 43,196).  For these reasons, Nucor alleges that Commerce's use of the Magnesium from Canada

standard pricing analysis was contrary to law.

        These arguments are unpersuasive.  When reviewing Commerce's construction of the trade

statute, this court follows the two-step Chevron framework.  See Apex Frozen Foods Private

Limited v. United States, 862 F.3d 1337, 1344 (Fed. Cir. 2017); Maverick Tube Corporation v.

United States, 41 CIT __, __, 273 F. Supp. 3d 1293, 1305 (2017) (quoting Xiping Opeck Food Co.

v. United States, 38 CIT __, __, 34 F. Supp. 3d 1331, 1342 (2014)).  Under the first step, if

Congress' intent under the statute is clear, then the court "must give effect to the unambiguously

expressed intent of Congress."  Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,

467 U.S. 837, 842–43 (1983).  If "the statute is silent or ambiguous with respect to the specific

issue, the question for the court is whether the agency's answer is based on a permissible

construction of the statute."  Id. at 843 (footnote omitted).  "Chevron requires us to defer to the

agency's interpretation of its own statute as long as that interpretation is reasonable."  Stanley

Works (Langfang) Fastening Systems Co., Ltd. v. United States, 41 CIT __, __, 279 F. Supp. 3d

1172, 1185 (2017) (quoting Koyo Seiko Co., Ltd. v. United States, 36 F.3d 1565, 1573 (Fed. Cir.

1994)).

        "Furthermore, the court affords Commerce significant deference in '[a]ntidumping and

[CVD] determinations involv[ing] complex economic and accounting decisions of a technical

nature[.]"  Nucor Corp. v. United States, 42 CIT __, __, 286 F. Supp. 3d 1364, 1370 (quoting

Fujitsu General Ltd. v. United States, 88 F.3d 1034, 1039 (Fed. Cir. 1996) (citation omitted)); see

also PSC VSMPO-Avisma Corp. v. United States, 688 F.3d 751, 764 (Fed. Cir. 2012).  To be

afforded deference, however, "Commerce's methodological approach must be a 'reasonable

means of effectuating the statutory purpose' and its conclusions must be supported by substantial

evidence."  Nucor, 286 F. Supp. 3d at 1370–71 (quoting Ceramica Regiomontana, S.A. v. United

States, 10 CIT 499, 404–05, 636 F. Supp. 961, 966 (1986) (citations omitted), aff'd, 810 F.2d

1137, 1138–39 (Fed. Cir. 1987)); see also CS Wind Vietnam Co. v. United States, 832 F.3d 1367,

1377 (Fed. Cir. 2016) ("The requirement of explanation presumes the expertise and experience of

the agency and still demands an adequate explanation in the particular matter." (citing Burlington

Truck Lines, Inc. v. United States, 371 U.S. 156, 167–68 (1962))).

Congress' intent regarding the use of preferential pricing as part of Commerce's analysis

is unclear.  Aside from a non-exhaustive list of "prevailing market conditions," which include

"price, quality, availability, marketability, transportation, and other conditions of purchase or

sale," the statute gives no guidance as to how Commerce should interpret the adequacy of

remuneration language, and neither the Statement of Administrative Action ("SAA")[9] nor

legislative history elucidate this issue.  See 19 U.S.C. 1677(5)(E); SAA at 912–13; Maverick Tube,

273 F. Supp. 3d at 1306; see also POSCO v. United States, 42 CIT __, __, 296 F. Supp. 3d 1320,

1355 (2018).  Despite Nucor's contentions otherwise, the relevant Statement of Administrative

Action does not clarify the definition of "adequate remuneration;" indeed, it merely provides the

---

[9] The SAA "shall be regarded as an authoritative expression by the United States concerning the
interpretation and application of the Uruguay Round Agreements and this Act in any judicial
proceeding in which a question arises concerning such interpretation or application."  19 U.S.C. §
3512(d).

same definition.  SAA at 912–13.  The court thus turns to the second <u>Chevron</u> step, and concludes

that Commerce's interpretation of the statute is reasonable.

The statute directs Commerce to evaluate adequate remuneration based on "prevailing

market conditions . . . in the country which is subject to the investigation or review," which is what

Commerce did here.  While the first two prongs of 19 C.F.R. § 351.511(a)(2) privilege the use of

market-determined prices in Commerce's adequate remuneration analysis, when dealing with

state-controlled markets -- and particularly, state monopolies over the provision of utilities --

"government prices [may be] the most reasonable surrogate for market-determined prices," and

thus a preferentiality analysis would be appropriate.  <u>CVD Preamble</u>, 63 Fed. Reg. at 65,378.  As

this court in <u>Maverick Tube</u> persuasively summarized:

> In a state-controlled monopolistic market, it is reasonable to determine the
> adequacy of remuneration by first examining how the state sets its rates, as the state
> (and not necessarily supply-and-demand) controls price and availability.  If the state
> does use a standard pricing mechanism to set its rates (i.e., if its prices are set by a
> consistent discernable method), it is also reasonable for Commerce to determine
> the adequacy of remuneration by examining whether respondents received a
> preferential rate when compared to those entities receiving a rate set by the standard
> pricing mechanism.
>
> As noted, the statute directs Commerce to determine if a benefit is present by
> determining whether a good or service is provided "for less than adequate
> remuneration."  Adequate remuneration is to be measured by "prevailing market
> conditions . . . in the country which is subject to the investigation or review."  19
> U.S.C. § 1677(5)(E).  The statute does not direct Commerce to create a fictional
> model market or (as shall be seen) to audit KEPCO's books to determine if it covers
> its costs.  The statute directs Commerce to judge the adequacy of remuneration
> based on market conditions that actually exist in Korea.  That the Korean electricity
> market is controlled by a state run monopoly does not change the statute.

273 F. Supp. 3d at 1306–07.

Nucor contends that such an interpretation defeats Congress' intent to shift the focus of

inquiry from preferentiality to adequate remuneration.  Nucor's Br. at 16–17.  However, the court

finds that "Commerce's tier-based approach to determining adequate remuneration 'accomplishes

Case 1:17-cv-00137-GSK   Document 81   Filed 12/06/18   Page 17 of 39

Consol. Court Number 17-00137                                                    Page 17
**PUBLIC VERSION**

the post-URAA preference for market-based prices.'" POSCO, 296 F. Supp. 3d at 1355 (quoting

Maverick Tube, 273 F. Supp. 3d at 1309); see also Nucor, 286 F. Supp. 3d at 1373 ("The statute

sets a standard of adequate remuneration . . . and the regulation explicates that standard in a variety

of contexts." (citations omitted)).   Commerce crafted its tier-based approach based on its

experience administering the new statutory provision, CVD Preamble, 63 Fed. Reg. at 65,377, and

"grappling with how best to apply the adequate remuneration standard in the context of

government monopolies," POSCO, 296 F. Supp. 3d at 1356 (citing Maverick Tube, 273 F. Supp.

3d at 1298); see also Steel Wire Rod From Trinidad and Tobago: Final Affirmative Countervailing

Duty Determination, 62 Fed. Reg. 55,003, 55,006 (Dep't Commerce Oct. 22, 1997) (noting the

"[p]articular problems [that] can arise when the government is the sole supplier of the good or

service in the country or within the area where the respondent is located"); Steel Wire Rod From

Germany: Final Affirmative Countervailing Duty Determination, 62 Fed. Reg. 54,990, 54,994

(Dep't Commerce Oct. 22, 1997) (noting that Commerce may need to "examine other options"

when there is no free market-derived benchmark with which to compare the government price).

"The resulting regulation emphasizes domestic and world market prices (Tier 1 and 2 analyses)

while permitting consideration of other factors, such as price-setting and price discrimination (in

a Tier 3 analysis), when market-based prices are unavailable." POSCO, 296 F. Supp. 3d at 1356

(citations omitted); see 19 C.F.R. § 351.511 (privileging the use of market-based comparators

where available); CVD Preamble, 63 Fed. Reg. at 65,377–79.  Crucially, "Nucor's assertion that

Commerce's reliance on a standard pricing mechanism analysis is unlawful post-URAA lacks

merit because it ignores the entirety of Commerce's regulatory changes and Commerce's separate

consideration of price-setting and preferentiality." POSCO, 296 F. Supp. 3d at 1356; see also

CVD Preamble, 63 Fed. Reg. at 65,377–79 (discussing Commerce's development of its regulations

Case 1:17-cv-00137-GSK   Document 81   Filed 12/06/18   Page 18 of 39

Consol. Court Number 17-00137                                              Page 18
PUBLIC VERSION

in light of the changes resulting from the URAA and Commerce's experience implementing the

new standard).

Nucor's argument[10] that Commerce's regulations give identical words different meanings

is also unpersuasive.  As discussed above, neither the statute nor the legislative history provide a

precise method for calculating "adequate remuneration" or dictate how Commerce should weigh

the different factors that comprise the "prevailing market conditions . . . in the country which is

subject to the investigation or review."  In light of the flexibility of the adequate remuneration

standard, it is reasonable for Commerce to adjust how it evaluates "prevailing market conditions"

and "adequate remuneration" based on the context of the relevant market and the information

available to Commerce when conducting its analysis.  See also Nucor, 268 F. Supp. 3d at 1372

("The phrase 'adequate remuneration' is capacious enough to be viewed as a standard to be applied

to given contexts.  In a tier three benchmark analysis, Commerce specifically looks at market

principles to assess adequate remuneration.") (citing 19 C.F.R. § 351.511(a)(2)(iii)).

Nucor also contends that Commerce failed to consider costs, as provided in 19 C.F.R. §

351.511(a)(2)(iii), and that Commerce's determination thus impermissibly rested solely on a

preferential pricing analysis.  Nucor's Br. at 9–11, 25–30.  However, Commerce did consider cost,

and specifically, assessed how KEPCO's standard pricing mechanism used costs as the basis for

---

[10] Nucor argues that Maverick Tube was erroneously decided because its interpretation fails to give "identical words and phrases within the same statute . . . the same meaning."  Nucor's Br. at 18–19 (quoting FCC v. AT&T Inc., 562 U.S. 397, 408 (2011) (citation omitted)).  Specifically, Nucor suggests that the Maverick court impermissibly allowed Commerce to give "the term 'adequate remuneration' one meaning under tier one and tier two of Commerce's regulations (where government distortions must be avoided to the greatest extent possible), and effectively the opposite meaning under tier three (where any price the government decides to charge must be blindly accepted as adequate remuneration)."  Id. at 20.  For these reasons, Nucor contends, this court should not find Maverick Tube's reasoning persuasive and should instead find Commerce's regulations to be impermissible under the URAA.

Case 1:17-cv-00137-GSK   Document 81   Filed 12/06/18   Page 19 of 39

Consol. Court Number 17-00137                                                   Page 19
PUBLIC VERSION

developing its electricity tariff schedule.  IDM at 32.  Commerce found that KEPCO calculated its

overall cost, including an amount for investment on return, the operational cost for generating and

supplying electricity to consumers, and taxes.  Id.  KEPCO then applied the following principles

in allocating costs across tariff classifications:

> The cost for each electricity classification was calculated by (1) distributing the
> overall cost according to the stages of providing electricity (generation,
> transmission, distribution, and sales); (2) dividing each cost into fixed cost, variable
> cost, and the consumer management fee; and (3) then calculating the cost by
> applying the electricity load level, peak level, and the patterns of consuming
> electricity.  Each cost was then distributed into the fixed charge and the variable
> charge.  KEPCO then divided each cost taking into consideration the electricity
> load level, the usage pattern of electricity, and the volume of the electricity
> consumed.  Costs were then distributed according to the number of consumers for
> each classification of electricity.

Id. at 32–33 (internal citations omitted); see also GOK Section II Questionnaire Resp. (July 15,

2016) at 13–15, P.R. 208, C.R. 151.  Commerce "verified that KEPCO applied th[e] same price-

setting method or standard pricing mechanism to determine the electricity tariffs for each tariff

classification including the industrial tariff that was paid by the respondents during the POI."  IDM

at 29.  The GOK provided KEPCO's cost data and explained its calculations and recovery costs,

KEPCO's electricity cost calculations, and data showing KEPCO's cost and investment return

during the POI.  Id. at 29, 32.  Based on its standard pricing mechanism analysis and KEPCO's

cost data for the POI, Commerce concluded that KEPCO more than fully recovered its costs for

the tariff applicable to POSCO.[11]  Id. at 32–33; GOK Questionnaire Resp. at 13–15.

---

[11] Nucor claims that the KPX -- which purchases electricity from generators and then sells it to
KEPCO -- cost-setting system is distorted because it systematically understates generation costs
and undercompensates high-fixed-cost generators like nuclear plants.  Nucor's Br. at 26–30.
However, Nucor failed to provide any record evidence supporting its contention that tariff rates
are differentiated based on the manner of electricity generation.  IDM at 32; see also POSCO, 296
F. Supp. 3d at 1358–60.  Moreover, "[n]othing in the statute requires Commerce to consider how
the authority acquired the good or service that was later provided to respondents."  Nucor, 286 F.
Supp. 3d at 1376.  Because "KEPCO is the exclusive supplier of electricity in Korea . . .

Nucor also claims Commerce ignored substantial evidence on the record that detracted

from its conclusion.  Nucor's Br. at 22–31.  In particular, Nucor points to a Korean National

Assembly report and KEPCO's 2013 application to increase tariff rates as substantial evidence

that Korean electricity prices are not consistent with market principles.  Nucor's Br. at 22–23.

However, Commerce did consider this information.  For example, Commerce assessed the Korean

National Assembly Report, but found it unusable because the data involved preceded the POI by

several years and because KEPCO's industrial electricity tariffs have increased multiple times

since the report was issued.  IDM at 33; see also GOK Questionnaire Resp. at Ex. E-3 at 50–51.

Thus, for the reasons discussed above, Commerce's determination was based on substantial

evidence and is in accordance with law.

### B.  Attribution.

Nucor argues that Commerce's determination that subsidies received by POSCO Energy

could not be attributed to POSCO was unreasonable, unsupported by substantial evidence, and

contrary to law.  Nucor's Br. at 31.  Nucor notes that: POSCO and POSCO Energy are cross-

owned; POSCO Energy supplies electricity to KPX for more than adequate remuneration; and

POSCO then purchased electricity from KPX for a lower price.[12]  Nucor's Br. at 32–33.  Therefore,

according to Nucor, the electricity production subsidy received by POSCO Energy should be

attributed to POSCO.  The court finds this argument unpersuasive.

---

Commerce's focus on KEPCO's costs and rate-setting method is reasonable."  POSCO, 296 F.
Supp. 3d at 1360 (citing Apex Frozen Foods, 862 F.2d at 1351) (internal quotations omitted).
[12] Nucor also states that [[                                                                    ]] and
[[

                                    ]].  Essentially, Nucor alleges that POSCO engaged in a
"lucrative scheme" by [[


                                    ]].  Nucor's Br. at 33; see also Nucor's
Case Br. at 4–10; POSCO Verification Report at 15.

**PUBLIC VERSION**

19 U.S.C. § 1671(a)(1) requires Commerce to calculate countervailing duties based upon

the net countervailable subsidy provided "directly or indirectly" with respect to "the manufacture,

production, or export of a class or kind of merchandise imported [] into the United States."

Commerce's regulations provide criteria for attributing subsidies received by one company to

another, including cross-owned corporations.  Relevant here:

> (iv) Input suppliers.  If there is cross-ownership between an input supplier and a
> downstream producer, and production of the input product is primarily dedicated
> to production of the downstream product, [Commerce] will attribute subsidies
> received by the input producer to the combined sales of the input and downstream
> products produced by both corporations (excluding the sales between the two
> corporations).

19 C.F.R. § 351.525(b)(6).  Under the regulations, cross-ownership is defined as one entity being

able to use or direct the assets of the other entity as it would its own.  19 C.F.R. § 351.525(b)(6)(vi).

POSCO Energy is an affiliate of POSCO dedicated to energy generation.  See Letter from

Morris, Manning & Martin LLP to Sec'y Commerce, re: Certain Carbon and Alloy Steel Cut-to-

Length Plate from the Republic of Korea, Case No. C-580-888: Response to "Other Companies

Subject to Investigation" Questions for Initial Questionnaire (June 17, 2016) at Ex. 4, p.1, P.R.

124–28, C.R. 45–49.  POSCO Energy produces electricity, and POSCO consumes electricity

during its manufacturing.  However, at no point during the POI did POSCO Energy sell or

otherwise provide electricity to POSCO; indeed, other than sales to KPX, POSCO Energy was

prohibited by law from selling electricity to third parties.[13]  See POSCO Verification Report (Jan.

10, 2017) at 14–15, P.R. 469, C.R. 475.  Commerce also verified that ownership of electricity was

formally transferred from POSCO Energy to KPX when the electricity reached the KPX meter.

---

[13] Specifically, "when POSCO Energy generates electricity, [it] [[

                                                                                ]]."

POSCO Verification Report at 15.

Id. at 12.  Based on this record evidence showing POSCO Energy sold electricity directly to KPX, and not to POSCO, Commerce found POSCO Energy was not an input supplier to POSCO under 19 C.F.R. § 351.525(b)(6).  IDM at 24.  Nucor contends that the transfer of title is merely a "legal fiction" and that Commerce should ignore the transfer of ownership from POSCO Energy to KPX, but Nucor provides no authority for this position.  For these reasons, Commerce's determination was supported by substantial evidence and in accordance with law.

    II.    **AFA Claims.**

    POSCO challenges Commerce's application of AFA on account of M-Tech's failure to report research and development ("R&D") grants, POSCO's Br. at 10; Chemtech's initial failure to report certain port usage grants, id. at 20; and Hyundai's tax return reporting error, id. at 33. Nucor alleges Commerce abused its discretion in its treatment of Chemtech's R&D grants. Nucor's Br. at 38.  POSCO further argues that Commerce erred in applying the highest AFA rates to POSCO, POSCO's Br. at 35, and that Commerce failed to corroborate the AFA rates applied to POSCO, id. at 38.  The court determines that Commerce's application of AFA is supported by substantial evidence and in accordance with law, except for the application of AFA to the countervailability determination of POSCO M-Tech's R&D grants.  There, the court finds that Commerce did not sufficiently justify its application of AFA to the benefit and specificity requirements of countervailability and remands the Final Determination on this issue for reconsideration.  The court also finds that Commerce did not evaluate the application of the highest available AFA rates and remands the Final Determination for reconsideration on this issue.[14]

---

[14] The court need not address the corroboration issue at this time.

**PUBLIC VERSION**

### A.   M-Tech.

#### 1.   Application of AFA for POSCO M-Tech Not Reporting Grants.

POSCO first argues that Commerce erred in applying AFA for POSCO M-Tech's failure to report certain R&D grants because the questionnaire did not require "that POSCO M-Tech report[] grants received by companies that no longer exist as ongoing entities."  POSCO's Br. at 11.  Specifically, POSCO contends that Commerce's questionnaire did not require M-Tech "to report subsidies received by Ricco Metal and Nine-Digit prior to their acquisition by POSCO M-Tech."  Id. at 12.

Commerce asked under Section D of its initial questionnaire, "Other Companies Subjection to Investigation," for POSCO to report "alleged allocable, non-recurring subsidies that your company may have received during the AUL period" and provide a full response "if your company obtained all or substantially all the assets of another company during the AUL period and that company still exists as an ongoing entity."  Id. (citing Initial Countervailing Duty Questionnaire at 1–3).  Ricco Metal and Nine-Digit ceased to exist as ongoing entities after their acquisition by M-Tech; therefore, according to POSCO, because that question called for subsidies provided to "ongoing entit(ies)," it did not include Ricco Metal or Nine-Digit subsidies.  Id.

As discussed above, 19 U.S.C. § 1677e(a) permits Commerce to use "an inference that is adverse to the interests of that party in selecting from among the facts otherwise available" when a respondent fails to provide requested information in a timely manner.  Commerce need not conclude that respondent acted with "intentional conduct" to apply AFA.  Nippon Steel, 337 F.3d at 1383.  "'Inadequate inquiries' may suffice.  The statutory trigger for Commerce's consideration of an adverse inference is simply a failure to cooperate to the best of respondent's ability, regardless of motivation or intent."  Id.

The court finds that M-Tech failed to report the subsidies received by Ricco Metal and Nine-Digit "under circumstances in which it is reasonable for Commerce to expect that more forthcoming responses should have been made." Id.  In Section II of its questionnaire, Commerce instructed respondents to report "any subsidy program(s)" and "describe such assistance in detail, including the amounts, date of receipt, purpose and terms, and answer all questions."   Initial Countervailing Duty Questionnaire at 21.  This question calls for "any subsidy," and thus it was reasonable for Commerce to expect POSCO to provide this information.

POSCO contends that "POSCO M-Tech personnel at verification were not familiar with [the questionnaire] and thus initially responded incorrectly."  POSCO's Br. at 10.  The "best of its ability" standard, however, "assumes that importers are familiar with the rules and regulations that apply to the import activities undertaken."  Nippon Steel, 337 F.3d at 1382.  Because lack of familiarity is not a cognizable excuse for failure to report, it does not preclude the application of AFA.  POSCO, moreover, also told Commerce that it exercised its discretion in not reporting the Ricco Metal and Nine-Digit subsidies because their value was small.  "It is Commerce, not the respondent, that determines what information is to be provided for an administrative review." Ansaldo Componenti, S.p.A. v. United States, 10 CIT 28, 37, 628 F. Supp. 198, 205 (1986). Commerce noted in the IDM that "M-Tech also explained that it exercised its discretion and did not report these subsidies because the value of the subsidies was small (internal citations omitted)." IDM at 42 (citing Verification Report at 28).  Commerce thus made a factual finding that POSCO exercised discretion in not reporting the subsidies.  Because Commerce asked for "any subsidies," and M-Tech either neglected to fully respond to the questionnaire from lack of familiarity or improperly exercised its discretion in not reporting, which Commerce addressed in the IDM, this court finds that Commerce's application of AFA was supported by substantial evidence.

**PUBLIC VERSION**

## 2. *Necessary Factual Findings.*

POSCO next contends that Commerce failed to "make the necessary factual findings to satisfy the requirements for countervailability."  POSCO's Br. at 15 (quoting <u>Changzou Trina Solar Energy Co., Ltd. v. United States</u>, 40 CIT __, __, 195 F. Supp. 3d 1334, 1350 (2016) (citing 19 U.S.C. §§1677e(a)–(c))).  In particular, POSCO argues that Commerce failed to show that the assistance provided to Ricco Metal and Nine-Digit were sufficiently "specific" and "beneficial" so as to meet the statutory requirements of a countervailable subsidy.  POSCO argues that, in terms of specificity, Commerce merely states in the <u>IDM</u> that "{a}s addressed above, we are finding, as AFA, that these subsidies are specific."  POSCO's Br. at 15 (quoting <u>IDM</u> at 44).  POSCO further contends that Tax Form 15 provides Commerce the requisite information to calculate a benefit of .001 percent, which Commerce considers not measurable and not countervailable.  <u>Id.</u> at 16.

As has been noted, <u>supra</u>, p. 3, to determine that a countervailable subsidy exists, Commerce must find that the assistance provided by a government to the respondent "provide[s] a financial contribution," is specific, and "confer[s] a benefit."  19 U.S.C.  § 1677(5).  "Because 'all governments, including the United States, intervene in their economies to one extent or another, and to regard all such interventions as countervailable subsidies would produce absurd results,' the specificity test is meant to exclude foreign subsidies that 'are broadly available and widely used throughout an economy.'"  <u>Trina Solar</u>, 195 F. Supp. 3d at 1348–49 (quoting SAA (citing <u>Carlisle Tire & Rubber Co. v. United States</u>, 5 CIT 229, 564 F. Supp. 834 (1983))).  In determining whether assistance constitutes a countervailable subsidy, Commerce must avoid making "a sweeping legal conclusion lacking any factual foundation."  <u>Id.</u> at 1349.

Here, Commerce contends that because it had no information on the record, besides respondents' own tax treatment of the grants as "government subsidies," it permissibly applied

**PUBLIC VERSION**

AFA to the specificity and benefit inquiries.  Def.'s Br. at 34; POSCO Verification Report at 28–

29.  "[E]ven when using facts otherwise available with adverse inferences, Commerce must still

point to actual information on the record to make required factual determinations."  Trina Solar,

195 F. Supp. 3d at 1350 (citing 19 U.S.C. §§ 1677e(a)-(c)).  Commerce does not, however, point

to information on the record to justify its application of AFA to the specificity and benefit inquiries

in the IDM.  The IDM says only that, "[a]s addressed above, we are finding, as AFA, that these

subsidies are specific.  Further, as AFA, we find that these subsidies confer a benefit under section

771(5)(E) of the Act," where neither are addressed above.  IDM at 44.  In its brief, the Government

cites to POSCO's description of the assistance in Tax Form 15 as "government subsidies" to justify

its financial contribution and specificity finding, Def.'s Br. at 34, yet at the same time argues that

because Tax Form 15 was not verified, the "record contained *no verified* information for purposes

of calculating benefit."  Def.'s Br. at 34.  The IDM does not clarify whether Commerce relied on

Tax Form 15 as record information to make a factual determination of countervailability or to

justify the use of AFA to find countervailability.  See IDM at 42–44.  Commerce here "bypass[es]

the prerequisite factual findings to reach the legal conclusion purely 'as AFA,'" thus "illegally

circumvent[ing] its obligation to make determinations that are supported by a reasonable reading

of the record, including consideration of the relevant evidence that 'fairly detract[s]' from the

reasonableness of its conclusions."  Trina Solar, 195 F. Supp. 3d at 1348 (citing Universal Camera

Corp. v. NLRB, 340 U.S. 474, 488 (1951)).  This court, therefore, remands to Commerce for

reconsideration its determination that the assistance received by Ricco Metal and Nine-Digit was

countervailable.

### 3.  *Rate Methodology.*

POSCO contends that "Commerce's selection of the AFA rate is inconsistent with its

Case 1:17-cv-00137-GSK   Document 81   Filed 12/06/18   Page 27 of 39

Consol. Court Number 17-00137                                                Page 27
PUBLIC VERSION

practice and is contradicted by record information." POSCO's Br. at 17. While POSCO opposes

any AFA application here, it argues that if the court finds AFA application justifiable, then "it

should find that the 1.05 percent rate used is unlawful." Id. at 18. POSCO maintains that the R&D

grants at use were received under the Industrial Technology Innovation Promotion Act ("ITIPA")

and cites to the verification report to support its contention. Id. Because Commerce calculated a

rate of .02 percent for another ITIPA grant received by POSCO, POSCO argues that this rate, not

the 1.05 percent AFA rate, should apply to these subsidies. Id. at 18–19, see also Def.'s Br. at 11–

12. This court concludes that Commerce's application of the 1.05 percent AFA rate is supported

by substantial evidence and in accordance with law.

> To calculate AFA rates in CVD investigations, Commerce uses a hierarchal methodology:
>
> when selecting rates, we first determine if there is an identical program and take the
> highest calculated rate for the identical program. If there is no identical program
> above de minimis, we then determine if there is a similar/comparable program
> (based on treatment of the benefit) and apply the highest calculated rate for a
> similar/comparable program. Where there is no comparable program, we apply the
> highest calculated rate from any non-company specific program, but we do not use
> a rate from a program if the industry in the proceeding cannot use that program.

IDM accompanying Certain Frozen Warmwater Shrimp from the People's Republic of China:

Final Affirmative Countervailing Duty Determination, 78 Fed. Reg. 50,391 (Dep't Commerce

Aug. 19, 2013) at 13–14 ("Shrimp IDM"); see also Essar Steel Ltd. v. United States, 753 F.3d

1368, 1371 (Fed. Cir. 2014). Commerce then must "corroborate that information from

independent sources that are reasonably at [its] disposal." 19 U.S.C. § 1677e(c).

Here, Commerce, consistent with its practice, applied its hierarchal methodology to

determine POSCO's AFA rate. POSCO argues that Commerce should have stopped at the first

step in its methodology: "tak[ing] the highest calculated rate for the identical program." POSCO's

Br. at 12 (citing Shrimp IDM at 13–14). However, Commerce's practice is to continue to the

second step when the rate at the first step is de minimis.  <u>Shrimp IDM</u> at 13–14.  Here, there is no

dispute that the identical program had a de minimis rate.  Therefore, because Commerce followed

its established practice, and POSCO does not challenge Commerce's corroboration of the <u>Korean</u>

<u>Washers</u> rate, the court finds that Commerce's AFA application to POSCO of 1.05 percent to be

supported by substantial evidence and in accordance with law.

### 4.  *Arbitrary and Capricious.*

Lastly, with respect to M-Tech's R&D grants, POSCO contends that Commerce acted in

an arbitrary and capricious manner when it applied AFA to the Ricco Metal and Nine-Digit R&D

grants, where it had not done so with other M-Tech R&D grants discovered at verification.

POSCO's Br. at 19–20.  POSCO argues that Commerce failed to justify its decision to treat the

grants differently by only applying AFA to the Ricco Metal and Nine-Digit R&D and not to other

M-Tech grants.  <u>Id.</u>

"An agency action is arbitrary when the agency offers insufficient reasons for treating

similar situations differently."  <u>SKF USA Inc. v. United States</u>, 263 F.3d 1369, 1382 (Fed. Cir.

2001) (quoting <u>Transactive Corp. v. United States,</u> 91 F.3d 232, 237 (D.C. Cir. 1996)).  Here,

however, the situations were different: the grants for which Commerce examined unreported

benefit information were previously reported and included inconsistences which Commerce

sought to reconcile.  Verification Report at 32.  The Ricco Metal and Nine-Digit grants, however,

were unreported.  The court thus concludes that Commerce did not act in an arbitrary and

capricious manner regarding M-Tech's R&D grants.

### B.  *Application of AFA for POSCO Chemtech's Port Usage Grants.*

POSCO challenges Commerce's application of AFA rates to POSCO for Chemtech's port

usage grants, arguing that (1) there was no factual basis for Commerce to find that Chemtech failed

to cooperate, POSCO's Br. at 24; (2) Commerce failed to search the record for evidence, id. at 26;

and (3) Commerce acted in an arbitrary and capricious manner, id. at 28.  The court determines

that Commerce's application of AFA rates to POSCO Chemtech was supported by substantial

evidence and in accordance with law.

### *1.   Factual Basis for AFA Application.*

With respect to Commerce's treatment of Chemtech, POSCO first contends that Commerce

erred in applying AFA rates to port usage grants because POSCO Chemtech's failure to report its

port usage grants in the initial questionnaire was inadvertent.  Id. at 23.  POSCO argues that

"POSCO Chemtech's failure to report these port usage grants in its initial response was due to

simple human error and POSCO Chemtech responsibly made two attempts to remedy this error."

Id.  POSCO maintains that "[t]he statute does not support the use of AFA on the basis of an

inadvertent failure to cooperate."  Id. (quoting Trina Solar, 195 F. Supp. 3d at 1346).  POSCO

argues that Commerce's actions contravened the intent of the statute, as "it amounted to nothing

more than punishment for a company that had never participated in a U.S. CVD investigation not

discovering and reporting in its initial questionnaire response miniscule amounts of other

assistance."  Id. at 24.

The court finds Commerce's application of AFA to POSCO Chemtech's port usage grants

to be supported by substantial evidence and in accordance with law.  As discussed, supra, p. 5, 19

U.S.C. § 1677e(b)(1) permits Commerce to apply AFA rates when it finds that a respondent "has

failed to cooperate by not acting to the best of its ability to comply with a request for information."

A party has acted to the best of its ability when it has "put forth its maximum effort to provide

Commerce with full and complete answers to all inquiries."  Nippon Steel, 337 F.3d at 1382.

Inadvertent error, when there is reason for confusion, "does not support the use of AFA."  Trina

Case 1:17-cv-00137-GSK   Document 81   Filed 12/06/18   Page 30 of 39

Consol. Court Number 17-00137                                                                 Page 30
PUBLIC VERSION

Solar, 195 F. Supp. 3d at 1346.  But where Commerce has made a determination that a party has

"failed to cooperate by not acting to the best of its ability to comply with [a] request for

information, by failing to report the additional grants . . . at verification, Commerce [may]

reasonably resort[] to AFA."  Id. at 1347.

Here, POSCO does not refute the fact that it failed to report port usage grants for Chemtech

by the original deadline required.  POSCO's Br. at 22.  POSCO objects to Commerce's subsequent

rejection of its attempts to report these port usage grants but acknowledges that Commerce did so

based on "strict interpretation of its factual regulations."  Id. at 23.  Because there is no dispute

over POSCO's initial failure to report the grants or over the regulations under which Commerce

rejected POSCO's subsequent attempts to report, the court must only address whether Commerce

reasonably found that Chemtech failed to act to the best of its ability.  In the IDM, Commerce

found not only that Commerce failed to report its port usage grants between 2011 and 2015, but

also that POSCO failed to cooperate fully with respect to Commerce inquiries about other forms

of assistance.  IDM at 37–38.  Commerce explained its decision to reject POSCO's additional

information:

> M-Tech timely reported its receipt of port usage grants from Pohang Youngil Port
> in its first U.S. CVD questionnaire response.  Further, weeks after POSCO
> Chemtech submitted its initial questionnaire response, POSCO reported the port
> usage grants that it received during the POI.  POSCO Chemtech did not report its
> receipt of port usage grants at that time.  Thus, we disagree with POSCO's
> argument that the application of facts available with respect to POSCO Chemtech's
> failure to report receipt.

Id. at 37.  This court, therefore, determines that Commerce's finding that POSCO did not act to

the best of its ability, as it did not "conduct prompt, careful, and comprehensive investigations of

all relevant records," to be supported by substantial evidence and in accordance with law.  Nippon

Steel, 337 F.3d at 1382. This action, moreover, was not arbitrary and capricious, as Commerce

**PUBLIC VERSION**

followed the plain language of the statute and regulations.  See 19 U.S.C. § 1677e(b)(1); 19 C.F.R.

§ 351.301–02.

### 2.   Countervailable Benefit.

POSCO argues that even if Commerce had a factual and legal basis to apply AFA, "it failed

to point to any record evidence to demonstrate that POSCO Chemtech received a countervailable

benefit from the port usage grants because it has refused to accept for the official record any

information that was submitted by POSCO Chemtech."  POSCO's Br. at 26.  POSCO argues that

Commerce failed to make the necessary findings regarding the benefit requirement in determining

whether a subsidy is countervailable.  Id. at 27.  The court finds that Commerce supported its

"benefit" determination with substantial evidence.

As discussed above, for a subsidy to be countervailable, it must provide the respondent a

financial contribution, be specific, and provide a benefit.  19 U.S.C. § 1677(5).  In applying AFA

rates, Commerce "must still make the necessary factual findings to satisfy the requirements for

countervailability."  Trina Solar, 195 F. Supp. 3d at 1350 (citing 19 U.S.C. § 1677e(a)–(c)).

Commerce "need not query [the respondent] again, but must nevertheless search 'the far reaches

of the record'-- and may re-open the record -- to make the prerequisite factual findings."  Id.

(internal citations omitted).

The court finds that Commerce reasonably relied on AFA for purposes of finding benefit.

Because Chemtech failed to timely report the port usage grants, Commerce lacked information on

the record to determine whether the port usage grants provided a benefit.  While Commerce could

have re-opened the record "to make the prerequisite factual findings," it was not required to do so.

Id.  In the IDM, Commerce explained the complete lack of information on the record, POSCO

Chemtech's failure to cooperate, and its subsequent decision to apply adverse facts to the benefit

inquiry.  IDM at 38.  Commerce thus permissibly applied adverse facts to the benefit inquiry.  The

court, therefore, finds that Commerce's determination that the subsidy was countervailable is

supported by substantial evidence.

### 3.  *Arbitrary and Capricious.*

POSCO also contends that Commerce's treatment of Chemtech was arbitrary and

capricious because Commerce did not apply AFA and found that M-Tech's grants provided no

benefit, but did apply AFA to find that Chemtech's port usage grants provided a benefit.  POSCO's

Br. at 28.  "An agency action is arbitrary when the agency offers insufficient reasons for treating

similar situations differently."  SKF USA Inc., 263 F.3d at 1382 (quoting Transactive Corp., 91

F.3d at 237).  Here, however, Commerce provided sufficient reasons for treating M-Tech and

Chemtech's port usage grants differently.  As the Government explained in its brief, "POSCO

Chemtech's port usage grants did not constitute a previously reported program, but rather new

information."  Def.'s Br. at 43.  In the case of POSCO M-Tech, the grants had previously been

reported, but Commerce "noted certain inconsistencies during [its] examination of POSCO M-

Tech's grants with respect to 'R&D Grants under ITIPA,'" POSCO Verification Report at 32, and

was reconciling certain inconsistences observed at verification for a previously reported program,

id.  Thus, the court concludes that Commerce did not act in an arbitrary and capricious manner

because it offered sufficient reasons for treating M-Tech and Chemtech differently with regards to

determining whether their respective grants provided a benefit.

### C.  *Treatment of Chemtech's R&D Grant.*

Nucor challenges Commerce's decision to treat Chemtech's R&D grants as recurring, as

well as its decision not to apply AFA to Chemtech for failure to report these grants.  Nucor's Br.

at 38.  In particular, Nucor argues that Commerce abused its discretion by "treating the exact same

subsidy as both recurring and non-recurring in the same investigation." Id. at 39. This court is

unpersuaded and finds that Commerce did not abuse its discretion in its treatment of Chemtech's

R&D grants.

"[I]f Commerce has a routine practice for addressing like situations, it must either apply

that practice or provide a reasonable explanation as to why it departs therefrom." Save Domestic

Oil, Inc. v. United States, 357 F.3d 1278, 1283–84 (Fed. Cir. 2004). The analysis thus becomes

whether Commerce had a standard practice, whether it deviated from this practice, and whether it

provided a reasonable explanation for the deviation.

The agency record shows that POSCO and Chemtech reported R&D grants as recurring,

but Commerce found in its Preliminary Determination that they were non-recurring. PDM at 27

n.149. Commerce issued supplemental questionnaires but "inadvertently addressed this

questionnaire only to POSCO and not to any other firm which submitted a complete questionnaire

response to the Department." IDM at 47. In other words, Commerce addressed a supplemental

questionnaire to POSCO but not to POSCO Chemtech.

As Commerce explained in the IDM:

> Given that the Department did not address the supplemental questionnaire to
> POSCO Chemtech and that in the course of this investigation the Department issued
> questionnaires directly to POSCO's cross-owned companies, the Department
> determines that POSCO Chemtech did not have notice that it was required to
> respond to the supplemental questionnaire concerning the ITIPA program.
> Consequently, consistent with section 782(d) of the Act, we determine that the
> application of AFA in this instance is unwarranted. As discussed above, POSCO,
> POSCO M-Tech, and POSCO Chemtech timely responded to the Department's
> initial questionnaire to state that they considered grants received under the ITIPA
> to be recurring. For example, each company stated that the grants under this
> program span multiple years and that the funds received each year from the
> government are set out in the original contract. Because there is no other
> information on the record with respect to POSCO Chemtech's use of the ITIPA
> program, the Department finds that, with respect to POSCO Chemtech only, it is
> appropriate to treat these grants as recurring.

Id.  Because Commerce provided a reasonable explanation for its decision to treat POSCO

Chemtech's grants as recurring and not to apply AFA, the court finds that Commerce did not abuse

its discretion.

### D.  Application of AFA for Hyundai Corporation's Reporting Error.

POSCO next challenges Commerce's application of AFA to Hyundai and its attribution of

this rate to POSCO, arguing that Commerce's actions were not supported by substantial evidence

and not in accordance with law.  POSCO's Br. at 28.  At issue here is Commerce's application of

AFA to assistance received by Hyundai under Korea's Restriction on Special Taxation Act

("RSTA") Article 22.  Def.'s Br. at 22.  POSCO first argues that Commerce erred in applying AFA

to Hyundai because Hyundai's reporting mistake was in an advertent error, and thus does not show

that Hyundai "failed to cooperate by not acting to the best of its ability."  POSCO's Br. at 29

(quoting 19 U.S.C. § 1677e(b)).  In response to the Initial Commerce Questionnaire, Hyundai

submitted its 2015 tax return filed in 2016 in lieu of its 2014 tax return filed in 2015.  See Hyundai

Corp.'s Initial Questionnaire Resp. (June 13, 2016) at 6 and Ex. 4, P.R. 156–58.  Hyundai did,

however, refer to the tax returns in its narrative response as its 2014 returns, which POSCO argues

shows Hyundai intended to submit the proper returns.  POSCO's Br. at 29.  POSCO argues that

because this was "plainly an inadvertent human error," AFA cannot apply.

As discussed above, intent is not relevant to whether Hyundai acted to the best of its ability;

rather, importers are expected to understand the organization of their own records and to diligently

search their records for the information requested by Commerce.  Nippon Steel, 337 F.3d at 1382.

Here, Hyundai provided the wrong year's tax returns, and explicitly asserted that it received no

income tax deductions, exemptions, or benefits, other than a tax credit under Article 57 of the

Corporate Tax Act.  IDM at 51; Hyundai Initial Questionnaire Resp. at 26–27.  Because Hyundai

**PUBLIC VERSION**

submitted the wrong tax returns and failed to report the RSTA subsidy, the court concludes that

Commerce's decision to apply AFA was supported by substantial evidence and in accordance with

law.

POSCO next argues that "[e]ven if the Court concludes that Commerce's application of

AFA to Hyundai Corporation was proper, which it should not, there is no lawful basis to have

attributed the 1.05 percent AFA rate to POSCO [because] Hyundai [] is an unaffiliated trading

company, POSCO has no ownership or control of it, and POSCO was not responsible for the

inadvertent human error in Hyundai Corporation's separate response and had no ability to induce

Hyundai Corporation not to make this inadvertent error." POSCO's Br. at 30. The Government

contends that Commerce was justified in attributing Hyundai's AFA rates to POSCO under its

regulations, and that, in any event, "POSCO produced all of the subject merchandise exported

through Hyundai" and "was in a position to induce the company to cooperate." Def.'s Br. at 48

(citing IDM at 53).

Under Mueller Comercial de Mexico, S. de R.L. De C.V. v. United States, Commerce may

apply AFA rates when the respondent "could and should have induced [the unaffiliated party's]

cooperation by refusing to do business . . . stating that [the unaffiliated party] could otherwise

evade its antidumping rate by funneling its goods through [respondent]." 753 F.3d 1227, 1233

(Fed. Cir. 2014). In that case, the Federal Circuit "conclude[d] that Commerce may rely on such

policies as part of a margin determination for a cooperating party . . . as long as the application of

those policies is reasonable on the particular facts and the predominant interest in accuracy is

properly taken into account as well." Id.

While the Government and POSCO dispute whether POSCO had the power to induce

Hyundai to comply fully with the investigation, the court concludes that the inducement analysis

set forth in Mueller is inapposite because Commerce did not apply AFA to POSCO here.  Rather,

the agency applied AFA to Hyundai Corporation and then attributed that benefit amount to POSCO

in accordance with its regulations.   See IDM at 52–53.   19 C.F.R. § 351.525(c) governs

Commerce's attribution of subsidy benefits, stating that "[b]enefits from subsidies provided to a

trading company which exports subject merchandise shall be cumulated with benefits from

subsidies provided to the firm which is producing subject merchandise that is sold through the

trading company, regardless of whether the trading company and the producing firm are affiliated."

Here, the regulation required Commerce to apply the benefit received by Hyundai to the

countervailing duty rate applicable to POSCO's sales made through Hyundai.   As Commerce

complied with its own regulations and did not apply AFA rates to POSCO itself, Commerce's

actions were in accordance with law and supported by substantial evidence.

### E.  CVD AFA Methodology.

POSCO next argues that Commerce failed to "explain[] the circumstances that justified its

usage of the highest non-*de minimis* rates available and just applied its AFA CVD methodology"

in violation of 19 U.S.C. §1677e(d)(2).  POSCO's Br. at 35–38.  POSCO contends that "[t]he

Court should remand this case to require that Commerce base any AFA rates that it applies on an

evaluation of the situation that resulted in the use of adverse inferences . . . [and] instruct

Commerce that the statute does not permit it to automatically selected the highest rate and that it

can only lawfully do so after an evaluation -- which it explains -- of why the facts and

circumstances warrant such a result."  Id. at 36.

The Government argues that, "[f]ar from acting 'automatically' to apply the highest

calculated rates, Commerce thoroughly explained the discoveries of previously unreported

information at verification which warranted an adverse inference."  Def.'s Br. at 51 (internal

**PUBLIC VERSION**

citations omitted) (citing <u>IDM</u> at 11–13, 36–39, 42–44, 50–54.).  The Government then contends Commerce "acted in accordance with § 1677e(d)(1)(A), guided by its methodology, and selected rates that were applied for the same or similar programs in a countervailing duty proceeding involving the same country."  <u>Id.</u>  The Government lastly asserts that "section 1677e(d)(2) authorizes Commerce to rely on the highest rate."  <u>Id.</u> at 52.

19 U.S.C. § 1677e(d) governs "[s]ubsidy rates . . . in adverse inference determinations." In cases in which Commerce applies an adverse inference, it may "use a countervailable subsidy rate applied for the same or similar program in a countervailing duty proceeding involving the same country" or "if there is no same or similar program, use a countervailable subsidy rate for a subsidy program from a proceeding that the administering authority considers reasonable to use." 19 U.S.C. § 1677e(d)(1)(A)(i)–(ii).  Commerce may apply any of these rates, "including the highest such rate or margin, based on the evaluation . . . of the situation that resulted in [Commerce] using an adverse inference in selecting among the facts otherwise available."  19 U.S.C. §1677e(d)(2).  As this court previously found in <u>POSCO v. United States</u>, 296 F. Supp. 3d at 1349, the statutory language requires Commerce to do "something more—i.e., an evaluation of the specific situation," to justify its decision to apply the highest available rates out of all possible rates.  <u>See also</u> <u>NMB Singapore Ltd. v. United States</u>, 557 F.3d 1316, 1319–20 (Fed. Cir. 2009); <u>POSCO v. United States</u>, 42 CIT __, __, Slip Op. 18-117 (Sept. 11, 2018) at 19.  "The plain language of the statute allows Commerce to select the highest rate, but only after Commerce examines the circumstances that led to the application of AFA.  In other words, 19 U.S.C. § 1677e(d)(2) clearly requires Commerce to conduct a fact-specific inquiry and to provide its reasons for selecting the highest rate out of all potential countervailable subsidy rates in a particular case." <u>POSCO</u>, Slip Op. 18-117 at 19.  "Moreover, because the requirement for this evaluation was added

Case 1:17-cv-00137-GSK   Document 81   Filed 12/06/18   Page 38 of 39

Consol. Court Number 17-00137                                                    Page 38
PUBLIC VERSION

to the pre-existing statutory requirements for using adverse facts available, clearly some additional

evaluation is required beyond that which justified the adverse inference." POSCO, 296 F. Supp.

3d at 1349.

Because Commerce failed to evaluate -- beyond its adverse inference determination -- why

the highest available rate should apply to POSCO, this court remands the final determination to

Commerce.  In its brief, the Government contends that § 1677e(d)(2) permits the highest non-de

minimis rate.  It does, so long as this application is "based on the evaluation . . . of the situation

that resulted in [Commerce] using an adverse inference in selecting among the facts otherwise

available." 19 U.S.C. § 1677e(d)(2).  Without such an evaluation, Commerce's application of the

highest non-de minimis rate is unsupported by substantial evidence and not in accordance with

law.[15]

## CONCLUSION

With the exceptions of the countervailability determination of M-Tech's R&D grants and

the application of the highest AFA rates, the court concludes that the Final Determination is in

accordance with law and supported by substantial evidence.  The court remands Commerce's

countervailability determination of M-Tech's grants and the application of the highest AFA rates

for reconsideration consistent with this opinion.  Commerce shall file with this court and provide

to the parties its remand results within 90 days of the date of this order; thereafter, the parties shall

have 30 days to submit briefs addressing the revised final determination to the court and the parties

shall have 15 days thereafter to file reply briefs with the court.

**SO ORDERED.**

---

[15] Because this court remands the issue of the use of the highest available AFA rate, as noted above, the court need not address POSCO's contention that Commerce failed to corroborate the AFA rates under 19 U.S.C. §1677e(c)(1).  POSCO's Br. at 38.

**PUBLIC VERSION**

*/s/   Gary S. Katzmann*
Gary S. Katzmann, Judge

Dated: December 6, 2018
         New York, New York