C-580-888
Remand
CAFC 2020-1357
CIT 17-00137
POI:  1/1/2015 – 12/31/2015
**Public Version**
E&C/OVI:  MYS

*POSCO v. United States*,
**Consol. Court No. 17-00137 (CIT March 16, 2021)**

**FINAL RESULTS OF REDETERMINATION
PURSUANT TO COURT REMAND**

## I.   SUMMARY

The Department of Commerce (Commerce) prepared these final results of

redetermination pursuant to the remand order of the U.S. Court of International Trade (CIT),

issued on March 16, 2021, for further proceedings consistent with the opinion issued by the U.S.

Court of Appeals for the Federal Circuit (CAFC) in *POSCO v. United States*.[1]  In *POSCO*, the

CAFC vacated and remanded to Commerce its decision, in the final determination in the

countervailing duty (CVD) investigation of certain carbon and alloy steel cut-to-length plate

(CTL plate) from the Republic of Korea (Korea),[2] that an alleged provision of electricity for less

than adequate remuneration (LTAR) subsidy program did not confer a benefit and, therefore,

was not countervailable.

As set forth below, Commerce has reexamined its benefit analysis in the provision of

electricity for LTAR program and further clarified its rationale and use of only the Korea

---

[1] *See POSCO v. United States*, 977 F.3d 1369 (Fed. Cir. 2020) (*POSCO*); *see also POSCO v. United States*, Consol. Court No. 17-00137, CIT Order at 1 (CIT March 16, 2021) (*Remand Order*).
[2] *See Certain Carbon and Alloy Steel Cut-To-Length Plate from the Republic of Korea:  Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination*, 82 FR 16341 (April 4, 2017) (*Final Determination*), and accompanying Issues and Decision Memorandum (IDM).

Electricity Corporation (KEPCO)'s costs in determining that a benefit does not exist, and the program is not countervailable.

## II.     BACKGROUND

On April 8, 2016, ArcelorMittal USA LLC, Nucor Corporation (Nucor), and SSAB Enterprises (collectively, the petitioners) filed with Commerce CVD and antidumping duty petitions concerning imports of CTL plate from Korea.[3]  The petitioners alleged that the Government of Korea (GOK), through KEPCO, provided countervailable subsidies to Korean producers of CTL plate, and that the GOK conferred a specific benefit on Korean CTL plate producers through the provision of electricity for LTAR.[4]  On April 28, 2016, Commerce initiated a CVD investigation of CTL plate from Korea.[5]  On May 31, 2016, following initiation, Commerce determined to individually examine POSCO and Daewoo International Corp. (DWI) as mandatory respondents in this investigation.[6]  On June 1, 2016, Commerce issued a CVD Questionnaire to the GOK, requesting that the GOK provide information about the Korean electricity industry and market, including KEPCO and the Korean Power Exchange (KPX).[7]  On September 14, 2016, Commerce issued its *Preliminary Determination* in this investigation.[8]  For purposes of the *Preliminary Determination*, DWI was incorporated into POSCO's subsidy

---

[3] *See* Petitioners' Letter, "Certain Carbon and Alloy Steel Cut-to-Length Plate from Austria, Belgium, Brazil, the People's Republic of China, France, the Federal Republic of Germany, Italy, Japan, the Republic of Korea, South Africa, Taiwan, and Turkey – Petitions for the Imposition of Antidumping and Countervailing Duties; Countervailing Duty Petition Volume XV:  Korea," dated April 8, 2016 (Petition).

[4] *Id.* at XV-4 – XV-19.

[5] *See Certain Carbon and Alloy Steel Cut-to-Length Plate from Brazil, the People's Republic of China, and the Republic of Korea:  Initiation of Countervailing Duty Investigations*, 81 FR 27098 (May 5, 2016), and accompanying CVD Investigation Initiation Checklist, dated August 28, 2016 (Initiation Checklist).

[6] *See* Memorandum, "Countervailing Duty Investigation of Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea:  Respondent Selection," dated May 31, 2016.

[7] *See* Commerce's Letter, "Investigation of Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea:  Countervailing Duty Questionnaire," dated June 1, 2016 (CVD Questionnaire) at Section II (pages 2-7).

[8] *See Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea:  Preliminary Negative Countervailing Duty Determination and Alignment of Final Determination with Final Antidumping Duty Determination*, 81 FR 63168 (September 14, 2016) (*Preliminary Determination*), and accompanying Preliminary Decision Memorandum (PDM).

analysis and *ad valorem* subsidy rate.[9]  For the provision of electricity for LTAR program, Commerce found KEPCO to be an authority and, thus, preliminarily determined that the GOK provided a financial contribution to CTL plate producers.[10]  However, for benefit, the GOK provided the necessary information regarding how it established the tariff rates and the underlying calculations and data on its electricity costs and investment return for the period of investigation (POI).[11]  Moreover, the GOK demonstrated that the applicable tariff rates were applied to the respondents.[12]  Given that the information and data mirrored our prior determinations for this alleged program in the CVD investigations of cold-rolled steel and hot-rolled steel, we preliminarily found no benefit.[13]  Thus, consistent with *Cold-Rolled Steel from Korea* and *Hot-Rolled Steel from Korea*, Commerce found that no benefit was conferred for the program during the POI and preliminarily determined that the program was not countervailable.[14]

Commerce issued its *Final Determination* on April 4, 2017.[15]  For the provision of electricity for LTAR program, Commerce addressed parties' comments and relied on its preliminary findings and continued to determine that the program did not confer a benefit and was not countervailable.[16]  Nucor Corporation subsequently contested, at the CIT, Commerce's determination with respect to the provision of electricity for LTAR.  On December 6, 2018, the

---

[9] *See Preliminary Determination* PDM at 13, unchanged in *Final Determination*.
[10] *Id.* at 29.
[11] *Id.*
[12] *Id.*
[13] *Id.*; *see also Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products from the Republic of Korea:  Final Affirmative Determination*, 81 FR 49946 (July 29, 2016) (*Cold-Rolled Steel from Korea*), and accompanying IDM at 45; and *Countervailing Duty Investigation of Certain Hot-Rolled Steel Flat Products from the Republic of Korea:  Final Affirmative Determination*, 81 FR 53439 (August 12, 2016) (*Hot-Rolled Steel from Korea*), and accompanying IDM at 44.
[14] *See Preliminary Determination* PDM at 29.
[15] *See Final Determination*.
[16] *See Final Determination* IDM at 25-33.

CIT sustained Commerce's decision as supported by substantial evidence and in accordance with law.[17]  Nucor appealed the CIT's decision on this issue to the CAFC, and the case was stayed pending the CAFC's final and conclusive decision in *POSCO*, No. 19-1213.

On October 15, 2020, the CAFC issued its opinion in *POSCO*, holding that Commerce's benefit analysis and its failure to investigate the role of KPX in the Korean electricity market were unlawful and unsupported by substantial evidence.[18]  Following *POSCO*, Nucor moved unopposed to vacate the CIT's decision sustaining Commerce's *Final Determination*.  On February 18, 2021, the CAFC vacated the CIT's judgment and remanded the matter for further proceeding consistent with *POSCO*.[19]

## III.   REMANDED ISSUES

In *POSCO*, the CAFC questioned Commerce's *Final Determination* regarding the provision of electricity for LTAR in two respects.  Specifically, the CAFC held that "{b}ecause Commerce improperly based its benefit-conferred analysis on a 'preferential price' standard … Commerce's final determination is contrary to law," and "Commerce's failure to investigate and include KPX's generation costs in its analysis renders its final determination unsupported by substantial evidence."[20]  We have addressed these concerns with respect to the underlying investigation in our analysis below.

## IV.   ANALYSIS

Before we provide a further explanation that the analysis employed by Commerce was fully consistent with the statutory language set forth in section 771(5)(E)(iv) of the Tariff Act of

---

[17] *See POSCO v. United States*, 353 F. Supp. 3d 1357 (CIT 2018).
[18] *See POSCO*, 977 F.3d at 1377-1378.
[19] *See Remand Order*.
[20] *See POSCO*, 977 F.3d at 1378.

1930, as amended (the Act), and then implement the analysis required by the CAFC, we must address a concern related to the description of the facts made by the CAFC in its holding.

The investigation of the provision of electricity for LTAR is framed by the allegation made by the petitioners. As noted above, the petitioners alleged that KEPCO subsidizes electricity to the steel industry by providing electricity at below market rates.[21] Based on the support provided in the Petition, Commerce initiated an investigation of the provision of electricity, provided by KEPCO, for LTAR.[22]

In *POSCO*, the CAFC held that Commerce did not request information regarding KPX's cost of electricity generation and that Commerce's determination that KPX was not relevant to its analysis leaves unresolved whether a benefit was conferred by way of the price charged by KPX to KEPCO. The CAFC also held, based on its reading of section 775 of the Act, that "Commerce has an affirmative duty to investigate any appearance of subsidies related to the investigation that are discovered during an investigation."[23] The CAFC further held that Commerce failed to investigate an appearance of a potential subsidy that was disclosed during the investigation within the Korean government's own questionnaire response.[24]

First, we note that KPX's existence and its role within the Korean electricity market were not disclosed for the first time in the GOK's questionnaire response. At the outset of the investigation, in the initial questionnaire to the GOK, Commerce explicitly requested information with respect to KPX and the Korean electricity market. These questions were: "Explain the roles of KEPCO, the Ministry of Trade, Industry and Energy, the Ministry of Strategy and Finance, the Korea Electricity Commission and {KPX} with respect to the

---

[21] *See* Petition at XV-4 – XV-19.
[22] *See* Initiation Checklist at 7.
[23] *See POSCO*, 977 F.3d at 1378.
[24] *Id*.

operation of the electricity market in Korea" and "KEPCO pays its subsidiaries the generating cost when it purchases electricity at {KPX} and that the capital and generating costs are included in the purchase price.  If the price paid is not sufficient to cover all the costs including the amount of investment return, please explain the costs that are not covered and provide the additional amount that would need to be paid to cover all costs including an appropriate amount of investment return.  Please make sure to also provide the additional amount in percentage terms."[25]  Commerce also requested the following information:  "The price of electricity from {KPX} reflects an adjusted coefficient that is determined by the Cost Evaluation Committee. Please explain how the adjusted coefficient was determined; how often the adjusted coefficient is changed; and provide the adjusted coefficients that were in effect during the {period of investigation or} POI."[26]

Therefore, the record demonstrates that Commerce, from the outset of the investigation, in its initial questionnaire, requested information from the GOK to confirm the Korean electricity market structure and that the electricity generation cost paid by KEPCO through KPX reflected the full cost of generating electricity, including an amount of investment return (profit).[27]

In *POSCO*, the CAFC also held that Commerce failed to investigate an appearance of a potential subsidy.  Section 775 of the Act addresses the discovery of countervailable subsidy practices during a proceeding.  Under the statute, if Commerce, in the course of a proceeding, discovers a practice that appears to be a countervailable subsidy, but that was not included in the matters alleged in a CVD petition, it:  (1) will include the subsidy in its investigation; or (2) transfer the information regarding the subsidy to the library maintained under section

---

[25] *See* CVD Questionnaire at Section II, pages 3 and 6-7 (Questions m and nn).
[26] *Id.* at 7 (Question oo).
[27] *See* GOK's Letter, "Countervailing Duty Investigation:  Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea:  Response," dated July 15, 2016 (GOK July 15, 2016 IQR) at 25-26.

777(a)(1) of the Act.  Commerce's obligations under section 775 of the Act are triggered only if Commerce discovers a "a practice that appears to be a countervailable subsidy," which is defined in section 771(5) of the Act.  Under section 771(5) of the Act, a countervailable subsidy has three required legal elements:  (1) a financial contribution that (2) confers a benefit which (3) is specific.  Thus, Commerce's obligation under section 775 of the Act is triggered only when Commerce discovers a program that appears to have involved a specific financial contribution that conferred a benefit on the respondent company.

In the *Final Determination*, Commerce did not include KPX as a part of its examination of the provision of electricity for LTAR, as a discovered countervailable subsidy, because the information on the record regarding KPX did not satisfy all three elements of a countervailable subsidy as set forth in section 771(5)(B) of the Act.  Because the alleged subsidy involving KPX did not appear to be a countervailable subsidy, the GOK's questionnaire response did not trigger Commerce's obligations under section 775 of the Act.  The record evidence demonstrated that KPX would be defined as an authority under section 771(5)(B) of the Act that provided a financial contribution, and the petitioners had already established possible specificity through the provision of electricity for LTAR allegation; however, there was no evidence on the record indicating a benefit was being provided.  The information on the record instead demonstrated that there was no benefit in the pricing of electricity between KPX and KEPCO.[28]  Because there was no information on the record to indicate that there was a benefit conferred in the pricing of electricity between KPX and KEPCO, Commerce properly did not include the purchase of

---

[28] *Id.*

electricity between KPX and KEPCO as a discovered subsidy within the statutory definition set forth in section 775 of the Act.[29]

Finally, in *POSCO*, the CAFC held that Commerce's failure to treat KPX as an authority or, at a minimum, to investigate whether it is an authority constitutes error as a matter of law.[30] The CAFC explained that, because the GOK's questionnaire response clarified that KPX was wholly-owned by KEPCO, and Commerce found in the *Final Determination* that KEPCO was an authority under the Act, the evidence therefore "strongly suggests" that KPX is similarly an authority for the purposes of section 771(5)(B) of the Act.[31] We agree with the CAFC that the information on the record demonstrates that KPX is wholly-owned by KEPCO. Because Commerce found KEPCO to be an authority under the Act in the underlying determination,[32] KPX, a company wholly-owned by KEPCO, would also be defined as an authority under section 771(5)(B) of the Act.

However, the mere fact that an entity such as KPX is an authority is not sufficient to establish the existence of "a practice which appears to be a countervailable subsidy," as set forth in section 775 of the Act. As explained above, there was no information on the record to support the conclusion that KPX's pricing of electricity provided a benefit as both defined and required by the statute. Because one of the three requirements set forth in section 771(5)(B) of the Act was not met, and thus the practice did not qualify as a potential countervailable subsidy discovered during the course of the investigation, Commerce did not initiate an investigation on the pricing of electricity between KPX and KEPCO under section 775 of the Act. For these

---

[29] This would also constitute an unusual subsidy allegation because, in essence, the allegation and investigation would be that the authority defined within section 771(5)(B) of the Act is subsidizing itself, since KPX is wholly-owned by KEPCO.

[30] *See POSCO*, 977 F.3d at 1378.

[31] *Id.*

[32] *See Preliminary Determination* PDM at 29, affirmed in *Final Determination* IDM at 25-33.

reasons, as we explain below, while Commerce agrees that KPX is an authority, Commerce continues to find that KPX's pricing of electricity does not qualify as a discovered countervailable subsidy under sections 771(5)(B) and 775 of the Act.

Commerce Did Not Base Its Benefit-Conferred Analysis on A "Preferential Price" Standard

In *POSCO*, the CAFC held that Commerce relied upon a preferential price analysis, rather than the standard set forth under section 771(5)(E)(iv) of the Act, with respect to Commerce's analysis as to whether KEPCO provided electricity to the respondents for LTAR. While the CAFC explained that Commerce considered KEPCO's overall cost, including its operational cost for generating and supplying electricity, in its analysis, the CAFC held that Commerce's analysis ultimately relied upon whether respondents were given preferential treatment.[33] The CAFC emphasized the following sentence in the underlying determination as evidence of Commerce's reliance on a preferentiality standard: "If the rate charged is consistent with the standard pricing mechanism and the company under investigation is, in all other respects, essentially treated no differently than other companies which purchase comparable amounts of electricity, then there is no benefit."[34] The CAFC, citing to its decision in *Nucor*,[35] concluded that Commerce's use of the pre-Uruguay Round Agreements Act (URAA) preferential-rates standard in this case is inconsistent with the adequate remuneration standard under section 771(5)(E)(iv) of the Act. The CAFC further held that Commerce cannot rely on price discrimination to the exclusion of a thorough evaluation of fair market principles to determine whether a recipient is receiving an unlawful benefit.[36] The CAFC references the

---

[33] See *POSCO*, 977 F.3d at 1374.
[34] *Id.*; see also *Final Determination* IDM at 29. This language was originally developed in the pre-URAA determination of *Magnesium from Canada*. See *Final Affirmative Countervailing Duty Determinations: Pure Magnesium and Alloy Magnesium from Canada*, 57 FR 30946, 30954 (July 13, 1992) (*Magnesium from Canada*).
[35] See *Nucor Corp. v United States*, 927 F.3d 1243 (Fed. Cir. 2019) (*Nucor*).
[36] See *POSCO*, 977 F.3d at 1376.

language in the Statement of Administrative Action (SAA) which states that the URAA has replaced preferentiality with the standard of LTAR. Thus, the CAFC explained that the words used in the statute, understood in their ordinary sense, make it unreasonable that lack of price discrimination is sufficient to establish adequacy of remuneration. Therefore, the CAFC concluded that, consistent with its holding in *Nucor*, Commerce's reliance on a preferential rate standard is inconsistent with the statute, in particular with the LTAR requirement, and is therefore contrary to law.[37]

To be clear, we wish to emphasize that the passage referenced by the CAFC in finding that Commerce relied on a preferential rate standard was, in fact, not the basis for Commerce's adequacy of remuneration analysis. Although the language emphasized by the CAFC was taken from a pre-URAA determination, *Magnesium from Canada*, Commerce, in citing this language, was neither referring to nor implementing a preferentiality standard of benefit analysis for the provision of electricity.

As Commerce explained in the underlying determination, the finding that KEPCO's provision of electricity to the respondent steel companies did not constitute a countervailable subsidy was based on Commerce's analysis of "fair-market principles" in order to determine whether a benefit was being provided for LTAR.[38] Using this statutory standard for its benefit analysis, Commerce determined "that KEPCO more than fully covered its cost for the industrial tariff applicable to our respondents."[39] Commerce did not rely on price discrimination, but rather the fact that KEPCO fully covered its costs in the industrial rates charged to the respondent steel companies. In citing to the language from *Magnesium from Canada*, Commerce was not

---

[37] *Id.*
[38] *See Final Determination* IDM at 32-33.
[39] *Id.* at 33.

10

referencing a pre-URAA "preferentiality" analysis as a basis for its conclusion. Rather, Commerce cited to that language to demonstrate that Commerce's analysis was consistent with the standards set forth in section 771(5)(E)(iv) of the Act, which states that "the adequacy of remuneration shall be determined in relation to prevailing market conditions for the good or service being provided … in the country subject to the investigation or review. Prevailing market conditions include price, quality, availability, marketability, transportation, and other conditions of purchase or sale." In reviewing the facts on the record, Commerce found that the record demonstrated that the industrial tariff rates in Korea were based upon costs plus a return on investment.[40] Therefore, consistent with the prevailing market conditions in Korea, Commerce analyzed whether KEPCO's tariff rates covered its costs plus a return on investment, and determined that "KEPCO more than fully covered its cost for the industrial tariff applicable to our respondents."[41]

As indicated by the facts on the record, KEPCO had different industrial tariff classes and different rates across those industrial tariff classifications based on the cost of providing electricity to each of those tariff classifications.[42] This method of establishing different tariff classifications based upon price, marketability, transportation and other conditions of purchase or sale constitutes prevailing market conditions within the meaning of section 771(5)(E)(iv) of the Act. Therefore, Commerce, in addition to determining that the KEPCO electricity tariffs charged to the respondent steel companies covered KEPCO's costs, analyzed whether the respondents were charged the appropriate tariff based on the prevailing market conditions within Korea.

---

[40] *See Final Determination* IDM at 25-33.
[41] *Id.* at 33.
[42] *Id.*

KEPCO differentiates its industrial tariff classifications by both contract demand for electricity and by low-voltage and high voltage.[43]  Contract demand is further differentiated between customers with an electricity demand of between 4kW and 300kW and industrial customers with a contract demand of more than 300kW.[44]  Moreover, KEPCO's tariff classifications are also differentiated by voltage, with the classifications being 220V – 380V (Low Voltage); more than or equal to 3,300V – 66,000V (High Voltage (A)); 154,000V (High Voltage (B)); and 345,000V or higher (High Voltage (C)).[45]  The higher the contract demand and the higher the voltage, the lower the industrial rate.

As Commerce explained in the *Final Determination*, with regard to the "tier three" benchmark used to determine whether the provision of electricity was for adequate remuneration, KEPCO's standard pricing mechanism used to develop its tariff schedule was based upon its costs.[46]  To develop the electricity schedules that were applicable during the POI, KEPCO first calculated its overall cost, including an amount for investment return.  These costs included the operational cost for generating and supplying electricity to its customers as well as taxes.  The cost for each electricity classification was calculated by:  (1) distributing the overall cost according to the stages of providing electricity (generation, transmission, distribution and sales); (2) dividing each cost into fixed cost, variable cost, and the consumer management fee; and (3) then calculating the cost by applying the electricity load level, peak level, and the patterns of consuming electricity.  Each cost was then distributed into the fixed charge and the variable charge.  KEPCO then divided each cost, taking into consideration the electricity load level, the usage pattern of electricity, and the volume of electricity consumed.  Costs were then distributed

---

[43] *See* GOK July 15, 2016 IQR at Exhibit E-15.
[44] *Id.* at "Industrial Tariff."
[45] *Id.* at "General Information, Supply voltage classification."
[46] *See Final Determination* IDM at 25-33.

according to the number of consumers for each classification of electricity.[47]  For the POI, Commerce concluded that KEPCO more than fully covered its cost for the industrial tariff applicable to the respondents.[48]

Therefore, the record evidence demonstrates that Commerce did not rely on the former "preferentiality" standard, but rather Commerce relied on the adequacy of remuneration standard set forth within section 771(5)(E)(iv) of the Act.  Citing *Softwood Lumber from Canada*, the CAFC explained:  "Preferential rate means 'more favorable to some within the relevant jurisdiction than to others within that jurisdiction.'"[49]  Commerce, however, in assessing the price charged for electricity by KEPCO to the respondents, did not compare the price charged to other customers in Korea.  Rather, Commerce analyzed whether the price charged to the respondents was consistent with market principles and prevailing market conditions in Korea in the form of the tariff classifications established by KEPCO.  Commerce determined that the price charged to the respondents by KEPCO "more than fully covered its cost."[50]  If Commerce had relied upon a "preferentiality" standard instead of the statutory standard set forth under section 771(5)(E)(iv) of the Act, then the comprehensive analysis of KEPCO's costs would have been irrelevant; Commerce merely would have compared the tariff charged by KEPCO to the respondent steel companies to the highest industrial rate (or the highest rate) set forth in KEPCO's tariff schedule.[51]  Thus, a preferentiality standard would have looked to whether any

---

[47] *Id.*

[48] *Id.* at 33.

[49] *See POSCO*, 977 F.3d at 1371 (citing *Final Negative Countervailing Duty Determinations; Certain Softwood Products from Canada*, 48 FR 24159, 24167 (May 31, 1983) (*Softwood Lumber from Canada*)).

[50] *See Final Determination* IDM at 33.

[51] Under the pre-URAA law provided that Commerce "would measure whether the government provided a good or service at a preferential rate based upon, in order of preference, the following benchmarks:  (1) The price the government charges to other parties for the identical or similar good; (2) the price charged by other sellers within the same political jurisdiction (*i.e.*, country under investigation); (3) the government's cost of providing the good or service; or (4) the price paid for that good outside the country under investigation."  *See Preliminary Affirmative*

other company within the relevant jurisdiction was receiving a higher rate than the respondent steel companies at issue here.

Under section 771(5)(E)(iv) of the Act, Commerce is required to carry out its analysis of adequate remuneration within the context of prevailing market conditions.  As stated above, KEPCO has separate industrial tariff classifications to account for electricity contract demand and voltage.  Furthermore, as Commerce explained in the *Final Determination*, KEPCO divided each cost, taking into consideration the electricity load level, the usage pattern of electricity, and the volume of electricity consumed.[52]  Costs were then distributed according to the number of consumers for each classification of electricity.[53]

Tariff classifications delineated by electricity contract demand, voltage, usage pattern of electricity, and volume of electricity consumed all fall within the statutory definition of adequate remuneration set forth within section 771(5)(E)(iv) of the Act, which states that "prevailing market conditions include price, quality, availability, marketability, transportation and other conditions of purchase or sale."  Thus, after Commerce determined that KEPCO's industrial tariffs more than covered its costs, it was required under section 771(5)(E) of the Act to determine whether the respondent steel companies had been charged the appropriate tariff rate in accordance with the criteria set forth in KEPCO's industrial tariff classifications.  KEPCO's electricity prices are differentiated by both contract demand for electricity and by low voltage and high voltage, and the costs for each of these tariff classifications takes into consideration the electricity load level, the usage pattern of electricity, and the volume of electricity consumed.[54]

---

*Countervailing Duty Determination:  Certain Softwood Lumber Products from Canada*, 57 FR 8800, 8801 (March 12, 1992).
[52] *See Final Determination* IDM at 32-33.
[53] *Id*. at 33.
[54] *See* GOK July 15, 2016 IQR at Exhibit E-15; *see also Final Determination* IDM at 32-33.

Therefore, even if each industrial tariff more than fully covered KEPCO's costs, the tariff charged could still be found to be for LTAR if KEPCO charged a respondent the rate set forth in the incorrect industrial tariff classification.

For example,[55] let us presume that the respondent steel company had a contract demand of between 4kW and 300kW and consumed electricity at a voltage of 220V – 380V but was charged the lower tariff rate for industrial companies that had a contract demand of over 300kW and consumed electricity at a voltage of 345,000V or higher.  In this example, despite the fact that KEPCO covered its costs within each industrial tariff class, the respondent company was ultimately charged a lower tariff rate than it should have been charged according to KEPCO's own tariff classifications.  Under section 771(5)(E) of the Act, this undercharging would still result in the provision of electricity for LTAR for a respondent steel company that had a contract demand of between 4kW and 300kW and consumed electricity at a voltage of 220V – 380V.

This analysis is not a "preferential price" analysis.  The provision of electricity would constitute the provision of a good or service for LTAR based upon prevailing market conditions that includes price and other conditions of purchase or sale.  Price and other conditions of purchase or sale include the electricity demand charge and low and high voltage, which are part of the prevailing market conditions of the Korean electricity market under section 771(5)(E)(iv) of the Act.  Even after determining that the industrial tariffs charged by KEPCO are set at rates that cover costs and provide a rate of return, a rate could nevertheless represent LTAR if a respondent company consumed electricity with a contract demand of between 4kW and 300kW and at a voltage of 220V – 380V but was charged the lower tariff applicable to industrial companies that had a contract demand of over 300kW and consumed electricity at a voltage of

---

[55] See GOK July 15, 2016 IQR at Exhibit E-15 at "Industrial Tariff."

345,000V or higher.  This is the meaning of the phrase in the *Final Determination*, "essentially treated no differently than other companies and industries which purchase comparable amounts of electricity."[56]  For these reasons, we continue to find that KEPCO did not provide electricity for LTAR under section 771(5)(E)(iv) of the Act.

KPX Generating Cost

In its decision in *POSCO*, the CAFC also held that "Commerce's failure to investigate and include KPX's generation costs in its analysis renders its final determination unsupported by substantial evidence."[57]  Because the CAFC instructed Commerce to include KPX's generation costs in our analysis of whether electricity was provided to the respondent steel companies for LTAR, we have done so on remand in this case.

As explained above, Commerce requested information in its initial questionnaire to the GOK to determine whether the price for electricity paid by KEPCO through KPX fully covered all costs for the generation of electricity.  These questions were:  "KEPCO pays its subsidiaries the generating cost when it purchases electricity at {KPX} and that the capital and generating costs are included in the purchase price.  If the price paid is not sufficient to cover all the costs including the amount of investment return, please explain the costs that are not covered and provide the additional amount that would need to be paid to cover all costs including an appropriate amount of investment return.  Please make sure to also provide the additional amount in percentage terms."[58]

In addition, Commerce requested the following information:  "The price of electricity from {KPX} reflects an adjusted coefficient that is determined by the Cost Evaluation

---

[56] *See Final Determination* IDM at 29.
[57] *See POSCO*, 977 F.3d at 1378.
[58] *See* CVD Questionnaire at Section II, pages 6-7, Question nn.

Committee.  Please explain how the adjusted coefficient was determined; how often the adjusted coefficient is changed; and provide the adjusted coefficients that were in effect during the POI."[59]  Therefore, Commerce requested and received information from the GOK to confirm that the electricity generation costs paid by KEPCO reflected the full cost to KPX of generating electricity, including an amount of investment return (profit).[60]

In the *2017 Administrative Review of Cold-Rolled Steel* and the *2017 Administrative Review of Hot-Rolled Steel*, Commerce, pursuant to a properly alleged and supported electricity upstream allegation, investigated the selling of electricity to KEPCO through KPX and determined that the electricity pricing system established by KPX is consistent with market principles and that a benefit was not conferred.[61]  Commerce's subsequent investigation into the pricing of electricity between KPX and KEPCO confirms the information on the record of this proceeding, which was submitted in the GOK's July 15, 2016 IQR at pages 25-26.  Because Commerce determined that the electricity generation costs paid by KEPCO also reflect the full costs to KPX of generating electricity, as well as an amount of investment return, we continue to find that electricity prices established by KPX are consistent with prevailing market conditions and thus do not provide a benefit under section 771(5)(B) of the Act.

---

[59] *Id.* at Section II, page 7, Question oo.

[60] *See* GOK July 15, 2016 IQR at 25.

[61] *See Certain Cold-Rolled Steel Flat Products from the Republic of Korea:  Final Results of Countervailing Duty Administrative Review; 2017*, 85 FR 38361 (June 26, 2017) (*2017 Administrative Review of Cold-Rolled Steel*), and accompanying IDM at Comment 1; *see also Certain Hot-Rolled Steel Flat Products from the Republic of Korea: Final Results of Countervailing Duty Administrative Review, 2017*, 85 FR 64122 (October 9, 2020) (*2017 Administrative Review of Hot-Rolled Steel*), and accompanying IDM at Comment 1.

## V.     DRAFT REMAND COMMENTS

On April 6, 2021, Commerce issued its *Draft Remand* and invited interested parties to comment.[62]  On April 13, 2021, Nucor timely filed comments on the draft remand redetermination.[63]  No other interested parties provided comments.

### Comment 1:  Commerce's Current Adequate Remuneration Analysis in the Context of the Replaced Preferentiality Standard

- The *Draft Remand* mischaracterizes Commerce's preferentiality analysis employed in the *Final Determination*.  Despite its attempt to shift focus away from the analysis that it performed in the *Final Determination*, Commerce indeed relied on the pre-URAA "preferential rate" analysis in the *Final Determination*.[64]  Commerce also applied the same preferentiality test in *Welded Line Pipe from Korea*, where there was no evidence of cost recovery on the record or a finding on such evidence.[65]

- Commerce's observation of KEPCO's full recovery of its cost in the *Final Determination* was a brief, off-handed aside at the end of an extended argument that disclaimed any obligation to consider cost recovery in a tier three analysis.[66]  Underscoring the irrelevance of this cost recovery finding in the *Final Determination*, there are no POI specific cost data from KEPCO on the record to support Commerce's cost recovery determination in the *Final Determination*.[67]  In the final remand redetermination,

---

[62] *See* Draft Results of Redetermination Pursuant to Court Remand:  POSCO v. United States Consol Court No. 17-00137 (CIT March 16, 2021), issued on April 6, 2021 (*Draft Remand*).

[63] *See* Nucor's Letter, "Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea:  Comments on Draft Remand Results," dated April 13, 2021 (Nucor Comments).

[64] *Id*. at 9-12 (citing *Magnesium from Canada*, 57 FR at 30950 and 30954; *Final Determination* IDM at 29-31; and *Welded Line Pipe from the Republic of Korea:  Final Negative Countervailing Duty Determination*, 80 FR 61365 (October 13, 2015) (*Welded Line Pipe from Korea*), and accompanying IDM at 17-18).

[65] *Id*. at 11 (citing *Welded Line Pipe from Korea* IDM at 17-18).

[66] *Id*. (citing *Final Determination* IDM at 48-50).

[67] *Id*. at 12 (citing Nucor's Letter, "Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea: Case Brief of the Nucor Corporation," dated January 18, 2017 (Nucor Case Brief) at 22) and 21-22 (citing *Final Determination* IDM at 33 n. 176).

Commerce cannot rely on this statement and must explain how its finding comports with the statutory language based on the analysis it actually employed.[68]

- The *Draft Remand* continues a preferentiality analysis which does not account for the fair market value of electricity, and characterizes the standard pricing mechanism analysis as a test of "adequate remuneration."[69]

- Commerce misconstrues the meaning of "adequate remuneration," as interpreted by the CAFC, and Commerce's reasoning is flawed because it used the pre-URAA preferentiality standard instead of the statutory standard of "adequate remuneration."[70] Moreover, Commerce's reasoning is unlawful and contrary to the CAFC's explanation because Commerce treats the prevailing market conditions in the Korean electricity market as coextensive with, and limited to, the tariff classification established by KEPCO.[71]

- Commerce's analysis circumscribes the scope of the prevailing market conditions in Korea and, in doing so, eschews the benchmark analysis by comparing KEPCO's pricing mechanism to itself; thereby perpetuating the same unlawful preferentiality test that the CAFC rejected.[72]  Thus, Commerce may not continue to rely on the standard pricing mechanism analysis or circumscribe its analysis to an unlawfully narrow subset of "prevailing market conditions."[73]

---

[68] *Id*. at 12.
[69] *Id*. at 12-13.
[70] *Id*. at 12-14 (citing *Nucor* at 1250 and 1253).
[71] *Id*. at 14-15 (citing *Citric Acid and Certain Citrate Salts:  Final Results of Countervailing Duty Administrative Review; 2012*, 79 FR 78799 (December 31, 2014), and accompanying IDM at 84; *Nucor*, 927 F.3d at 1251; and *POSCO*, 977 F.3d at 1377-1378).
[72] *Id*. at 15-16.
[73] *Id*. at 26.

***Commerce's Position:***

Nucor continues to argue that the methodology employed by Commerce in the *Final Determination*, and explained in detail in the *Draft Remand*, is not compliant with the current statutory language and employs the old "preferentiality" standard that was in effect prior to the URAA. We disagree and continue to find that the methodology used in the *Final Determination* was consistent with the statutory language governing a determination of whether the government provision of a good or service is for LTAR. Below, we provide a more thorough discussion of the old "preferentially" standard, as referenced in the SAA, and as referred to by the CAFC, and further discussion regarding comments received.

## A. Discussion of "preferentially" standard, as referenced in the SAA, and as referred to by the CAFC

While we fully explained in the *Draft Remand* why the methodology used in the *Final Determination* was consistent with the statutory language governing a determination of whether the government provision of a good or service is for LTAR, it is still clear from Nucor's comments on the *Draft Remand* that its assumptions of "preferentially" are incorrect. Therefore, in order to provide further guidance on this issue, Commerce believes that it would be instructive to all parties to provide a more detailed discussion of the old "preferentially" standard, as referenced in the SAA, and as referred to by the CAFC.[74]

As the CAFC explained in referencing *Softwood Lumber from Canada*: "Preferential rate means 'more favorable to some within the relevant jurisdiction than to others within that

---

[74] *See* SAA, H.R. Doc. 103-316, vol. 1 (1994) at 927, "With respect to the provision of goods or services, current law relies on a standard of "preferentiality" to determine the existence and amount of a benefit. Section 771(5)(E)(iv) replaces this standard with the standards from Article 14 of the Subsidies Agreement – 'less than adequate remuneration' (in the case of goods or services) and 'more than adequate remuneration' (in the case of procurement of goods)"; *see also POSCO*, 977 F.3d at 1376.

jurisdiction.'"[75]  Prior to the enactment of the URAA, a countervailable benefit would include the government "provision of goods or services at preferential rates."[76]  Congress did not define the term or the methodology to be employed in determining whether the government has provided a good or service at a "preferential rate."  Instead, Congress delegated to the administering authority, Commerce, to define and develop an employed methodology for analyzing whether there has been a "provision of goods or services at preferential rates."[77]  Accordingly, pursuant to that authority, Commerce explained in *Softwood Lumber from Canada*, that "preferentiality" did not mean "inconsistent with commercial considerations."[78]  Therefore, in order to determine whether a government has provided a good or service at a preferential rate, Commerce explained that it would compare the price charged to the respondent to prices the government charged to the same or other users.[79]

In addition, Commerce also recognized in *Softwood Lumber from Canada* that in some cases the number of users of a government-provided good or service might be so limited that it might require the use of a different benchmark.[80]  For example, in the administrative review of the CVD order on *Carbon Black from Mexico*, the government-provided good in question was carbon black feedstock (CBFS), for which there were only two users in Mexico.[81]  Given the limited number of users of CBFS, Commerce determined that its standard test for determining "preferentiality" would not work.[82]  In order to determine whether the CBFS had been provided

---

[75] *See POSCO*, 977 F.3d at 1371.

[76] *Id*.

[77] As it did with the "less than adequate remuneration" standard enacted in the URAA.  *Id*. at 1371-72.

[78] *See Softwood Lumber from Canada*, 48 FR at 24167.

[79] *Id*. ("The standard contained in subsection (ii) is 'preferential,' which normally means only more favorable to some within the relevant jurisdiction than to others within that jurisdiction.")

[80] *Id*. at 24167, n.3.

[81] *See Carbon Black from Mexico; Preliminary Results of Countervailing Duty Administrative Review*, 51 FR 12329, 13271 (April 18, 1986) (*Carbon Black from Mexico*).

[82] *Id*.

at a preferential rate, Commerce instead considered alternative benchmarks, and issued a

"Preferentiality Appendix," as part of this administrative review, describing these alternatives

and requesting public comments.[83]  These alternatives, in order of preference, were:  (1) prices

charged by the same seller for a similar or related good or service; (2) prices charged within the

jurisdiction by other sellers for an identical good or service; (3) the same seller's cost of

producing the good or service; and (4) external prices.[84]  In *Carbon Black from Mexico*,

Commerce used the first alternative.  It was not until 1989 that Commerce attempted to codify

these "preferentiality" rules.

On May 31, 1989, Commerce issued its *Proposed Rules* where it first attempted to codify

its existing methodology based on preferentiality.[85]  Section 355.44(f) and subsection (f)(1) set

forth the methodology for determining whether a government provided a good or service at

preferential rates, and attempted to codify the standard concept of "preferentiality."[86]  Under the

preferentiality methodology, to determine whether a government good or service was provided to

a respondent at a preferential rate, Commerce would determine whether the price charged by the

government for the good or service was less than the benchmark price, which normally would be

the nonselective prices the government charged to the same or other users of the good or service

within the same political jurisdiction.  Therefore, under this preferentiality standard, if we were

investigating electricity provided to a respondent, we would simply compare the price that the

government charged the respondent to the price the government charged to other users.[87]  If the

---

[83] *Id*. at 13272.

[84] *Id*. at 13272-73.

[85] *See Notice of Proposed Rulemaking and Request for Public Comments*, 54 FR 23366 (May 31, 1989) (*Proposed Rules*).  These *Proposed Rules* were never finalized.

[86] *Id*. at 23371-72.

[87] The reference in the proposed regulation to "nonselective" prices means a price or rate that is not limited to a specific enterprise or industry, or group of enterprises or industries.  *See, e.g.*, *Proposed Rules*, 54 FR at 23368 (section 355.43(b)(1)).

government sold an input that is generally available (not specific) to other firms in its jurisdiction at a higher price than to producers of the product under investigation, then this government action was preferential and the measure of the preference (*i.e.*, the benefit) was the difference between the two prices charged by the government.[88]  The Preferentiality Appendix further stated that this measure of preferentiality, price discrimination by the government, was Commerce's preferred test for finding whether the provision of goods conferred a countervailable benefit.[89]

In situations such as the one faced by Commerce in *Carbon Black from Mexico*, where Commerce found there was no available benchmark using the preferred preferentiality methodology under subsection (f)(1), Commerce also set forth four alternative benchmarks under subsection (f)(1); again, taken from the Preferentiality Appendix.  These four alternative benchmarks were:  (1) The price, adjusted for any cost differences, the government charges for a good or service which is similar or related to the good or service in question, provided that the similar or related good or service and its price is not selective; (2) the price charged by other sellers to buyers within the same political jurisdiction for an identical good or service; (3) the government's cost of providing the good or service; or (4) the price paid for the identical good or service outside of the political jurisdiction in question.

The *Proposed Rules* confirmed that Commerce's standard of measuring preferentiality under the pre-URAA methodology was government price discrimination.[90]  The Preamble to the *Proposed Rules* stated that the standard of "preferentiality" within the meaning of the statute is

---

[88] *See Preferentiality Appendix*, 51 FR at 13272.
[89] *Id.*
[90] *See Final Negative Countervailing Duty Determination:  Phthalic Anhydride from Venezuela*, 59 FR 40868, 40869 (August 10, 1994).  Indeed, just four months before the enactment of the URAA, Commerce reemphasized this standard by stating that "{Commerce}'s preferred benchmark is the non-selective prices the government charges to the same or other users."

more favorable treatment to some within the jurisdiction than to others within that jurisdiction.

Therefore, under the *Proposed Rules*, Commerce would compare the government price under

scrutiny to a benchmark price, which normally would be the prices the government charged to

the same or different users of the good or service within the same political jurisdiction.[91]  Only

when Commerce could not use this preferred methodology for measuring "preferentiality" by

analyzing whether the government engaged in price discrimination, such as in instances where

there were too few users of the government good or service to establish a "generally available"

government price, did Commerce develop and use market-based benchmarks such as prices from

private parties, the government's cost for the good or service, or external prices such as a world

market price.  It was these market-based benchmarks that later became the foundation for the

LTAR analysis currently conducted under the post-URAA regulations.

As can be seen from the above explanation, the traditional pre-URAA standard was to

determine whether the government is providing more favorable treatment to some within its

jurisdiction than to others within that jurisdiction.  In *Steel Products from Sweden*, we compared

the price the government-owned mining company charged the respondent for iron ore to the

price the government-owned mining company charged other customers.[92]  In *IPA from Israel*,

Commerce determined whether the provision of rail facilities by the Government of Israel to the

respondent was at a preferential rate compared to the price the government charged other

companies.[93]  In *Groundfish from Canada*, to determine whether the Government of Canada was

providing preferential rates to fishermen under the Small Craft Harbour Program, Commerce

---

[91] *See Proposed Rules*, 54 FR at 23372.
[92] *See Final Affirmative Countervailing Duty Determinations; Certain Carbon Steel Products from Sweden*, 50 FR 33375, 33379 (August 19, 1985) (*Steel Products from Sweden*).
[93] *See Final Affirmative Countervailing Duty Determination:  Industrial Phosphoric Acid from Israel*, 52 FR 25447, 25450-51 (July 7, 1987) (*IPA from Israel*).

compared the fees the government charged to commercial fishermen to the fees the government charged to other commercial vessels and recreational boaters.[94]  As evidenced by these determinations, under the preferentiality standard, Commerce performed a direct comparison of prices charged to the respondent to prices charged to other companies for the same product or service.  This comparison was done without further analyses regarding the market conditions or pricing methodologies present in the country, which are required to be carried out under the current standard set forth in section 771(5)(E) of the Act.

As a point of comparison to determinations in which Commerce relied on the old preferentiality methodology, it is also instructive to review the determinations in *Magnesium from Canada* because these determinations demonstrate that Commerce's development and application of the standard pricing methodology is not based on price discrimination or preferentiality.  In the *Preliminary Determination* of *Magnesium from Canada*, Commerce, in determining whether the Government of Quebec provided electricity to the respondent at a preferential rate, relied upon the preferred standard under the preferentiality methodology (*i.e.*, simply comparing the rate the government charged the respondent for electricity to the rate the government charged other industrial users).[95]  In the final determination, Commerce revised its analysis, stating that this price discrimination methodology was not appropriate with respect to the electricity analysis and that we needed to examine whether the price charged to the respondent was consistent with the power company's standard pricing mechanism.[96]  In the

---

[94] *See Final Affirmative Countervailing Duty Determination; Certain Fresh Atlantic Groundfish from Canada*, 51 FR 10041, 10046-47 (March 24, 1986) (*Groundfish from Canada*).
[95] *See Preliminary Affirmative Countervailing Duty Determination:  Pure and Alloy Magnesium from Canada*, 56 FR 63927, 63929-30 (December 6, 1991) (*Preliminary Determination of Magnesium from Canada*).  In this determination, Commerce stated:  "To calculate the benefit under this program, we took the difference between the rate paid by Norsk Hydro for electricity under its Risk and Profit Sharing contract during the review period and the weighted-average rate paid by other industrial customers during the review period."
[96] *See Magnesium from Canada*, 57 FR at 30949-50.

*Magnesium from Canada Changed Circumstances Review*, we provided further elaboration on the concept of the standard pricing mechanism.[97]  To determine whether the respondent's individual electricity rate provided a countervailable benefit, Commerce examined the government-owned utility company's price setting mechanism and determined that one of the guiding principles in the setting of the utility company's rates is that in establishing its electricity tariffs, the rates must reflect the costs of supply associated with each of its various rate categories.[98]  The *Magnesium from Canada* determinations clearly demonstrate that the current methodology involving the standard pricing mechanism was developed as a distinct and separate methodology from the previous preferentiality methodology.

Thus, it is inaccurate to claim that the methodology used by Commerce in the underlying determination here constitutes the application of a preferentiality standard, as Nucor attempts to argue in its Comments.

## B.  Nucor's Comments

The CAFC in *POSCO* provided guidance on this issue related to the interpretation of "preferentiality" with its focus on price discrimination.  In the decision, the CAFC stated that Commerce cannot rely on price discrimination to the exclusion of a thorough evaluation of fair market principles.[99]  In articulating this interpretation, the CAFC has highlighted the essential difference between the pre-URAA preferentiality standard and the URAA standard of LTAR.

[97] *See Preliminary Results of Changed Circumstances Administrative Reviews:  Pure Magnesium and Alloy Magnesium from Canada*, 57 FR 47619 (October 19, 1992), unchanged in *Final Results of Changed Circumstances Administrative Reviews:  Pure Magnesium and Alloy Magnesium from Canadas*, 57 FR 54047 (November 16, 1992) (collectively, *Magnesium from Canada Changed Circumstances Review*).
[98] This cost standard is consistent with statements made by the CAFC with respect to utility pricing:  One need only look outside the present statutory context to the familiar rate-regulation context to see the great variety of methodologies used over time to ensure that rates of a monopoly provider are not too low, some directly focus on value (such as "fair value"), some reflect on various measures of "costs" (which may reflect value).  *See Nucor*, 927 F.3d at 1254-55.
[99] *See POSCO*, 977 F.3d at 1376.

The fundamental element of the preferentiality standard was whether the government engaged in price discrimination in its provision of a good or service, whereas the current standard focuses on "prevailing market conditions" which include actual market – determined prices, world market prices, and where these are not available, whether the government price is consistent with market principles such as the recovery of cost.

Throughout the course of the underlying investigation, as well as in its comments submitted in response to the *Draft Remand*, Nucor has failed to articulate arguments that demonstrate an understanding of both Commerce's previous preferentiality methodology, our current standard pricing methodology, and the differences between the two.  The result of Nucor's apparent confusion is that in one example, Nucor offers up a methodological argument which actually reflects Commerce's standard market principles analysis, while in another example, Nucor offers up an alternative that undermines the very basis of its primary argument.

In the first instance, in its case brief submitted in the underlying investigation, Nucor argued that KEPCO did not recover its cost of supplying industrial electricity during the POI and thus the GOK's electricity prices are not established in accordance with market principles.[100] We do not disagree that "cost recovery" is a vital part of an adequacy of remuneration analysis. In fact, our analysis under the standard methodology is "cost recovery" plus "a return on investment or profit."[101]  Nucor argued that because we were allegedly using a preferentiality methodology, we were not taking into consideration "cost recovery," but that simply is untrue, as demonstrated by the *Final Determination*.

---

[100] *See Final Determination* IDM at 32 ("Therefore, the argument by Petitioners that we may only use cost in assessing the adequacy of remuneration is clearly unsupported by the statute and the regulations governing the provision of a good or service."); *see also* Nucor Case Brief at 22.
[101] *See Final Determination* IDM at 25-33.

In the second instance, Nucor also argued in its case brief that Commerce should use a market determined price in a similarly situated third country as the benchmark to determine whether the electricity prices charged by KEPCO to the Korean respondent steel companies are for LTAR.[102]  Notably, Nucor's proposed electricity benchmarks would be consistent with the benchmark analysis specifically set forth in both the Preferentiality Appendix and *Proposed Rules* as benchmarks to determine whether a government good or service is provided at "preferential rates."  For example, Nucor's proposed use of an out of country benchmark can be clearly traced to the Preferentiality Appendix[103] and the *Proposed Rules*.[104]  Yet, as we have explained, Nucor also argues that Commerce should <u>not</u> use a "preferentiality" standard or benchmark.  Accordingly, Nucor's argument that we should use a similarly situated third country's benchmarks is a contradiction of its own arguments that we should not use what it classifies as a "preferentiality" standard.

In addition to Nucor's proposed benchmarks in the *Final Determination* constituting methodologies under the preferentiality standard, Nucor's understanding and approach to both the pre – and post-URAA standards for determining whether a government's provision of a good or service constitutes a countervailable benefit would, confusingly, mean that the CAFC's decisions in both *Nucor* and *POSCO* support the use of a methodology from the pre-URAA preferentiality standard.  That is simply not the case.

As we have explained, an appropriate methodology under the current post-URAA statute and implementing regulations, as ruled by the CAFC in both *Nucor* and *POSCO*, is one based on cost recovery, a methodology developed under the pre-URAA preferentiality standard and set

---

[102] *See Final Determination* IDM at 25 (citing Nucor Case Brief at 22-23).
[103] *See* Preferentiality Appendix alternative benchmark (4) External Prices.
[104] *See* section 344.44(f)(1) Provision of Goods or Services at Preferential Rates subclause (2)(iv) The price paid for the identical good or service outside of the political jurisdiction in question.

forth previously in both the Preferentiality Appendix and the *Proposed Rules*. Given that in both *Nucor* and *POSCO* the CAFC stated that a preferential-rate standard is inconsistent with the URAA and is, therefore, contrary to law,[105] it would be logically and legally incorrect to take a position, such as the one espoused by Nucor, that a methodology developed pre-URAA cannot be compliant with the current statutory provision of LTAR or the decision made by the CAFC in *POSCO*.[106]

Nucor's incorrect interpretation continues to suffuse its arguments on remand. In the *Final Determination*, Commerce stated that "{i}f the rate charged is consistent with the standard pricing mechanism and the company under investigation is, in other respects, essentially treated no differently than other companies and industries which purchase comparable amounts of electricity then there is no benefit."[107] That singular sentence and statement has led Nucor to argue that Commerce's methodology is based on "preferentiality," while at the same time ignoring a significant amount of evidence on the record showing that description of Commerce's methodology to be false. Most importantly, Nucor ignores the fact that, in the *Final Determination*, Commerce determined no benefit existed through a market principles analysis that examined KEPCO's tariff rate setting process that was based on its costs and receiving a rate of return.[108] Commerce explained that the phrase cited by Nucor as the basis for its arguments

---

[105] *See Nucor*, 927 F.3d at 1254 – 1255; *see also POSCO*, 977 F.3d at 1376.
[106] *See* Nucor Comments at 9. As a means to argue that the methodology used to determine whether KEPCO provided electricity at LTAR in the *Final Determination* was inconsistent with the statute, Nucor states that in *Magnesium from Canada*, a case cited to by Commerce, Commerce used the terms "preferential" and "preference." Commerce used those terms in other sections of the decision in *Magnesium from Canada* because those were the terms referenced in the statute at the time *Magnesium from Canada* was decided. However, as we have demonstrated, the current benchmarks used by Commerce since the URAA (private prices within the country under investigation, world market prices, and costs) are all from the Preferentiality Appendix and the *Proposed Rules*. Thus, Nucor's logic would invalidate the entirety of Commerce's ability to enforce section 771(5)(E).
[107] *See Final Determination* IDM at 29.
[108] *Id*. at 30-33.

does not stand for the proposition that the agency used a preferential methodology in the *Final Determination* IDM[109] and this fact is explained even more extensively below.

In sum, the statement in the *Final Determination* referenced by both Nucor and the CAFC indicates that when the rate charged is consistent with the standard pricing mechanism (in this case, the electricity tariffs charged to the respondent covers cost plus a return) and the respondent is treated no differently than other companies that purchase comparable amounts of electricity (in this case, the rate charged to the respondent is from the correct tariff classification based on its contract demand for electricity and voltage for that electricity consumption, as this is a market condition for the provision of electricity in Korea), there is no benefit within the meaning of section 771(5)(E) of the Act.  In other words, if the tariff charged to the respondent does not cover "cost of production" plus "a profitable return on the investment," which is the same standard set forth in KEPCO's standard pricing methodology, then the respondent has received a countervailable benefit under section 771(5)(E) of the Act.  Moreover, even in the event that the tariff charged to the respondent covers "costs of production" plus "a profitable return on the investment," there is still a countervailable benefit conferred under the statute if KEPCO charges the respondent less than what it should be charged under its designated tariff classification.  An example of this type of situation would be a scenario in which KEPCO charged the respondent the tariff from an industrial category for companies that have a higher contract demand of electricity and consume electricity at a higher voltage.[110]  In this scenario, KEPCO would be charging the respondent less than it should be charged under its own tariff

---

[109] *See Final Determination* IDM at 30-31.

[110] Putting aside the legal fact that Nucor's argument is inconsistent with the statute; Commerce does not understand why Nucor would take a position that is inconsistent with its interests by arguing that if KEPCO's tariffs fully cover its "costs of production" plus "a return on its investment" that a countervailable benefit would still not be provided even if KEPCO provided the steel company with the lower rate applicable to users that consume more electricity and at a higher voltage.

classifications, and would thus be providing the respondent a countervailable benefit under the statute.

Nucor further argues that the phrase emphasized by both the petitioners and the CAFC[111] considers whether certain firms are treated differently than others, and therefore represents an analysis of price discrimination and preferentiality which the CAFC held is "beyond any reasonable interpretation of the statute, or of its implementation regulation."[112]  As support for this attempt to classify Commerce's analysis as a preferentiality analysis, Nucor references the following statement made by the CAFC in *POSCO*:  "Commerce cannot rely on price discrimination to the exclusion of a thorough evaluation of fair market principles."[113]  This statement by the CAFC in *POSCO*, however, does not have the meaning that Nucor tries to argue it has.  In *Nucor*, the CAFC upheld the identical analysis of KEPCO's pricing because Commerce "also found, and gave specific reasons for finding that KEPCO's pricing met familiar standards of cost recovery."[114]  In *POSCO*, the basis of this Remand Redetermination, the CAFC also set forth cost recovery as the appropriate standard, but faulted Commerce for failing to include KPX's generation costs in our analysis.[115]  Therefore, the CAFC has determined that Commerce's use of analyzing electricity tariffs using the standard of cost recovery is an appropriate standard under section 771(5)(E) of the Act.  Because KEPCO's standard pricing mechanism is based on cost recovery, it is clear from the statement in the *Final Determination*

---

[111] *See Final Determination* IDM at 29 ("If the rate charged is consistent with the standard pricing mechanism and the company under investigation is, in other respects, essentially treated no differently than other companies and industries which purchase comparable amounts of electricity then there is no benefit.")

[112] *See* Nucor Comments at 16.

[113] *Id*. at 7 (Citing *POSCO*, 977 F.3d at 1376).

[114] *See Nucor*, 927 F.3d at 1254.

[115] The Remand Redetermination has addressed elsewhere the issue of KPX's costs, but we would note here that KPX is not a generator of electricity.  *See, e.g.*, GOK July 15, 2016 IQR at 8-9 ("Under Article 31 of the {Electricity Business Law}, the sales and purchases of electricity in Korea can be accomplished only through the KPX operated market. . . . KEPCO . . . purchases electricity from generators in the KPX operated electricity market and transmits and distributes to the customers.")

("the rate charged is consistent with the standard pricing mechanism")[116] that Commerce was not relying "on price discrimination to the exclusion of a thorough evaluation of fair market principles," as Nucor claims.

Nucor asserts that Commerce's underlying cost analysis is lacking because the GOK did not place KEPCO's POI cost data on the record.  According to Nucor, citations referencing KEPCO's POI cost recovery in the *Final Determination* erroneously cite to this information or other record information that would corroborate that KEPCO's tariffs recovered costs and provided a rate of return.[117]  Upon further examination of the *Final Determination*, we agree with Nucor that our citations to KEPCO's POI cost data are inaccurate and do not support our cost recovery analysis.  However, this does not change our conclusion that KEPCO recovered its cost in selling its electricity to the respondents.

In the *Final Determination*, we began our cost recovery analysis with an examination of KEPCO's tariff rates, which were established in 2013.  Commerce stated:

> The GOK reported that a single tariff rate table applied throughout the POI, and that this tariff rate went into effect on November 21, 2013, and was applicable to the respondents in this investigation[118] …. The GOK provided KEPCO's data that were submitted to the Ministry of Trade, Industry, and Energy (MOTIE) in 2013 for the tariff in effect during the POI, as well as an explanation of its calculations and recovery costs[119]…. We verified that KEPCO applied this same price-setting method or standard pricing mechanism to determine the electricity tariffs for each tariff classification including the industrial tariff that was paid by the respondents during the POI.[120]

Although the citations were misplaced, Commerce analyzed KEPCO's tariff rates, particularly for the industrial classification, and there is record information that supports our finding of a

---

[116] *See Final Determination* IDM at 29.
[117] *See* Nucor Comments at 12 and 21 – 22.
[118] *See* GOK July 15, 2016 IQR at 18 – 19 (Corrected cite).
[119] *Id*. at 6, 18 – 19 and 21 – 23 (Corrected cite).
[120] *Id*. (Corrected cite).

standard mechanism, based on cost recovery, to establish tariff rates for all classifications in Korea.[121]

The next step in the analysis was to confirm whether KEPCO recovered its cost and a rate of return to ensure future operations for the industrial classification, based on the 2013 tariff rates, during the POI.  In its submissions, the GOK indicated KEPCO's cost data were not available by the questionnaire deadline set by Commerce.[122]  Even so, the GOK did provide other information to establish KEPCO's tariff rates recovered costs during the POI.[123] Furthermore, following our additional requests for the cost data, the GOK provided the status of the requested data, described the attempts to obtain the data, and submitted other relevant information that may be used in place of the KEPCO's POI cost data.[124]  Thus, the GOK cooperated to the extent that data were available and, moreover, submitted alternative information to assist Commerce in its analysis.

In its submissions, the GOK provided KEPCO's 2014 cost data, which is immediately prior to the POI, and KEPCO's 2015 overall electricity cost data.[125]  As in the *Final Determination*, Commerce's analysis focused on the tariff rate paid by the respondents, in this

---

[121] *See* corrected footnotes above.

[122] *See* GOK July 15, 2016 IQR at 18; *see also* GOK August 15, 2016 SQR at 6 – 7; GOK's Letter, "Countervailing Duty Investigation of Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea:  4th Supplemental Questionnaire Response," dated September 28, 2016 at 3; GOK's Letter, "Countervailing Duty Investigation of Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea:  4th Supplemental Questionnaire Response," dated October 3, 2016 at 3; and GOK's Letter, "Countervailing Duty Investigation of Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea:  4th Supplemental Questionnaire Response," dated October 4, 2016 at 3.

[123] *See* GOK July 15, 2016 IQR at 18; *see also* GOK August 15, 2016 SQR at 6 – 7.

[124] *See* GOK July 15, 2016 IQR at 18; *see also* GOK August 15, 2016 SQR at 6 – 7; GOK's Letter, "Countervailing Duty Investigation of Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea:  4th Supplemental Questionnaire Response," dated September 28, 2016 at 3; GOK's Letter, "Countervailing Duty Investigation of Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea:  4th Supplemental Questionnaire Response," dated October 3, 2016 at 3; and GOK's Letter, "Countervailing Duty Investigation of Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea:  4th Supplemental Questionnaire Response," dated October 4, 2016 at 3.

[125] *See* GOK July 15, 2016 IQR at Exhibit E-16; *see also* GOK August 15, 2016 SQR at GSQR1-2.

instance the industrial classification, for cost recovery.[126]  Given the absence of KEPCO's cost

data, Commerce has to balance this gap with the record information to establish that the

industrial classification recovered its cost (with a rate of return).  The GOK proffered KEPCO's

2014 cost data to be used as a proxy, a ratio applied to affirmatively demonstrate cost recovery,

and a rate of return of return for this classification during the POI.[127]  While the methodology is a

sound alternative in using available data, the ratio does not provide a complete picture upon

which the underlying factors impacting the Korean market may influence one classification or

another.  For example, in determining whether to adjust tariff rates upward, KEPCO, among

other factors, will examine the forecast of the cost for supplying electricity and the forecast of

the volume of the electricity to be consumed.[128]

KEPCO's United States Securities and Exchange Commission Form 20-F filed in 2016

(2015 data) (KEPCO 20-F 2016), shows that the overall increase in demand for electricity in

2015 was 1.3 percent and the industrial classification increased by only 0.4 percent.[129]  As

compared to other tariff classifications, it was the lowest increase in 2015, and the industrial

classification's overall percentage of usage decreased from 57 percent to 56.6 percent.[130]  Thus,

for the POI, the industrial classification slightly increased demand on a percentage basis, but also

its overall consumption slightly decreased in relation to overall usage.[131]

---

[126] *See Final Determination* IDM at 31 – 33.

[127] *See* GOK August 15, 16 at 7 ("Assuming that the same ratio applies in 2015, the recovery rate for supplying industrial electricity during the POI is expected to be approximately [      ].")

[128] *See* GOK July 15, 2016 IQR at 6 and 21 – 24 ("In changing the tariff rates, the forecast on the aggregate cost for supplying electricity and the electricity amount to be consumed are the most important data.")

[129] *See* Nucor's Letter, "Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea: Comments on the Government of Korea's Initial Questionnaire Response," dated August 4, 2016 (Nucor August 4, 2016 Comments) at Exhibit 1 (KEPCO 20-F 2016), 49.

[130] *Id*.

[131] *Id*.

For reported cost data, the KEPCO 20-F 2016 indicates that, from 2013 to 2015, the 2013 tariff increases, the "general decline of fuel prices," and the use of coal over {liquefied natural gas} (the former being a cheaper fuel source) for electricity production significantly increased operating profit.[132]  The KEPCO 20-F 2016 elaborates that "{f}uel costs accounted for 45.1%, 36.1% and 25.9% of our sales and 47.8%, 41.4% and 33.3% of our cost of sales in 2013, 2014 and 2015, respectively."[133]  Moreover, on a consolidated basis, KEPCO reported a 24.6 percent decrease in fuel costs in 2015.[134]  Thus, for the POI, the data demonstrate that the continued decreases in fuel prices, a major component in the pricing of electricity, lowered the impact of fuel costs on the sales and the cost side.[135]

From the KEPCO 20-F 2016, we note that neither of the above factors that would result in an upward adjustment of the tariff rates were present in 2015.  In the submitted KEPCO 2014 cost data, we note the overall cost and sales for this period was [          ] Korean Won and [          ] Korean Won, respectively.[136]  For 2015, we have overall cost and sales reported as [          ] Korean Won and [          ] Korean Won.[137]  In response to Commerce's initial questionnaire, the GOK explained and provided the cost data that were used as support to adjust the electricity tariffs in November 2013.[138]  Moreover, the methodology in the 2012 cost data was also used in the 2014 cost data.[139]  The record information establishes that no changes were made to this methodology as it would be applied to calculate the 2015 cost

---

[132] *Id*. at 73.
[133] *Id*.
[134] *Id.* at 82.
[135] *Id.* at 30 ("The primary purpose of the marginal price is to compensate the generation companies for fuel costs, which represents the principal component of the variable costs of generating electricity.")
[136] *See* GOK July 15, 2016 IQR at Exhibit E-16.
[137] *See* GOK August 15, 2016 SQR at Exhibit GSQR1-2.
[138] *See* GOK July 15, 2016 IQR at 11 – 12.
[139] *Id*. at 11 – 12 and 15 – 16.

data.[140]  As there are no factors that would impact the industrial classification (*e.g.*, adjusted tariffs, increased electricity demand or rising fuel prices) based on our evaluation of the KEPCO 20-F 2016, we find that the cost data methodology and the KEPCO overall electricity costs, taken together, strongly indicate that the industrial classification recovered costs and a rate of return during the POI.

As the CAFC explained, the URAA replaced the standard of provision of a good or service at preferential rates with the standard of LTAR.  As set forth within the SAA:  "With respect to the provision of goods or services, current law relies on a standard of 'preferentiality' to determine the existence and amount of a benefit.  Section 771(5)(E)(iv) of the Act replaces this standard with the standards from Article 14 of the Subsidies Agreement – 'less than adequate remuneration' (in the case of goods or services) and 'more than adequate remuneration" (in the case of procurement of goods)."[141]  Nucor's argument, when reviewed in the context of this statement in the SAA, appears to contend that any methodology employed by Commerce that was developed prior to the URAA constitutes a benefit analysis based on a "preferentiality" standard.  However, this literal approach to the statement made within the SAA is inappropriate and inapplicable.  As explained in the *Final Determination*, the URAA's move away from the preferentiality methodology "flipped," or revised, the regulatory hierarchy, with market prices from the country under investigation moving up the hierarchy, and other considerations remaining potentially relevant only if market prices within the country under investigation or world market prices are not available.[142]

---

[140] *Id.* at 14 – 16, Exhibit E-12 and Exhibit E-16.
[141] *See* SAA at 927.
[142] *See Final Determination* IDM at 31.

Nucor's argument that Commerce cannot use a methodology for analyzing whether a government's provision of electricity is for LTAR because it was developed before the enactment of the URAA fails because under that claim, Commerce would have little or no ability to enforce section 771(5)(E) of the Act.  As we have already noted, both the Preferentiality Appendix and the *Proposed Rules* listed:  (1)  prices from private sellers within the country under investigation, (2) world market prices, and (3) the government's cost of providing the good or service as potential alternative methodologies that might be used to determine whether the provision of a good or service is at a preferential rate.  Thus, if Nucor's argument is taken to its ultimate conclusion, each of these three methodologies is from the pre-URAA "preferentiality" standard, and thus could not be used to determine whether a good or service is provided for LTAR.  In any case, the argument is illogical, as the methodology used by Commerce, an analysis of the utility company's standard pricing methodology, is the <u>only</u> methodology that is not explicitly referenced in either the Preferentiality Appendix or the *Proposed Rules*, and was instead developed as an alternative to the preferentiality standard, as evidenced by the *Magnesium from Canada* determinations.[143]

Finally, it should be made clear that in their comments on the *Draft Remand*, Nucor completely misrepresents Commerce's *Final Determination* in the underlying investigation.[144] In attempting to argue that Commerce relied on a preferentiality standard to make its determination, Nucor takes various statements from different pages of the *Final Determination* IDM, removes any relevant context surrounding those statements, and then attempts to argue that these isolated statements prove Commerce's reliance on preferentiality in making its

---

[143] *See Preliminary Determination of Magnesium from Canada*, 56 FR at 63929-30; *see also Magnesium from Canada*, 57 FR at 30949-50; and *Magnesium from Canada Changed Circumstances Review*.
[144] *See* Nucor Comments at 10-12.

determination.[145]  Moreover, certain of the statements that Nucor has referenced from the *Final Determination* IDM in support of their argument are from sections where Commerce is addressing different comments related to different elements of the LTAR analysis made by petitioners on our tier (iii) analysis under 19 CFR 351.511.  This attempt to select single, specific instances of language, remove all context, and then use that language to conclude Commerce relied on a preferentiality standard in the underlying *Final Determination* is a mischaracterization of Commerce's analysis; thus, we need not address those arguments further.

### C.  Summary

As explained above, Nucor's arguments that the methodology employed by Commerce in the *Final Determination*, and explained in detail in the *Draft Remand*, is not compliant with the current statutory language and employs the old "preferentiality" standard that was in effect prior to the URAA, are without merit.  Therefore, we continue to find that the methodology used in the *Final Determination* was consistent with the statutory language governing a determination of whether the government provision of a good or service is for LTAR.

### Comment 2:  KPX's Generation Costs and Commerce's Finding of No Subsidy Related to KPX's Pricing of Electricity to KEPCO

- The draft remand redetermination does not remedy the errors that the CAFC identified because Commerce's explanation on remand that it accounted for the full cost of generating and supplying electricity is insufficient and unsupported by the record.[146]

- Commerce's mere request for information, in the absence of the provision of the accurate and verifiable information by the GOK, is not substantial evidence because the GOK provided no data to support its claim.[147]

---

[145] *Id*.
[146] *Id*. at 16-18 (citing *POSCO*, 977 F.3d at 1376-1378).
[147] *Id*. at 18-20.

- Commerce's referenced questions in the *Draft Remand* also did not request the necessary information to address the errors cited by the CAFC because those questions were limited to requesting information regarding KEPCO's cost of purchasing electricity through KPX. The CAFC held that Commerce's requested information was insufficient given the structure of the transactions and the nature of the relationships among KEPCO, KPX, and KEPCO's generation subsidiaries.[148]

- Although Nucor raised various comments to ask Commerce to request additional information and data regarding KPX's "Cost Evaluation Committee" and the actual costs of generating and supplying electricity, Commerce did not incorporate them in its supplemental questionnaires in the course of the investigation.[149] Commerce also did not require the GOK to substantiate its assertion that KEPCO's KPX acquisition price reflected the full cost of generation plus an amount for investment return.[150]

- Commerce's awareness of the existence and role of KPX at the outset of the investigation underscores its error in choosing not to investigate KPX fully and not to request the data to develop the record in order to determine whether the prices that the respondents paid for electricity reflected the fair market value of electricity.[151] The *Draft Remand* also does not address the CAFC's concerns regarding Commerce's error and thus remains unsupported by substantial evidence.[152]

- The *Draft Remand* mischaracterizes the CAFC's holding that Commerce erred in treating KPX as irrelevant in part because it did not consider whether KPX was an "authority" by

---

[148] *Id*. at 19.
[149] *Id*. at 20-21.
[150] *Id*. at 21.
[151] *Id*.
[152] *Id*.

virtue of KPX's position within KEPCO's corporate structure.[153]  Notwithstanding

Commerce's arguments in the *Nucor* appeals, the *Draft Remand* reverses Commerce's

previous position, and suggests that Commerce has never disputed KPX's "authority"

status.[154]

- The GOK never provided KEPCO's POI cost data in the underlying investigation.  Thus,

  there is no POI-specific information on the record to support Commerce's cost recovery

  determination.  Cites in the *Final Determination* pointing to KEPCO's POI cost data

  include other unrelated information or are not on the record.

- Commerce instead transforms the CAFC's holding into an upstream subsidy issue when

  no such allegation was made during the investigation and no such errors were alleged on

  appeal.[155]  While conceding that KPX has been part of the "authority," Commerce

  attempts to justify the *Final Determination* because there was purportedly no information

  on the record to support the conclusion that KPX's electricity pricing provided a

  benefit.[156]

- The issue is not whether Commence failed to initiate a separate upstream subsidy

  investigation of the prices that KPX charged KEPCO, but rather whether Commerce

  erred by treating KPX as irrelevant in the context of the LTAR allegation.[157]  The *Draft*

  *Remand* does not comply with the CAFC's holding concerning KPX's status and role as

  one of an "authority's" wholly owned affiliates and thus remains unlawful and

  unsupported by substantial evidence.[158]

---

[153] *Id*. at 23-24 (citing *POSCO*, 977 F.3d at 1378).
[154] *Id.* (citing *Nucor*, 927 F.3d at 1255-1256 and 1261).
[155] *Id*.
[156] *Id.* at 24-25.
[157] *Id.* at 25.
[158] *Id*.

- Commerce may not exclude KPX from its analysis; it must thoroughly account for the role of KPX in the Korean electricity market, and for the actual costs of generation and supply.[159]

- Commerce's analysis may not be limited to the price that KEPCO pays to acquire electricity through KPX, and thus the determination by Commerce in the *Draft Remand* to rely on KEPCO's pricing for the acquisition of electricity through KPX remains unsupported by substantial evidence.[160]

***Commerce's Position***:

Nucor argues that Commerce did not follow the instructions from the CAFC because Commerce failed to include KPX's generation cost in our analysis, and ultimately referenced only two questions presented to KPX in the underlying investigation as a part of our analysis. We agree, in part, with Nucor's argument that a reference only to the questions posed to KPX would fail to follow the CAFC's instructions, but these two questions, by themselves, were not the sole basis of our analysis addressing the issue remanded to us by the CAFC. This argument made by Nucor oversimplifies our analysis and the evidence cited in support of Commerce's *Draft Remand*. The evidence shows that a countervailable subsidy involving KPX's pricing of electricity to KEPCO does not exist.

As is shown in the *Draft Remand*, the initial reference made to the KPX questions was made to demonstrate that Commerce did not include KPX as part of our examination of the provision of electricity for LTAR as a discovered countervailable subsidy because, based on the information on the record, KPX's pricing of electricity to KEPCO did not satisfy all three

---

[159] *Id.* at 26.
[160] *Id.*

elements of a countervailable subsidy.[161]  While Nucor attempts to support its argument by

stating "{w}hile the Draft Remand Results suggest that {Commerce} 'requested and received'

the necessary information, there is no substantive discussion of the GOK's responses or how

they address the CAFC's concerns,"[162]  Commerce in fact made an explicit reference to the

GOK's Initial Questionnaire Response in the *Draft Remand*, which shows that the electricity cost

paid by KEPCO through KPX reflected the full cost of generating electricity, including an

amount of investment return (profit).[163]

　　　　As further explanation of the evidence Commerce cited within the *Draft Remand*, and

because the GOK's Initial Questionnaire Response is business proprietary, we refer further to

publicly available evidence on the record that clearly demonstrates no subsidy existed related to

KPX's pricing of electricity to KEPCO.  As a part of its comments, Nucor submitted the KEPCO

2016 20-F.[164]  In this public document, the average unit price (Won per kWh) and average fuel

cost (Won per kWh) for each of KEPCO's generation subsidiaries are listed.[165]  In reviewing the

---

[161] *See Draft Remand* at 5-9.  On page 25 of Nucor Comments, it is also argued the "Draft Remand Results now reverse course and concede that the KPX is, and apparently has always been, part of KEPCO the 'authority' for purposes of the Department analysis."  While the point Nucor is trying to make is unclear, Commerce has never denied that KPX was owned by KEPCO.  In the *Final Determination*, while recognizing that electricity generators "sell" electricity to KPX and then KEPCO "purchases" that electricity from KPX, we concluded that the costs that are relevant with respect to KEPCO's tariff schedule were the purchase price of electricity between KEPCO and KPX.  *See Final Determination* IDM at 32.  The fact that KPX is owned by KEPCO, and is thus itself an authority, was not part of that decision in the *Final Determination*.  And, as we previously noted, merging KEPCO and KPX as the identical "authority" would make for an unusual subsidy allegation because, in essence, the allegation would be that the authority defined within section 771(5)(B) of the Act is subsidizing itself, since KPX is wholly owned by KEPCO.  Because, we were aware of KPX at the start of the investigation, we did solicit information to ascertain whether the price of electricity between KPX and KEPCO reflected the full costs of generation.  The response from the GOK showed that this price reflected the full costs of generation.  Therefore, based on the allegation and the supporting documents for that allegation that were submitted in the petition, and exercising the authority delegated to Commerce by Congress, we did not further examine the pricing of electricity between KPX and KEPCO.  The CAFC disagreed with Commerce on this point and instructed us "to investigate and include KPX's generation costs."
[162] *See* Nucor Comments at 18.
[163] *See Draft Remand* at 6, n.27 and 17.
[164] *See* Nucor August 4, 2016 Comments at Exhibit 1 (KEPCO 2016 20-F).
[165] *Id.* at Exhibit 1 (KEPCO 2016 20-F) at 34, 39 and 41-45 (Korea South-East Power Co., Ltd:  70.69 Won vs. 43.9 Won; Korea Midland Power Co., Ltd.:  87.24 Won vs. 57.6 Won; Korea Western Power Co., Ltd.:  89.24 Won vs.

listed costs and prices for each of KEPCO's generation subsidiaries, it is readily apparent that the KPX unit price more than covered the fuel costs for each of these generators. The KEPCO 2016 20-F also shows that KEPCO, as a consolidated entity, was profitable and their revenue was positive in transmission, distribution and power generation (nuclear and non-nuclear).[166] With the evidence on the record clearly indicating KEPCO was profitable over the POI, it follows that KEPCO satisfied the requirement under our methodology that they recover not only the cost of production, but also a return on investment. Lastly, each KEPCO generation subsidiary was profitable in 2015 and, moreover, all six companies were so profitable that they paid out cash dividends.[167] For KPX, the only revenue permitted is membership fees, commissions on electricity utility transactions and other revenue proscribed by MOTIE, and its financial statements establish that revenue from commissions more than covered its operating expenses.[168] However, the KEPCO 2016 20-F demonstrates that, taking into account the revenue recorded, KPX also recovered costs during the period.[169] With both KEPCO and KPX recovering cost and receiving a return on investment, there is nothing that indicates that KPX's pricing of electricity to KEPCO was for LTAR.

If KPX's pricing of electricity to KEPCO was for LTAR, KPX would not have been able to recover its costs during the period, much less receive a return on their investment <u>beyond</u> merely recovering costs. Thus, the information available on the record of the underlying

---

62.7 Won; Korea Southern Power Co., Ltd.: 90.90 Won vs. 64.4 Won; Korea East-West Power Co., Ltd.: 84.75 Won vs. 82.0 Won; and Korea Hydro & Nuclear Power Co., Ltd.: 64.32 Won (total)/62.61 (nuclear) vs. 6.8 Won (nuclear only listed)).

[166] *Id.* at Exhibit 1 (KEPCO 2016 20-F) at F-7 – F-8 (Consolidated Statements of Comprehensive Income (Loss) and F-38 (Financial Information {for Segments in 2015}).

[167] *Id*. at Exhibit 1 (KEPCO 2016 20-F) at F-72 (Financial Information of Consolidated Subsidiaries) and F-77 (note 8).

[168] *See* GOK July 15, 2016 IQR at Exhibit E-5 (Article 40) and Exhibit KPX-2; *see also* GOK August 15, 2016 SQR at Exhibit DRR-4 at 10 and 38 (note 18).

[169] *See* Nucor August 4, 2016 Comments at Exhibit 1 (KEPCO 2016-20-F) (Comprehensive Income Statement).

investigation establishes that no benefit exists, because KEPCO's generation subsidiaries recovered costs in its revenue and, ultimately, KPX's price to KEPCO also covered costs to KPX for the POI.  Because no benefit existed, all three elements required to establish a countervailable subsidy were not sufficiently met, and thus no countervailable subsidy existed related to KPX's pricing of electricity to KEPCO during the POI.  As noted above, the fact the GOK was unable to provide KEPCO's POI cost data does not invalidate our cost analysis.[170]

Moreover, in the event that the Court wanted additional information with respect to "KPX's generation costs," in the *Draft Remand*, Commerce referenced the *2017 Administrative Review of Cold Rolled Steel* and the *2017 Administrative Review of Hot-Rolled Steel*.[171]  In the *2017 Administrative Review of Cold Rolled Steel* and the *2017 Administrative Review of Hot-Rolled Steel*, Commerce investigated the selling of electricity to KEPCO through KPX and determined that the electricity pricing system established was consistent with market principles.[172]  Furthermore, the thorough investigations of the pricing of electricity between KPX and KEPCO in the *2017 Administrative Review of Cold Rolled Steel* and the *2017 Administrative Review of Hot-Rolled Steel* confirm the information on the record in the underlying investigation discussed above, which demonstrates that the price paid by KEPCO to KPX reflected the full cost of generating electricity, including an amount for investment return (profit).[173]  Because Commerce has already conducted thorough investigations and verifications related to this issue in the *2017 Administrative Review of Cold Rolled Steel* and the *2017 Administrative Review of*

---

[170] *See* pages 32 – 36, above.
[171] *See Draft Remand* at 17.
[172] *Id.*
[173] *Id.*; *see also* GOK July 15, 2016 IQR at 25; and Nucor August 4, 2016 Comments at Exhibit 1 (KEPCO 2016-20-F) at 29-32.

*Hot-Rolled Steel*, it is unnecessary to conduct a separate, additional, and duplicative investigation into the same issue for the purposes of this Remand Redetermination.

Nucor also argues that the *Draft Remand* mischaracterized the CAFC's ruling and attempted to transform the issue into the investigation of an upstream subsidy, when no such allegation was made during the investigation.[174]  We can find no merit in this argument.  While the *2017 Administrative Review of Cold Rolled Steel* and the *2017 Administrative Review of Hot-Rolled Steel* did involve the investigations of an alleged upstream subsidy, Commerce did not cite those determinations because they involved the investigations of an upstream subsidy.  The *2017 Administrative Review of Cold Rolled Steel* and the *2017 Administrative Review of Hot-Rolled Steel* are relevant to this Remand Redetermination because they show Commerce investigated and verified the pricing structure between KPX and KEPCO and determined that these electricity prices fully included all generation costs; and, therefore, were consistent with market principles.[175]  These investigations of the pricing between KPX and KEPCO completely addresses the CAFC's remand instructions that Commerce "include KPX's generation costs in its analysis," and further confirms the information on the record of the underlying administrative proceeding at issue here that demonstrates there was no countervailable subsidy related to KPX's pricing of electricity to KEPCO during the POI.

Finally, as we explained in the *Draft Remand*, we would again point out that Nucor did not include KPX as part of its LTAR allegation,[176] nor did Nucor file a new subsidy allegation

---

[174] *See* Nucor Comments at 24.

[175] *See 2017 Administrative Review of Cold Rolled Steel* at 13; *see also 2017Administrative Review of Hot-Rolled Steel* IDM at 13 ("Commerce reviewed and verified:  (1) KPX's methodology used to forecast demand; (2) KPX's methodology to set the system marginal price; (3) the electricity generator's reporting requirements to establish variable and fixed costs; and (4) the underlying methodology to determine the electricity generator's rates of return and the adjusted coefficient.")

[176] Although KPX is referenced in Nucor's allegation on the Provision of Electricity at More Than Adequate Remuneration, no reference was made to KPX in the allegation related to provision of electricity for less than

with respect to the pricing of electricity between KPX and KEPCO.  While Nucor may have submitted follow-up questions to Commerce for the KPX during the investigation, an interested party cannot circumvent the statutory requirement to properly allege a countervailable subsidy by making a request to Commerce to ask questions on "programs" that have not been properly alleged.  When Commerce reviewed the information submitted to the record by the GOK and determined that all of the elements of a countervailable subsidy had not been met, it satisfied the agency's obligations under the regulations to investigate any subsidies discovered during the course of an investigation related to KPX's pricing of electricity to KEPCO.

## VI.    FINAL RESULTS OF REDETERMINATION

In accordance with the CAFC's remand mandate, Commerce has reexamined its benefit analysis and decision to examine only KEPCO's costs for the provision of electricity for LTAR program.  For purposes of these final results, Commerce continues to rely upon the *Final Determination* to determine that the program does not confer a benefit and is not countervailable.  Therefore, the CVD rate for POSCO from the *Final Determination* (*i.e.*, 4.31 percent), for the period of January 1, 2015, through December 31, 2015, will remain unchanged.

7/2/2021

X _____

Signed by: CHRISTIAN MARSH

_____
Christian Marsh
Acting Assistant Secretary
 for Enforcement and Compliance

---

adequate remuneration, which is the subsidy at issue in this Remand Redetermination.  *See* Petition at Volume XV-4- XV-19.