NON-CONFIDENTIAL VERSION

# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| |
|---|
| POSCO, |
|      **Plaintiff,** |
|   and |
| NUCOR CORPORATION, |
|      **Consolidated Plaintiff,** |
|   and |
| ARCELORMITTAL USA LLC, *et al.*, |
|      **Plaintiff-Intervenors,** |
|   v. |
| UNITED STATES, |
|      **Defendant,** |
|   and |
| ARCELORMITTAL USA LLC, *et al.*, |
|      **Defendant-Intervenors.** |

Before: Hon. Gary S. Katzmann,
   Judge

Consol. Court No. 17-00137

<u>NON-CONFIDENTIAL VERSION</u>

Business Proprietary Information
Removed from Page 19

## NUCOR CORPORATION'S COMMENTS IN OPPOSITION TO FINAL RESULTS OF REDETERMINATION PURSUANT TO COURT REMAND

Alan H. Price, Esq.
Christopher B. Weld, Esq.
Adam M. Teslik, Esq.

WILEY REIN LLP
1776 K Street, NW
Washington, DC 20006
(202) 719-7000

*Counsel to Nucor Corporation*

Dated: August 6, 2021

**Consol. Ct. No. 17-00137**                                    NON-CONFIDENTIAL VERSION

## <u>TABLE OF CONTENTS</u>

**Page**

I.      INTRODUCTION ........................................................................................... 1

II.     BACKGROUND ............................................................................................ 1

III.    ARGUMENT .................................................................................................. 4

        A.      Commerce's Remand Results Do Not Comply with the CAFC's
                Holding ...............................................................................................4

                1.      The Remand Results Articulate, But Do Not Properly Apply,
                        a Standard that Would Comply with the Statutory Adequate
                        Remuneration Standard................................................................4

                2.      The Final Determination Was an Analysis of Preferential
                        Rates..............................................................................................6

                3.      The Remand Results Do Not Consider the Actual Costs of
                        Generation and Supply..................................................................9

IV.     CONCLUSION............................................................................................. 20

Consol. Ct. No. 17-00137                              NON-CONFIDENTIAL VERSION

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Maverick Tube Corp. v. United States*,
   273 F. Supp. 3d 1293 (Ct. Int'l Trade 2017) ............................................................7

*Nucor Corp. v. United States*,
   286 F. Supp. 3d 1364 (Ct. Int'l Trade 2018) ..........................................................14

*Nucor Corp. v. United States*,
   927 F.3d 1243 (Fed. Cir. 2019)...........................................................1, 2, 3, 14, 15

*POSCO v. United States*,
   977 F.3d 1369 (Fed. Cir. 2020)............................................................... *passim*

*U.S. Steel Corp. v. United States*,
   33 CIT 1935 (2009) ....................................................................................19

**Regulations**

19 C.F.R. § 351.511 .............................................................................................3

**Administrative Materials**

*Certain Corrosion-Resistant Steel Products from the Republic of Korea*,
   84 Fed. Reg. 11,749 (Dep't Commerce Mar. 28, 2019) ...........................................1

*Certain Corrosion-Resistant Steel Products from the Republic of Korea*,
   81 Fed. Reg. 35,310 (Dep't Commerce June 2, 2016) ...........................................17

*Certain Hot-Rolled Steel Flat Products from the Republic of Korea*,
   81 Fed. Reg. 53,439 (Dep't Commerce Aug. 12, 2016)...........................................17

*Circular Welded Carbon Quality Steel Pipe from the People's Republic of China*,
   73 Fed. Reg. 31,966 (Dep't Commerce June 5, 2008) ...........................................18

*Light-Walled Rectangular Pipe and Tube from the People's Republic of China*,
   73 Fed. Reg. 35,642 (Dep't Commerce June 24, 2008) ...........................................18

*Pure Magnesium and Alloy Magnesium from Canada*,
   57 Fed. Reg. 30,946 (Dep't Commerce July 13, 1992) ........................................6, 8

*Pure Magnesium and Alloy Magnesium from Canada*,
   57 Fed. Reg. 47,619 (Dep't Commerce Oct. 19, 1992) ...........................................8

*Welded Line Pipe from the Republic of Korea*,
   80 Fed. Reg. 61,365 (Dep't Commerce Oct. 13, 2015) ...........................................7

Consol. Ct. No. 17-00137                                    NON-CONFIDENTIAL VERSION

## I.    <u>INTRODUCTION</u>

On behalf of Nucor Corporation ("Nucor"), we respectfully submit the following comments on the Department of Commerce's ("Commerce") Final Results of Redetermination Pursuant to Court Remand Order (July 6, 2021), ECF No. 118 ("Remand Results").

## II.    <u>BACKGROUND</u>

These remand proceedings arise from the decision of the Court of Appeals for the Federal Circuit ("CAFC") in *POSCO v. United States*, 977 F.3d 1369 (Fed. Cir. 2020) ("*POSCO CAFC*"). In *POSCO CAFC*, the court held that Commerce's final determination with respect to the Government of Korea's ("GOK") alleged provision of electricity for less than adequate remuneration ("LTAR") in the countervailing duty investigation of *Certain Cold-Rolled Steel Flat Products from the Republic of Korea*, 81 Fed. Reg. 49,943 (Dep't Commerce July 29, 2016) (final affirm. deter.), was unlawful and unsupported by substantial evidence.  A subsequent appeal before the CAFC regarding a similar determination in *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea*, 82 Fed. Reg. 16,341 (Dep't Commerce Apr. 4, 2017) (final affirm. countervailing duty deter. and final neg. critical circumstances deter.), P.R. 505, and accompanying Issues and Decision Memorandum, P.R. 497 at 25-33 ("Final Determination"), originally on appeal here, was stayed pending the outcome of *POSCO CAFC*.

*POSCO CAFC* was the second case in which the CAFC addressed Commerce's application of the "standard pricing mechanism" analysis to determine whether the GOK provided electricity to Korean steel producers for LTAR.  The first, *Nucor Corp. v. United States*, 927 F.3d 1243 (Fed. Cir. 2019) ("*Nucor CAFC*"), sustained Commerce's final determination in *Certain Corrosion-Resistant Steel Products from the Republic of Korea*, 84 Fed. Reg. 11,749 (Dep't Commerce Mar. 28, 2019) (final results and partial rescission of countervailing duty admin. rev.; 2015-2016).

The *Nucor CAFC* court rejected Commerce's argument that an analysis of "preferential rates" could suffice under the "adequate remuneration" standard in the current statute. *Nucor CAFC*, 927 F.3d at 1249. The court nevertheless sustained Commerce's final determination because it believed that Commerce also took into account "that {the Korea Electric Power Corporation's ('KEPCO')} pricing met familiar standards of cost recovery" and that Nucor showed "no reversible error in Commerce's decision to rely on that combination of facts as sufficient to meet the 'adequate remuneration' standard." *Id.* at 1254. The court's holding was "limit{ed} . . . to saying that Nucor has not supplied a persuasive reason to conclude that Commerce's finding of cost recovery in this case was either legally incorrect or factually unsupported." *Id.* at 1255.

In reaching this holding, the court declined to consider Nucor's argument that Commerce erred in limiting its analysis to the price that KEPCO paid to purchase electricity from wholly owned affiliates through the Korea Power Exchange ("KPX"). *Id.* The court "agree{d} with the Court of International Trade that this argument is in substance a contention that KPX is part of KEPCO as the 'authority' whose prices Commerce had to analyze," and that "Nucor failed to exhaust this argument at the agency level . . . ." *Id.*

In *POSCO CAFC*, however, the court noted that "{t}he government does not raise an exhaustion argument in this case" and "conclude{ed} that Nucor preserved this issue for appeal." *POSCO CAFC*, 977 F.3d at 1377. The court held that "the administrative record does not support Commerce's determination that KEPCO is the only relevant entity for purposes of analyzing costs," and that "it {is} implausible that Commerce adequately investigated Korea's prevailing market condition for electricity without a thorough understanding of the costs associated with generating and acquiring that electricity." *Id.* "Commerce's failure to investigate and include

KPX's generation costs in its analysis" thus "renders its final determination unsupported by substantial evidence." *Id.* at 1378.

In both *Nucor CAFC* and *POSCO CAFC*, the CAFC held that an analysis of preferential rates alone does not comply with the adequate remuneration standard. In *Nucor CAFC*, Commerce defended its determination in part by arguing "that it suffices for compliance with the statutory and regulatory standard . . . that the foreign government authority not be charging the producer at issue 'a preferential rate,'" or a "rate {that} is set by a 'consistent and discernible method' and does not reflect 'price discrimination.'" *Nucor CAFC*, 927 F.3d at 1249. The court rejected this position and held that it was "unreasonable to deem mere lack of discrimination sufficient to establish adequacy of remuneration, as Commerce's broad position does." *Id.* at 1250.

The court reasoned that the statute "convey{s} a familiar notion of payment of an amount that reflects the value of what is being paid for . . . ." *Id.* This meaning applies to each tier of Commerce's adequate remuneration regulation at 19 C.F.R. § 351.511 because it "sensibly treats the three methods as all of a piece," reflecting "competitive-market prices, which . . . are tied to 'fair value.'" *Id.* at 1253. The court explained further that:

> No different conclusion is suggested by the command that adequacy be determined "in relation to prevailing market conditions" . . . . At most it directs attention to any competitive-market prices, as reflected in Commerce's regulation making market prices the primary tool of analysis if available, and to the complex of 'conditions' relevant to assessing prices charged . . . .

*Id.* at 1251. The *POSCO CAFC* court incorporated these holdings of the *Nucor CAFC* court. *POSCO CAFC*, 977 F.3d at 1375.

The CAFC issued its mandate in this appeal on February 18, 2021. Mandate, *POSCO v. United States*, No. 20-1357 (Fed. Cir. Feb. 18, 2021), ECF No. 111. This Court remanded to Commerce for redetermination consistent with *POSCO CAFC*. Scheduling Order (Mar. 16, 2021),

ECF No. 114.  Commerce issued draft remand results on April 6, 2021 and continued to find that the GOK's provision of electricity was not for LTAR and conferred no benefit.  Draft Results of Redetermination Pursuant to Ct. Remand (Apr. 6, 2021), P.R.R. 1 ("Draft Remand Results").  Nucor filed comments on the draft results on April 13, 2021, arguing that Commerce failed to address the holdings in *POSCO CAFC* and that the Draft Remand Results remained unlawful and unsupported by substantial evidence.  Letter from Wiley Rein LLP to Sec'y Commerce, re: *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea: Comments on Draft Remand Results* (Apr. 13, 2021), P.R.R. 2.  Commerce filed the Remand Results on July 6, 2021.  In the Remand Results, Commerce again determined that the GOK's provision of electricity was not for LTAR and, thus, did not confer a benefit.

## III.  ARGUMENT

### A.  Commerce's Remand Results Do Not Comply with the CAFC's Holding

#### 1.  The Remand Results Articulate, But Do Not Properly Apply, a Standard that Would Comply with the Statutory Adequate Remuneration Standard

In responding to Nucor's comments, the Remand Results articulate a tier-three methodology that would comply with the adequate remuneration standard if properly applied.  In the Remand Results, Commerce explains that "{w}e do not disagree that 'cost recovery' is a vital part of an adequacy of remuneration analysis.  In fact, our analysis under the standard methodology is 'cost recovery' plus 'a return on investment or profit.'"  Remand Results at 27.  "In other words," Commerce explains,

> if the tariff charged to the respondent does not cover "cost of production" plus "a profitable return on the investment," . . . then the respondent has received a countervailable benefit under section 771(5)(E) of the Act.  Moreover, even in the event that the tariff charged to the respondent covers "costs of production" plus "a profitable return on the investment," there is still a countervailable benefit

conferred under the statute if {the government supplier} charges the respondent less than what {they} should be charged . . . .

*Id.* at 30.

Nucor agrees that this methodology, as stated, would apply the tier-three benchmark regulation in a manner that is consistent with the requirements of the adequate remuneration standard. A government price that covers the cost of production and supply, plus an appropriate amount for profit, and that is not otherwise less than the respondent should be charged, would be consistent with market principles and thus lawful under the post-Uruguay Round Agreements Act statute. It would address the CAFC's holdings, and it would be consistent with Nucor's position before the agency. *See, e.g.*, Letter from Wiley Rein LLP to Sec'y Commerce, re: *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea: Case Brief of Nucor Corporation* (Jan. 18, 2017), C.R. 479, P.R. 481 at 12-14 ("Nucor Case Brief") (arguing that the statute requires a "market based" benchmark price and that a price below the cost of production would not satisfy that requirement).

However, the Remand Results do not apply this standard in accordance with *POSCO CAFC*. First, the agency did not apply it in the original Final Determination, as the Remand Results suggest. Asserting that the legal standard applied in the Final Determination was correct is therefore insufficient. Second, the Remand Results do not address the CAFC's holdings regarding the flaws in the Final Determination's cost analysis because they do not consider the actual costs of generation and supply. Finally, any additional cost-plus-profit analysis in the Remand Results considers KEPCO as a whole and the broader tariff class applicable to the respondents. Commerce has not determined whether prices actually paid by the respondents covered cost plus profit.

### 2.    The Final Determination Was an Analysis of Preferential Rates

The Remand Results suggest that the Final Determination relied on the standard noted above.  According to the Remand Results, "consistent with the prevailing market conditions in Korea, Commerce analyzed whether KEPCO's tariff rates covered its costs plus a return on investment," Remand Results at 11, and then considered whether the respondents were charged the appropriate rate under the tariff schedule for their consumption characteristics.  *Id.* at 14-15.  *See also id.* at 30-31.  Commerce references the rule that the Final Determination drew from the 1992 investigation of *Magnesium from Canada – i.e.*, "if the rate charged is consistent with the standard pricing mechanism and the company under investigation is, in all other respects, essentially treated no differently than other companies which purchase comparable amounts of electricity, then there is no benefit" – and asserts that this "was, in fact, not the basis for Commerce's adequacy of remuneration analysis."  *Id.* at 9-10.  According to the agency, Commerce instead "rel{ied} on . . . the fact that KEPCO fully covered its costs in the industrial rates charged to the respondent steel companies."  *Id.* at 10.

The Final Determination, however, relied on the standard pricing mechanism analysis drawn from *Magnesium from Canada*, where Commerce explained that its "definition of pr∢ference does not require that all users pay identical prices.  In the case of electricity, where users can be categorized according to different use characteristics, a finding of no pr∢ference requires that similarly situated users pay the same rate."  *Pure Magnesium and Alloy Magnesium from Canada*, 57 Fed. Reg. 30,946, 30,954 (Dep't Commerce July 13, 1992) (final affirm. countervailing duty deters.) ("*Magnesium from Canada*") (emphasis added).  Commerce found that "{i}f the rate charged is consistent with the standard pricing mechanism and the company under investigation is, in all other respects, essentially treated no differently than other industries

which purchase comparable amounts of electricity, we would probably not find a countervailable subsidy." *Id.* at 30,950.

This is the rule that Commerce relied upon in the Final Determination.   Commerce explained that "{i}f the rate charged is consistent with the standard pricing mechanism and the company under investigation is, in all other respects, essentially treated no differently than other companies and industries which purchase comparable amounts of electricity, then there is no benefit." Final Determination at 29.  It emphasized that a finding of this nature "is *sufficient* to support a finding that no benefit is conferred{,}" and that the "argument . . . that a *preferentiality* analysis cannot be *sufficient* to assess adequate remuneration is mistaken." *Id.* at 30-31 (emphasis added).  The agency thus concluded that "this program provides no benefit to POSCO because the prices charged to POSCO under the applicable industrial tariff {rate} were consistent with KEPCO's standard pricing mechanism." *Id.* at 29.  Commerce applied the same test and reached the same conclusion in *Welded Line Pipe from Korea*, where no cost recovery finding was made. *See* Issues and Decision Memorandum accompanying *Welded Line Pipe from the Republic of Korea*, 80 Fed. Reg. 61,365 (Dep't Commerce Oct. 13, 2015) (final neg. countervailing duty deter.) at 17-18.  *See also Maverick Tube Corp. v. United States*, 273 F. Supp. 3d 1293, 1310 (Ct. Int'l Trade 2017).

The one-sentence observation that "KEPCO more than fully covered its cost for the industry tariff applicable to our respondents," Final Determination at 33, was not a "comprehensive analysis of KEPCO's costs . . . ." Remand Results at 13.  It was an off-handed aside at the end of an extended argument disclaiming any obligation to consider cost recovery at all.   Final Determination at 31-33.  The assertion that Commerce relied on "the fact that KEPCO fully

covered its costs in the industrial rates charged to the respondent steel companies" mischaracterizes the Final Determination.  Remand Results at 10.

Commerce's similar attempt to present the *Magnesium from Canada* analysis as one of adequate remuneration created under the preferential rates framework does not remedy the Final Determination's flaws.  *See id.* at 25-26.  According to the agency, in *Magnesium from Canada*, "Commerce examined the government-owned utility company's price setting mechanism and determined that one of the guiding principles in the setting of the utility company's rates is that . . . the rates must reflect the costs of supply associated with each of its various rate categories."  *Id.* at 26.  As a result, "the current methodology involving the standard pricing mechanism was developed as a distinct and separate methodology from the previous preferentiality methodology."  *Id.*

The benefit determination in *Magnesium from Canada*, however, did not turn on whether the prices paid by the respondent covered the government supplier's costs plus a reasonable amount for profit.  Rather, it turned on whether "over the life of the {respondent's} contract, one could reasonably expect that the price charged would yield a revenue stream consistent with the power company's standard pricing mechanism for purchasers of comparable quantities of electricity."  *Magnesium from Canada*, 57 Fed. Reg. at 30,950.  In the changed circumstances review, Commerce found no benefit under the respondent-specific contract because "the revenue Hydro Quebec can expect to receive under the amended contract is consistent with rate of return and rate setting principles" applicable to all users.  *Pure Magnesium and Alloy Magnesium from Canada*, 57 Fed. Reg. 47,619 (Dep't Commerce Oct. 19, 1992) (prelim. results of changed circumstances admin. revs.).  The agency found that the rate was not preferential because the respondent was paying the same amount as other users over the life of the contract, not because

that amount reflected the fair market value of the input and the supplier's costs plus a reasonable rate of profit. *See* Def.'s Resp. to Pls.' Mots. For J. Upon the Agency R. (Mar. 23, 2018), ECF No. 52 at 13-14 ("Def. Resp. Br.") (noting that *Magnesium from Canada* turned on whether "the contracts negotiated with these 14 companies would provide the state-owned utility company the full projected revenue that it would have earned had it charged these companies the general industrial rates," and that, "{a}pplying that test, Commerce found no evidence that POSCO was treated differently from other industrial users . . . .").

Likewise, in the Final Determination here, Commerce found no benefit because (i) the respondents' rates were consistent with KEPCO's standard pricing mechanism and (ii) the respondents were otherwise treated no differently than similarly situated users. Commerce did not find that there was no benefit because the rates that the respondents paid were cost-plus-profit prices and were not otherwise lower than what they should have paid. As discussed below, the agency has yet to examine the prices actually paid by the respondents at all.

Even if the court agrees with the agency's characterization of the "standard pricing mechanism" analysis as requiring that the government supplier charge a price that covers costs and amount for profit, Commerce did not comply with the CAFC's holdings regarding a proper analysis of costs in this case.

### 3.     The Remand Results Do Not Consider the Actual Costs of Generation and Supply

In the underlying investigation, Nucor argued that "{t}he operations of the KPX, as the entity that determines the wholesale price on which KEPCO's costs and thus its retail prices are based, deserves careful scrutiny in the final determination." Nucor Case Brief at 17. Nucor pointed out that the KPX's role in the market included a "'policy making' function," and that the

KPX was "closely supervised and controlled by the" Korean government. *Id.* at 18. Nucor also argued that Commerce could not simply take the price that KEPCO paid to purchase electricity through the KPX as representing actual costs because the KPX Cost Evaluation Committee determined the values of each variable in the formula used to establish that price. *Id.* at 18-19. Commerce, however, did not look beyond KEPCO's purchase price through the KPX because KEPCO's "costs for electricity are based upon the purchase price of electricity from the KPX, and this is the cost that is relevant for KEPCO's industrial tariff schedule." Final Determination at 32.

In *POSCO CAFC*, the CAFC remanded this aspect of Commerce's findings. It held that "Commerce's failure to investigate and include KPX's generation costs in its analysis renders its final determination unsupported by substantial evidence." *POSCO CAFC*, 977 F.3d at 1378. The court rejected Commerce's argument that "{n}othing in the statute requires Commerce to consider how the authority acquired the good or service that was later provided to respondents." *Id.* at 1377. The court pointed to three provisions of the statute that require Commerce to expand its findings beyond the "limited analysis" of KEPCO's cost of purchasing electricity. *Id.* at 1376-78.

First, the court said, "Commerce has an affirmative duty to investigate any appearance of subsidies related to the investigation that are discovered during an investigation." *Id.* at 1378. Second, "Section 1677(5) requires Commerce to evaluate subsidies 'without regard to whether the subsidy is provided directly or indirectly on the manufacture, production, or export of merchandise' . . . ." *Id.* Third, the statute "requires Commerce to consider the adequacy of remuneration 'in relation to prevailing market conditions.'" *Id.*

The Remand Results do not remedy the Final Determination's flaws with respect to the KPX and the true costs of generating and supplying electricity.

      a.      **The Remand Results Unlawfully Construe the "Prevailing Market Conditions" as Limited to KEPCO's Pricing Methodology**

The CAFC held that that "it {is} implausible that Commerce adequately investigated Korea's prevailing market condition for electricity without *a thorough understanding of the costs associated with generating and acquiring that electricity*." *Id.* at 1377 (emphasis added). In an investigation of the Korean electricity market, in other words, Commerce must view the "prevailing market conditions" broadly enough to encompass the market through which "all electricity generated in Korea must be sold . . . ." *Id.* In an investigation of how electricity prices are established in the Korean market, the "prevailing market conditions" must be broad enough to encompass the entity "with responsibilities for setting the price of electricity . . . {in} the electricity market in Korea." Letter from Yoon & Yang LLC to Sec'y Commerce, re: *Countervailing Duty Investigation of Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea: Response* (July 15, 2016), C.R. 151-222, P.R. 184-239, at Exhibit E-3, p. 30 ("GOK Questionnaire Response").

The Remand Results are thus unlawful inasmuch as they treat the "prevailing market conditions" in the Korean electricity market as coextensive with KEPCO's rate setting methodology. According to the Remand Results, KEPCO's "method of establishing different tariff classifications based upon price, marketability, transportation and other conditions of purchase or sale constitutes prevailing market conditions within the meaning of section 771(5)(E)(iv) of the Act." Remand Results at 11. The Remand Results add that KEPCO's "{t}ariff classifications delineated by electricity contract demand, voltage, usage pattern of electricity, and volume of electricity consumed all fall within the statutory definition of adequate remuneration . . . which states that 'prevailing market conditions include price, quality, availability,

11

marketability, transportation and other conditions of purchase or sale.'" *Id.* at 14.  Commerce thus "analyzed whether the price charged to the respondents was consistent with market principles and prevailing market conditions in Korea in the form of the tariff classifications established by KEPCO." *Id.* at 13.

The Remand Results effectively treat the "prevailing market conditions" in Korea as coextensive with "the tariff classifications established by KEPCO" and do not properly consider additional information regarding the KPX or actual generation costs.  Instead, they assert that certain questions posed to the GOK in the initial questionnaire were sufficient to address the *POSCO CAFC* court's holdings.  *See id.* at 16-17.  These questions, however, were limited to requesting information regarding KEPCO's cost of purchasing electricity through the KPX.  The first question asked the Korean government whether "the price paid {by KEPCO} is . . . sufficient to cover all the costs including the amount of investment return," while the second related to the "adjusted coefficient," which adjusts the prices that KEPCO pays and does not determine the actual costs of generating electricity.  *Id.*

The *POSCO CAFC* court was aware that Commerce requested this information regarding KEPCO's costs of purchasing electricity through the KPX.  *POSCO CAFC*, 977 F.3d at 1377-78. It held that this was insufficient given the structure of the transactions and the nature of the relationships among KEPCO, the KPX, and KEPCO's generation subsidiaries.  *Id.*  The Korean government's responses to those questions do not address the evidentiary deficiencies underlying the *POSCO CAFC* court's holdings.  With respect to cost recovery, the Korean government simply asserted that "the price {KEPCO} paid to the six subsidiaries was sufficient to cover all the costs including the amount of investment return."  GOK Questionnaire Response at 25.  The Korean

government provided neither data to support this claim, nor any reference to prices actually paid by the respondents.

In its comments on the Korean government's questionnaire response, Nucor pointed out that Commerce could not simply assume that the GOK's response was accurate. Nucor commented that "{t}he operations of the KPX, as the entity that determines the wholesale price on which KEPCO's costs and thus its retail prices are based, should be at the heart of {Commerce's} investigation." Letter from Wiley Rein LLP to Sec'y Commerce, re: *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea: Comments on the Government of Korea's Initial Questionnaire Response* (Aug. 3, 2016), C.R. 291-293, P.R. 278-280, at 3. Nucor requested that Commerce "require the GOK to support {its} statement by providing a thorough explanation, with underlying data, of how the KPX mechanism operates to ensure that generators of all types cover their costs and otherwise ensure that electricity prices are consistent with market principles." *Id.* at 3-4. Nucor pointed to record evidence that the KPX mechanism systematically undercompensated generators and asked Commerce to request data and explanation regarding the establishment of the elements of the KPX pricing formula. *Id.* at 4-9. None of Nucor's suggested questions were incorporated into the supplemental questionnaires. *See Final Determination* at 32 (explaining that Commerce "did not request these costs . . . ."). In its Case Brief, Nucor again emphasized the importance of the KPX and provided detailed discussion of record evidence that KEPCO's cost of acquisition through the KPX *did not* reflect the full cost of generation, even based on costs assigned by the Cost Evaluation Committee. Nucor Case Brief at 19-22.

On appeal, the CAFC held Commerce's treatment of the KPX as irrelevant, and its failure to adequately investigate the KPX's role in the market, constituted reversible error because it is

"implausible that Commerce adequately investigated Korea's prevailing market condition for electricity without a thorough understanding of the costs associated with generating and acquiring that electricity."  *POSCO CAFC*, 977 F.3d at 1377.  Because the Remand Results include no additional information or analysis confirming whether the KPX pricing mechanism reflects the actual costs of generating and supplying electricity, they fail to address this aspect of the CAFC's holdings.

### b.       The Remand Results Fail to Consider the KPX and Electricity Generators as Part of the Relevant Authority

The CAFC also held that Commerce erred by ignoring evidence that the KPX was itself an "authority" relevant to the investigation.  *Id.* at 1378.  This aspect of the court's opinion should be read in the context of Commerce's arguments and the court's holdings in *Nucor CAFC*.  Before the Court of International Trade ("CIT") in *Nucor Corp. v. United States*, Commerce "argued that Nucor and Plaintiff-Intervenors did not raise at the agency level the argument that, because the KPX was owned by KEPCO, the KPX should be considered *part of the relevant authority*."  *Nucor Corp. v. United States*, 286 F. Supp. 3d 1364, 1377 (Ct. Int'l Trade 2018) (emphasis added).  The CIT agreed with Commerce and held that Nucor "did not argue at the agency level that, as a result of the corporate ownership structure, KPX should be treated *as part of the relevant authority*."  *Id.* (emphasis added).

Nucor challenged this holding in *Nucor CAFC*.  The *Nucor CAFC* majority, however, concurred with the CIT.  *Nucor CAFC*, 927 F.3d at 1255-56.  In dissent, Judge Reyna disagreed, finding that "Nucor's arguments as to the relevance of KPX's costs and its role in providing a subsidy could hardly have been more explicit.  Absent expressly using the word 'authority' in describing KPX, Nucor did more than enough to raise these issues before Commerce; it made

persuasive arguments." *Id.* at 1261 (Reyna, J., dissenting).  The exhaustion ruling was "a mere semantic formality . . . that deprive{d} Nucor of its day in court . . . ." *Id.*  Writing for the court in *POSCO CAFC*, Judge Reyna noted that there were no exhaustion issues and held that Commerce erred, in part because it did not consider whether the KPX was an "authority" by virtue of its position within KEPCO's corporate structure.  *POSCO CAFC*, 977 F.3d at 1378.

The Remand Results attempt to transform this holding into an upstream subsidy issue.  *See* Remand Results at 17.  No upstream subsidy allegation was made during the investigation, and no such arguments were raised on appeal.  The Remand Results suggest that Commerce has never disputed the KPX's "authority" status and attempt to justify the Final Determination's treatment of the KPX as irrelevant because there was purportedly "no information on the record to support the conclusion that KPX's pricing of electricity provided a benefit as both defined and required by the statute." *Id.* at 8-9.  As a result, "Commerce did not initiate an investigation on the pricing of electricity between KPX and KEPCO . . . ." *Id.* at 8.  *See also id.* at 18-19 (discussing upstream subsidy determinations in subsequent administrative reviews of different countervailing duty orders).

This reasoning is irrelevant to the CAFC's holdings.  The question is not whether Commerce improperly declined to initiate an upstream subsidy investigation.  The question is whether Commerce improperly treated the KPX as irrelevant in investigating whether KEPCO's prices conferred a benefit to the respondents.  Commerce's upstream subsidy findings in subsequent administrative reviews of different countervailing duty orders are inapposite.

Commerce argued before the CIT and CAFC in the *Nucor* appeals that its decision was justified because Nucor did not properly argue that the KPX was *a part of KEPCO* the "authority," and the courts declined to consider Nucor's arguments based on this defense.  The Remand Results

now reverse course and concede that the KPX is, and apparently always has been, part of KEPCO the "authority" for the purpose of Commerce's analysis.  The KPX is thus an integral part of the "authority" under investigation, and its role in that authority's price-setting process must be thoroughly examined in accordance with the CAFC's holdings in *POSCO CAFC*.

### c.    KEPCO's POI Cost Data Is Not on the Record

In its Case Brief before the agency, Nucor pointed out that the period of investigation ("POI") data on which the agency had previously relied for its purported cost recovery finding was not on the record of the underlying investigation.  Nucor Case Brief at 22.  In its Response Brief before the Court in the original proceedings in this appeal, however, Defendant asserted that "{t}he government of Korea further provided KEPCO's calculation of electricity costs, as well as data showing KEPCO's cost and investment return pertaining to the period of investigation for the industrial users of electricity."  Def. Resp. Br. at 12.  Nucor thus explained, again, that this data was not, in fact, on the record of the investigation.  Reply of Consol. Pl. Nucor Corp. and Consol. Pl.-Intervenors ArcelorMittal USA LLC and SSAB Enterprises LLC to the Resp. Brs. of Def. United States and Consol. Def.-Intervenor POSCO (May 4, 2018), ECF No. 64 at 7-8.  In the Draft Remand Results, Commerce nevertheless pointed to the same finding in the original decision memorandum to assert that the Final Determination relied on "the fact that KEPCO fully covered its costs in the industrial rates charged to the respondent steel companies."  Draft Remand Results at 10.  In its comments on the Draft Remand Results, Nucor thus pointed out, once again, that the data supposedly underlying this determination *is not on the record* here.  Letter from Wiley Rein LLP to Sec'y Commerce, re: *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea: Comments on Draft Remand Results* (Apr. 13, 2021), P.R.R. 2 at 21-22.

In the Remand Results, Commerce finally acknowledges that KEPCO's POI cost data is not on the record of the investigation, but the agency asserts that "the fact the GOK was unable to provide KEPCO's POI cost data does not invalidate our cost analysis." Remand Results at 44. Rather, Commerce relied on pre-POI cost data from 2014 and an assessment of KEPCO's POI Form 20-F to determine that "the cost data methodology and the KEPCO overall electricity costs, taken together, strongly indicate that the industrial classification recovered costs and a rate of return during the POI." *Id.* at 35-36.

This finding is arbitrary. In a series of investigations prior to this one in which the agency considered the Korean government's provision of electricity for LTAR, it rejected arguments based on information in a pre-POI Korean government analysis of industrial electricity rates because the information predated the POI. Issues and Decision Memorandum accompanying *Certain Corrosion-Resistant Steel Products from the Republic of Korea*, 81 Fed. Reg. 35,310 (Dep't Commerce June 2, 2016) (final affirm. countervailing duty deter., and final affirm. critical circumstances deter., in part) at 23-24; Issues and Decision Memorandum accompanying *Certain Cold-Rolled Steel Flat Products from the Republic of Korea*, 81 Fed. Reg. 49,943 (Dep't Commerce July 29, 2016) (final affirm. countervailing duty deter.) at 50-51; Issues and Decision Memorandum accompanying *Certain Hot-Rolled Steel Flat Products from the Republic of Korea*, 81 Fed. Reg. 53,439 (Dep't Commerce Aug. 12, 2016) (final affirm. countervailing duty deter.) at 50. Here, Defendant argued that "{t}he main reason" Commerce rejected this information "was that the report concerned data outside of the period of investigation," and that this "alone negated its usability . . . ." Def. Resp. Br. at 14-15.

Whereas the agency treated information undermining its determination as fatally flawed because it pre-dated the POI, it has now attempted to rely on pre-POI information that it believes supports its determination.  The Remand Results are thus arbitrary and unsupported by the record.

> **d.      Any  Additional  Cost  Analysis  in  the  Remand  Results Unlawfully Considers Only KEPCO in the Aggregate**

To the extent that the Remand Results attempt to cite additional evidence that KEPCO's prices to the respondents reflect the full cost of generation and supply plus an amount for profit, they  do  so  only  with  respect  to  KEPCO  in  the  aggregate.  *See*  Remand  Results  at  42-43. Referencing KEPCO's Form 20-F for the POI, the Remand Results find that "the KPX unit price more than covered the fuel costs for each of these generators," that "KEPCO, as a consolidated entity,  was  profitable,"  and  that  "KEPCO's  generation  subsidiar{ies}  {were}  profitable  in 2015 . . . ." *Id.*

A finding that KEPCO or KEPCO's generation subsidiaries were profitable on all sales to all  users  does  not  support  a  determination  that  KEPCO's  prices  to  the  respondents  reflected adequate  remuneration.    Commerce  has  previously  rejected  arguments  that  a  government supplier's  overall  profitability  suggests  that  prices  to  the  respondents  represent  adequate remuneration.  *See, e.g.*, Issues and Decision Memorandum accompanying *Circular Welded Carbon Quality Steel Pipe from the People's Republic of China*, 73 Fed. Reg. 31,966 (Dep't Commerce June 5, 2008) (final affirm. countervailing duty deter. and final affirm. deter. of critical circumstances) at 65 ("{W}e agree with Petitioners{} . . . that the profitability of Chinese HRS producers is not relevant to the determination of whether HRS was sold for LTAR."); Issues and Decision  Memorandum  accompanying  *Light-Walled  Rectangular  Pipe  and  Tube  from  the People's Republic of China*, 73 Fed. Reg. 35,642 (Dep't Commerce June 24, 2008) (final affirm.

**Business Proprietary Information Has Been Deleted**

countervailing duty investigation deter.) at 36 ("{T}he profitability of SOE HRS producers . . . is not relevant to the determination of whether HRS was sold for LTAR."). The CIT has also rejected such arguments. *U.S. Steel Corp. v. United States*, 33 CIT 1935, 1944 n.10 (2009) ("The overall profitability of the NMDC does not demonstrate that its prices to Essar are market-based.").

Nucor argued during the original investigation that KEPCO's pricing structure creates "*de facto* cross-subsidization in favor of large, industrial consumers that can and do consume substantial amounts of electricity during the off-peak hours," like the mandatory respondents in the investigation. Nucor Case Brief at 20. Nucor showed that the respondents purchased electricity [                                        ], when [

                        ]. *See id.* at 20-21; Letter from Morris, Manning & Martin LLP to Sec'y Commerce, re: *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea, Case No. C-580-888: Initial Questionnaire Response* (July 13, 2016), C.R. 106-150, P.R. 168-183, at Exhibit A-2 (showing [

            ]). Nucor pointed out that "{t}hese prices are [

                        ]. Nucor Case Brief at 21. *See also* Remand Results at 42-43 n.165 (showing that the lowest cost generator sold electricity through the KPX at a unit price of KRW 62.61).[1]

Whether KEPCO or its generation subsidiaries in the aggregate were profitable ignores this dynamic and is irrelevant to KEPCO's subsidization of the respondents under investigation. In an adequate remuneration analysis, Commerce may not simply ignore the prices that the respondents

---

[1]        As noted above, these prices through the KPX are established by costs assigned to generators by the Cost Evaluation Committee and thus do not represent the *actual costs* of generating and supplying electricity.

actually paid for the input under consideration and rely on the government supplier's overall financial performance based on all sales to all customers.  As discussed above, regardless of the regulatory "tier" under which the analysis is performed, Commerce must determine whether the prices paid by the respondent reflect the fair value of the input under competitive market conditions.

The Remand Results thus do not comply with the holdings of *POSCO CAFC* because they do not determine whether the prices paid by the respondents reflected the actual costs of generating and supplying electricity, plus a reasonable amount for profit.

## IV.   **CONCLUSION**

For these reasons, Nucor respectfully requests that the Court find that Commerce's Remand Results remain unlawful and unsupported by substantial evidence and remand for the agency to comply with the holdings of *POSCO CAFC*.

Respectfully submitted,

*/s/ Christopher B. Weld*
Alan H. Price, Esq.
Christopher B. Weld, Esq.
Adam M. Teslik, Esq.

**WILEY REIN LLP**
1776 K Street, NW
Washington, DC 20006
(202) 719-7000

*Counsel to Nucor Corporation*

Dated: August 6, 2021

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Chamber Procedure 2(B)(l), the undersigned certifies that these comments comply with the word limitation requirement.  The word count for Nucor Corporation's Comments in Opposition to Final Results of Redetermination Pursuant to Court Remand, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2019), is 5,947 words.


  */s/ Christopher B. Weld*
(Signature of Attorney)

  Christopher B. Weld
(Name of Attorney)

  Nucor Corporation
(Representative Of)

  August 6, 2021
(Date)