## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE GARY S. KATZMANN, JUDGE

| | |
|---|---|
| POSCO, | ) |
| Plaintiff, | ) |
| and | ) |
| NUCOR CORPORATION, | ) |
| Consolidated Plaintiff, | ) |
| and | ) |
| ARCELORMITTAL USA LLC, *et al.,* | )    Consol. Court No. 17-00137 |
| Plaintiff-Intervenors | ) |
| v. | ) |
| UNITED STATES, | ) |
| Defendant, | ) |
| and | ) |
| ARCELORMITTAL USA LLC, *et al.,* | ) |
| Defendant-Intervenors. | ) |

## <u>JUDGMENT ORDER</u>

Upon consideration of the plaintiffs' comments regarding the remand redetermination, defendant's response thereto, and all other pertinent papers, it is hereby

ORDERED that the remand redetermination is sustained in its entirety; and it is

FURTHER ORDERED that final judgment shall enter in favor of the United States.

_____
Judge

Dated: _____
     New York, New York

**UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:  THE HONORABLE GARY S. KATZMANN, JUDGE

| | |
|---|---|
| POSCO, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| and | ) |
| | ) |
| NUCOR CORPORATION, | ) |
| | ) |
| Consolidated Plaintiff, | ) |
| | ) |
| and | ) |
| | ) |
| ARCELORMITTAL USA LLC, *et al.,* | )   Consol. Court No. 17-00137 |
| | ) |
| Plaintiff-Intervenors | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES, | ) |
| | ) |
| Defendant, | ) |
| | ) |
| and | ) |
| | ) |
| ARCELORMITTAL USA LLC, *et al.*, | ) |
| | ) |
| Defendant-Intervenors. | ) |

**DEFENDANT'S RESPONSE TO COMMENTS
ON FINAL RESUTLS OF REDETERMINATION**

Defendant, the United States, respectfully submits this response to comments filed by

defendant-intervenor Nucor Corporation (Nucor), Nucor Remand Cmts., on August 6, 2021

(ECF No. 121), regarding the Department of Commerce's remand redetermination, Final Results

of Redetermination Pursuant to Court Remand Order, dated July 6, 2021 (Remand

Redetermination) (ECF No. 118).  Commerce issued its remand redetermination consistent with

the opinion of the United States Court of Appeals for the Federal Circuit in *POSCO v. United States*, 977 F.3d 1369 (Fed. Cir. 2020) (*POSCO II*), as directed by this Court.  For the reasons set forth below, we respectfully request that the Court sustain the remand redetermination and enter final judgment in favor of the United States because Commerce has fully complied with the Federal Circuit's mandate and because the remand redetermination is supported by substantial evidence and otherwise in accordance with law.

## BACKGROUND

In 2017, Commerce issued its final determination in the countervailing duty investigation of certain carbon and alloy steel cut-to-length plate from the Republic of Korea.  *Certain Carbon and Alloy Steel Cut-To-Length Plate from the Republic of Korea: Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination*, 82 Fed. Reg. 16,341 (Dep't of Commerce April 4, 2017) (final determin.), P.D. 505, and accompanying Issues and Decision Memorandum, P.D. 497.  For the provision of electricity for less-than-adequate remuneration (LTAR) program, Commerce addressed parties' comments, relied on its preliminary findings, and continued to determine that the program did not confer a benefit and was not countervailable.

This Court sustained Commerce's final determination, holding that Commerce's determinations concerning the provision of electricity for less-than-adequate remuneration were supported by substantial evidence and otherwise in accordance with law.  *See POSCO v. United States,* 353 F. Supp. 3d 1357 (Ct. Int'l Trade 2018) (*POSCO CTL*).  Nucor appealed the judgment, and the appeal was stayed pending the Federal Circuit's final and conclusive decision in *POSCO II*.

On October 15, 2020, the Federal Circuit issued its opinion and order in *POSCO II*, holding that Commerce's benefit analysis and its failure to investigate the role of KPX in the Korean electricity market were unlawful and unsupported by substantial evidence. *POSCO II*, 977 F.3d at 1376. Following *POSCO II*, Nucor moved the Federal Circuit to vacate this Court's judgment. On February 18, 2021, the Federal Circuit vacated this Court's judgment and remanded the matter for further proceedings consistent with *POSCO II*. In turn, this Court remanded the determination to Commerce, directing it to address *POSCO II*. Remand Scheduling Order dated March 16, 2021 (ECF No. 114).

In its draft remand redetermination, Commerce continued to find that the government of Korea's (GOK) provision of electricity to the respondents was not for less-than-adequate remuneration and thus conferred no benefit. Remand P.R. 1. In its comments on the draft remand redetermination, Nucor argued that Commerce had failed to address *POSCO II* and that the draft remand redetermination was not in accordance with law. Nucor Draft Remand Comments, (Remand P.R. 2). In the final remand redetermination, Commerce continued to determine that the GOK's provision of electricity was not for less-than-adequate remuneration and thus did not confer a benefit. *See* Remand Redetermination at 46.

## ARGUMENT

### I. Standard Of Review

In remand proceedings, the Court will sustain Commerce's determinations if they are "in accordance with the remand order" and are "supported by substantial evidence, and are otherwise in accordance with law." *See MacLean-Fogg Co. v. United States*, 100 F. Supp. 3d 1349, 1355 (Ct. Int'l Trade 2015) (citing 19 U.S.C. § 1516a(b)(1)(B)(i)). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).  Under this standard, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) (citations omitted).  Instead, when, as here, Congress has entrusted an agency to administer a statute that demands inherently fact-intensive inquiries, Commerce's conclusions may be set aside only if the record contains evidence "so compelling that no reasonable factfinder" could reach the same conclusion.  *See I.N.S. v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992).

## II.    The Remand Redetermination Complies With The Federal Circuit's Mandate, Is Supported By Substantial Evidence, And Is Otherwise In Accordance With Law

In vacating and remanding Commerce's analysis as to whether KEPCO had provided electricity to the respondents for less-than-adequate remuneration during the period of investigation in *POSCO II*, the Federal Circuit held that Commerce had unlawfully relied on a preferential price analysis rather than the statutorily-mandated analysis set forth in 19 U.S.C. § 1677(5)(E)(iv).  977 F.3d at 1376.  Although the Federal Circuit acknowledged that Commerce had considered KEPCO's overall cost, including its operational cost for generating and supplying electricity, the Court nonetheless held that Commerce's analysis ultimately relied upon whether respondents had received preferential treatment.  *POSCO II*, 977 F.3d at 1376.  The Federal Circuit further held that Commerce had failed to account for KPX's role in the electricity market as a part of its less-than-adequate remuneration analysis.  *Id.*

On remand, Commerce thoroughly explained its benefit analysis and clarified that its less-than-adequate remuneration analysis is a multifaceted analysis of "fair-market principles" used to determine whether KEPCO had charged a tariff to the respondent that covers "cost of production" plus "a profitable return on the investment."  Remand Redetermination at 14-16, 30-

6

36.  Commerce also cited additional evidence regarding KPX's role in the electricity market, as well as the cost of generating electricity, to demonstrate that its analysis accounted for KPX's role in the electricity market.  *Id.* at 16-17, 41-44.  By explaining how its remand redetermination is based on an analysis of fair-market principles, rather than a preferentiality standard, Commerce complied with *POSCO II.*

### A. Commerce's Less-Than-Adequate Remuneration Analysis Is Based On A Determination Of Whether KEPCO Recovered Cost Of Production Plus A Return On Investment And Is In Accordance With The Statute

Nucor argues that Commerce did not apply the "cost plus a return on investment" standard in either the final determination or in the remand redetermination.  Nucor Cmts. at 4-9.  Nucor ignores the thorough explanation set forth in the remand redetermination that details how Commerce performed its less-than-adequate remuneration analysis regarding electricity in Korea.  First, in determining whether electricity has been provided for less-than-adequate remuneration, Commerce examined whether the tariff charged to the respondent covers "cost of production" plus a "profitable return on the investment."  Remand Redetermination at 13-15, 30-31.  Commerce next examined whether the tariff actually charged to the respondent is in accordance with the tariff established.  *Id.*

As Commerce explained, KEPCO's standard pricing mechanism, which serves as the basis for its tariff schedule and classifications, is based on KEPCO's costs.  *Id.* at 12 (citing IDM at 25-33).  KEPCO calculated the cost for each electricity tariff classification by:  (1) distributing the overall cost according to the stages of providing electricity (generation, transmission, distribution and sales); (2) dividing each cost into fixed cost, variable cost, and the consumer management fee; and (3) then calculating the cost by applying the electricity load level, peak level, and the patterns of consuming electricity.  *Id.*  After distributing each cost into the fixed

charge and the variable charge, KEPCO divided each cost, taking into consideration the electricity load level, the usage pattern of electricity, and the volume of electricity consumed.  *Id.* Costs were then further distributed according to the number of consumers for each classification of electricity.  *Id.*

Commerce, in analyzing the price charged for electricity by KEPCO to the respondents, determined whether the price charged was consistent with market principles and prevailing market conditions in Korea by first analyzing KEPCO's tariff classifications.  *Id.* at 14.  Tariff classifications, including the ones established by KEPCO, which are delineated by electricity contract demand, voltage, usage pattern of electricity, and volume of electricity, are established in a manner that accounts for typical prevailing market conditions such as "price, quality, availability, marketability, transportation, and other conditions of purchase or sale" as described in  § 1677(5)(E).  *Id.*  Because KEPCO considered prevailing market conditions such as those identified in § 1677(5)(E) in establishing its tariff classifications, Commerce determined that KEPCO had developed a tariff schedule that adequately enabled recovery of costs, in addition to obtaining a profitable return on investment.  *Id.* at 14-16.  Thus, Commerce did not treat KEPCO's tariff classifications as "coextensive with" the prevailing market conditions in Korea, as Nucor claims.  *See* Nucor Remand Cmts. at 11-14.  Instead, Commerce determined that KEPCO's tariff classifications were developed *in accordance with* market principles as described in § 1677(5)(E).  *See* Remand Redetermination at 14.

Once Commerce determined that KEPCO had established its tariff classification schedule in accordance with market principles, it further examined under § 1677(5)(E) whether the respondent was actually charged the appropriate tariff rate, in accordance with the criteria set forth in the tariff classifications.  *Id.* at 14-15.  KEPCO, in determining electricity prices for

purchasing companies, differentiated by both contract demand for electricity and by the voltage of electricity distributed, and the costs used for each tariff classification further considered the electricity load level, the usage pattern of electricity, and the volume of energy consumed.  *Id.*

In reviewing the record evidence, Commerce found that the prices charged to respondent companies were in accordance with the tariff classifications applicable to each respondent company as established by KEPCO.  Thus, Commerce ensured that KEPCO had actually recovered its costs plus a return on investment during the period of investigation.  *Id.*  Because KEPCO had established a tariff schedule based on a variety of relevant market conditions for purposes of recovering costs plus a return on investment, as well as charged respondent steel companies electricity rates under the appropriate tariff classification to ensure cost recovery plus a return, Commerce found that KEPCO had recovered its cost plus a profitable return on investment, and therefore no benefit had been conferred in the form of electricity for less-than-adequate remuneration.  *Id.*

In arguing that Commerce had actually used a preferentiality standard, Nucor relies heavily on *Pure Magnesium and Alloy Magnesium from Canada*, 57 Fed. Reg. 30,946 (Dep't of Commerce July 13, 1992) and mischaracterizes Commerce's analysis.  *See* Nucor Remand Cmts. at 6-9.  Nucor takes separate and distinct sentences out of context, mashes them together, and then uses this misleading combination as evidence that Commerce's determination was based on a preferentiality standard.  *See, e.g.,* Nucor Remand Cmts. at 6-7.

As explained at length in the remand redetermination, Commerce cited *Magnesium from Canada* because that is the first case in which Commerce developed an adequacy of remuneration analysis, as an alternative to preferentiality.  *See* Remand Redetermination at 25-26.  That historical case is not the basis for Commerce's contemporaneous remand determination

here, nor did Commerce rely on any preferentiality standard, such as that found in *Magnesium from Canada*, in determining that KEPCO had provided no benefit to respondent companies in the form of the provision of electricity for less-than-adequate remuneration.  *See* Remand Redetermination at 10-16, 25-26, 29-38.  Further, although Commerce cited *Magnesium from Canada*, the final determination here was ultimately based on an analysis under § 1677(5)(E) and a finding that KEPCO had recovered costs of production plus a profitable return on investments. *Id.* at 11-16.  Commerce did not rely on a simple price-to-price comparison to determine whether respondent companies had received preferential treatment, which is what Commerce would have done had it used a preferentiality standard.  Rather, Commerce examined whether KEPCO had established tariff classifications in accordance with market principles, and whether KEPCO had actually charged prices that enabled both recovery of costs and a profitable return on investment. *Id.*

Thus, in further explaining its less-than-adequate remuneration analysis and how it is based on whether KEPCO had recovered the "cost of production" plus a "return on investment" in accordance with fair-market principles, Commerce complied with the mandate in *POSCO II* and did *not* rely on a preferentiality standard in determining whether KEPCO had provided electricity for less-than-adequate remuneration during the period of investigation.

### B. Commerce's Determination That KEPCO Recovered Its Costs In Selling Electricity To The Respondents Is Supported By Substantial Evidence On The Record

Nucor argues that Commerce's reliance on KEPCO's 2014 cost data in the context of KEPCO's 2016 Form 20-F is inconsistent with other determinations made in the *Certain Corrosion-Resistant Steel from Korea* and *Certain Cold-Rolled Steel from Korea* investigations. *See* Nucor Remand Cmts. at 17-18.  According to Nucor, Commerce's conclusion in the remand redetermination is inconsistent with the final determinations in those investigations because it

relies upon data from before the period of investigation, in the form of KEPCO's 2014 cost data. *Id.* In the remand redetermination, Commerce relied on KEPCO's 2014 cost data, KEPCO's overall 2015 electricity cost data, and contemporaneous 2015 data in the form of KEPCO's 2016 Form 20-F, to fill a gap on the record regarding information necessary to establish whether or not the industrial tariff classification recovered its cost with a rate of return. *See* Remand Redetermination at 33-36.

Commerce's approach was reasonable because using KEPCO's 2014 cost data and applying a ratio to KEPCO's overall 2015 electricity cost data alone would not have provided a complete picture of how the underlying factors of the Korean market may influence one industrial tariff classification or another. *Id.* at 34. The GOK stated in its initial questionnaire response that the two key factors impacting whether tariff prices should be adjusted upward (denoting a loss in cost recovery and rate of return) are cost of supplying electricity and volume of electricity consumed. *Id.* at 34, n.128. To examine these factors, Commerce examined 2015 data provided in KEPCO's 2016 Form 20-F. For consumption, the data shows that while the relevant industrial tariff classification slightly increased in demand on a percentage basis, the overall consumption of electricity for that industrial tariff classification also decreased in relation to usage overall. *Id.* at 34. Further, for reported cost data, the KEPCO 2016 Form 20-F indicated that KEPCO's operating profit significantly increased from 2013 to 2015, and further demonstrated that KEPCO reported a decrease in fuel costs in 2015 on a consolidated basis. *Id.* at 35. The data demonstrate that neither of these factors would have resulted in an upward adjustment of tariff rates or, by extension, that cost recovery or a rate of return would have a negative impact on the industrial classification in 2015. *Id.*

Thus, after considering the above, Commerce determined that no factors, such as adjusted tariffs, increased electricity demand, or rising fuel prices, existed that would potentially impact the calculation of the cost recovery and rate of return amount reported for the industrial tariff classifications present in KEPCO's 2014 cost data. *Id.* at 35-36. Commerce further determined that record information established that no changes were made to the tariff calculation methodology applied to calculate the 2015 cost data. *Id.* at 35. Based on this evaluation of data from KEPCO's 2016 Form 20-F, Commerce found that KEPCO's cost data methodology for deriving cost recovery and rate of return on a tariff classification basis (applied in the 2014 cost data) and 2015 overall electricity costs, taken together, strongly indicated that the relevant industrial tariff classification would have recovered costs and a rate of return during the period of investigation. *Id.* at 35 - 36.

This reasoning is consistent with Commerce's determinations in the investigations of *Certain Corrosion-Resistant Steel from Korea* and *Certain Cold-Rolled Steel from Korea*. In the final determinations for both investigations, Commerce found that data prior to the period of investigation was not preferable to contemporaneous cost data already available on the record in the form of KEPCO's 2014 cost data. *See Certain Corrosion-Resistant Steel Products from the Republic of Korea*, 81 Fed. Reg. 35,310 (Dep't of Commerce June 2, 2016), and accompanying Issues and Decision Memorandum at 23-24; *Certain Cold-Rolled Steel Flat Products from the Republic of Korea*, 81 Fed. Reg. 49,943 (Dep't of Commerce July 29, 2016), and accompanying Issues and Decision Memorandum at 50-51. Because the data from before the period of investigation did not fully account for multiple increases in the industrial electricity tariffs that took place between 2012, the date the alternative data were published, and 2014, the period of

investigation for both previous investigations, Commerce found the alternative data not relevant for the purposes of determining adequate remuneration under 19 C.F.R. § 351.511.  *Id.*

Unlike the previous investigations cited by Nucor, KEPCO's specific cost data for the period of investigation related to industrial classifications were not available on the record of this proceeding, and thus Commerce could not have relied entirely on contemporaneous data to determine adequacy of remuneration.  Remand Redetermination at 32-33.  Instead, Commerce reviewed the only available cost data on the record, KEPCO's 2014 industrial classification cost data and 2015 overall electricity cost data, in the context of KEPCO's 2016 Form 20-F to ensure there were no changes in factors that would impact the industrial classifications and ensure the 2014 cost data could be relied on in making a determination.  *Id.* at 34-36.  Commerce's decision does not conflict with or otherwise contradict the determinations made in the *Certain Corrosion-Resistant Steel from Korea* and *Certain Cold-Rolled Steel from Korea* investigations.

### C. Commerce Appropriately Accounted For KPX's Role In The Electricity Market In Korea And Accounted For The Cost Of Generating Electricity In Its Less-Than-Adequate Remuneration Analysis

As explained in the remand redetermination, publicly available record evidence demonstrates that the KPX unit price more than covered fuel costs for each of the generators, and further demonstrates that KPX not only recovered costs, but also received a return on investment during the period of investigation.  *See* Remand Redetermination at 41-43.  First, listed costs and prices for each of KEPCO's generation subsidiaries can be found in KEPCO's 2016 Form 20-F, and demonstrate that the unit price charged by KPX more than covered the cost of generating electricity for each of the generators in question during the period of investigation.  *See id.* at 42 (citing "Nucor August 4, 2016 Comments" at Exhibit 1, P.R. 278).  This same Form 20-F further shows not only that KEPCO itself was profitable during the period of investigation in 2015, but

also that KPX's prices had enabled KEPCO's generation subsidiaries to recover costs and receive a return on investment. *See* Remand Redetermination at 43. Given that KPX's unit prices more than covered fuel costs, and KEPCO's generation subsidiaries both recovered their own costs and received a return on investment, Nucor's assertion that Commerce did not account for the cost of generating electricity in its less-than-adequate remuneration analysis, or that any benefit resulted from KPX's pricing of electricity sold to KEPCO, fails. *Id*. at 43-44.

Nucor's argument that this analysis is based solely on KEPCO's overall profitability oversimplifies the remand redetermination and fails to examine this evidence in the context of the full benefit analysis discussed above. Nucor Cmts. at 18-20. Commerce based its analysis on a determination of whether KEPCO had established a tariff classification schedule based on market principles and had charged respondent companies a price that enabled KEPCO not only to recover costs, but also to receive a return on investment. *See* Remand Redetermination at 11-16. In citing the GOK's Form 20-F in the remand redetermination, Commerce included a step-by-step analysis of profitability from the generators to KPX, from KPX to KEPCO, and from KEPCO to the respondent companies who purchased the electricity. *See id.* at 42-44. Substantial evidence supports this conclusion, in the form of the following record evidence: (i) KPX purchased electricity from generators at prices sufficient to ensure recovery of costs plus a return on investments for the generators; (ii) sold the electricity to KEPCO at prices sufficient to ensure recovery of costs plus a return on investments for KPX; (iii) KEPCO established a tariff classification schedule that ensured recovery of costs plus a return on investments for KEPCO; and (iv) charged respondent companies a price that actually resulted in KEPCO recovering costs plus a return on investments. *Id*. The record, thus, contained sufficient evidence demonstrating that KEPCO's prices to the respondents reflected adequate remuneration. *Id.*

14

This is not, as Nucor argues, evidence strictly related to KEPCO in the aggregate being profitable on all sales to all users, but rather it demonstrates that the electricity market, at each step in the chain of electricity distribution, operated based on prices that ensured a recovery of costs plus a return on investment as provided in 19 C.F.R. § 351.511(a)(2)(iii).  Because the Form 20-F shows this step-by-step exchange of electricity and both KEPCO's and KPX's profitability during the period of investigation, it constitutes substantial record evidence demonstrating that the cost of generating electricity was accounted for and did not ultimately result in a benefit to respondent companies in the form of the provision of electricity for less-than-adequate remuneration.  *Id.*  This record evidence demonstrates no benefit resulted from KPX's pricing of electricity, and thus there was no need for Commerce to request any of the additional information Nucor argues should have been included in Commerce's supplemental questionnaires. *See, e.g.,* Nucor Remand Cmts. at 12-13.

Further, the administrative determinations on which Nucor relies in its remand comments, as well as *U.S. Steel Corp. v. United States*, 33 CIT 1935 (2009), deal only with the selection of benchmarks in either a tier-one or tier two analysis under 19 C.F.R. §§ 351.511(a)(2)(i) and (a)(2)(ii), respectively.  They did not contain a tier-three analysis under 19 C.F.R. § 351.511(a)(2)(iii), which Commerce relied on in the remand redetermination.  In *LWRP from China* and *Circular Welded Pipe from China*, the respondents requested a tier-three analysis for hot-rolled steel (HRS) producers.  *See Light-Walled Rectangular Pipe and Tube from the People's Republic of China*, 73 Fed. Reg. 35,642 (Dep't of Commerce June 24, 2008) (final CVD determin.), and accompanying IDM at 33; *Circular Welded Carbon Quality Steel Pipe and Tube from the People's Republic of China*, 73 Fed. Reg. 31,966 (Dep't of Commerce June 5, 2008), and accompanying IDM at 64-66.  But in *LWRP from China*, Commerce

determined only that HRS producers' profitability was not relevant in the context of the tier-one

analysis and subsequently used a tier-two benchmark. *LWRP from China* IDM at 36-37.  In

*Circular Welded Pipe from China*, Commerce was able to use world market-determined price as

a surrogate for actual import prices, under a tier-one analysis.  *Circular Welded Pipe from China*

IDM at 65-66 ("These prices are thus appropriately considered tier one benchmark prices").  In

each of these cases, Commerce discussed the producers' profitability within the context of a tier-

one benchmark related to actual import prices.  *See LWRP from China* IDM at 36-37; *Circular*

*Welded Pipe from China* IDM at 64-66.

Thus, Commerce had no occasion to address the issue of market principles under tier

three in those cases because it was able to rely on either a tier-two world market price or tier-one

import prices for HRS, an input that is globally traded and does not have the limitations of the

Korean electricity market that necessitated a tier-three analysis.  *See Countervailing Duties,* 63

Fed. Reg. 65,348, 65,377-65,378 (Dep't of Commerce Nov. 25, 1998).  This is also true for *U.S.*

*Steel Corp. v. United States*, in which this Court reviewed Commerce's reliance on actual

transaction prices under a tier-one analysis, rather than an assessment of government prices in

accordance with market principles under a tier-three analysis.  *See* 33 C.I.T. at 1943-45.  Neither

the administrative determinations nor the Court's precedent cited by Nucor are relevant to the

type of benchmark analysis that Commerce performed in the remand redetermination, nor do

they show that Commerce somehow erred in its tier-three benchmark analysis to determine

whether government prices were consistent with market principles.

Finally, Nucor argues that Commerce's reference to upstream subsidy findings in

subsequent administrative reviews is irrelevant to the question of whether Commerce had

adequately analyzed KPX's role in investigating whether KEPCO's prices conferred a benefit to

the respondents.  *See* Nucor Remand Cmts. at 15-16.  As Commerce explained, "while the *2017 Administrative Review of Cold Rolled Steel* did involve the investigation of an alleged upstream subsidy, Commerce did not cite that determination because it involved the investigation of an upstream subsidy."  Remand Redetermination at 45.  Instead, Commerce referenced this subsequent review because, in the review of the same countervailing duty order that resulted from the affirmative final determination in the underlying proceeding, Commerce had "investigated and verified the pricing structure between KPX and KEPCO" including KPX's methodology used to forecast demand, KPX's methodology to set the system marginal price, the electricity generator's reporting requirements to establish variable and fixed costs, and the underlying methodology to determine the electricity generator's rates of return and the adjusted coefficient.  *See id.* at 45, n.175.

The investigation and verification conducted in an administrative review in the *2017 Administrative Review of Cold Rolled Steel*, which Commerce performed after the investigation here, are both relevant to the Federal Circuit's remand instructions that Commerce include KPX's generation costs in its analysis and further confirmed the information on the record of this investigation demonstrating there was no measurable benefit related to KPX's pricing of electricity to KEPCO during the period of investigation.  *See id.*

Thus, Commerce complied with the Federal Circuit's mandate and instructions in *POSCO II* and explained in the remand redetermination how KPX's role in the electricity market and the cost of generating electricity did not confer a benefit to respondent companies during the period of investigation.

## <u>CONCLUSION</u>

For these reasons, we respectfully request that the Court sustain the remand

redetermination and enter final judgment in favor of the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/ Tara K. Hogan
TARA K. HOGAN
Assistant Director

OF COUNSEL:                              /s/Kelly A. Krystyniak
REZA KARAMLOO                            KELLY A. KRYSTYNIAK
Senior Attorney                          Trial Attorney
U.S. Department of Commerce              U.S. Department of Justice
Office of the Chief Counsel              Commercial Litigation Branch
  for Trade Enforcement & Compliance     P.O. Box 480, Ben Franklin Station
Washington, D.C.                         Washington, DC 20044
                                         Tel: (202) 307-0163
                                         kelly.a.krystyniak@usdoj.gov

September 7, 2021                         Attorneys for Defendant

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Standard Chambers Procedure ¶ 2(B)(2), I hereby certify that this brief complies with the appropriate word-count limitation. According to the word-count function of the software used to prepare this brief, the brief contains 4,573 words.


/s/ Kelly A. Krystyniak
 KELLY A. KRYSTYNIAK